**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**SEATTLE DIVISION**

-----------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**    :

                        **Plaintiff,**    :        **23 Civ. 580**

             **- against -**    :        **ECF Case**

                                :

**BITTREX, INC., BITTREX GLOBAL GMBH, and**    :        **COMPLAINT**
**WILLIAM HIROAKI SHIHARA,**    :        **Jury Trial Demanded**

                  **Defendants.**    :

-----------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission"), for its

Complaint against Defendants Bittrex, Inc. ("Bittrex"), Bittrex Global GmbH ("Bittrex Global"), and

William Hiroaki Shihara ("Shihara"), alleges as follows:

## SUMMARY

1.      Since 2014, Bittrex has operated a trading platform (the "Bittrex Platform") through

which U.S. customers can buy, sell, and trade crypto assets.  The assets made available on the Bittrex

Platform include crypto asset securities.  The Bittrex Platform, like other crypto asset trading platforms,

has merged three functions that are typically separated in traditional securities markets—those of

broker-dealers, exchanges, and clearing agencies—despite the fact that Bittrex has never registered with

the SEC as a broker-dealer, national securities exchange, or clearing agency.  All the while, Bittrex

earned at least $1.3 billion in revenues from, among other things, transaction fees from investors

(including U.S. investors) it has placed at significant risk while servicing them in these unregistered

capacities.

2.      Congress enacted the Securities Exchange Act of 1934 (the "Exchange Act") in part to

provide for the regulation of the national securities markets.  And Congress charged the SEC with

protecting investors, preserving fair and orderly markets, and facilitating capital formation, in part

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

1    through a series of registration, disclosure, recordkeeping, inspection, and anti-conflict-of-interest

2    provisions.  These regulatory provisions have led, in turn, to the separation of key functions related to

3    securities transactions—including those carried out by brokers, exchanges, and clearing agencies—in

4    part to better protect investors and their assets from conflicts of interest.  By collapsing these functions

5    into a single platform and failing to register with the SEC as to any of the three functions, and not

6    having obtained any applicable exemptions from registration, Bittrex has for years defied the regulatory

7    structures and evaded the disclosure requirements that Congress and the SEC have over the course of

8    decades constructed for the protection of the national securities markets and investors.

9           3.      Since it launched the Bittrex Platform, Bittrex has been operating as an unregistered

10   broker (including by soliciting potential investors, handling customer funds and assets, and charging a

11   fee for these services) and an unregistered clearing agency (including by holding its customers' assets in

12   Bittrex-controlled wallets and settling its customers' transactions by debiting and crediting the relevant

13   customer accounts).  In addition, since the launch of the Bittrex Platform, Bittrex and, since 2019, its

14   foreign affiliate Bittrex Global, acting in concert, have operated the Bittrex Platform as an unregistered

15   exchange by providing a market place that, among other things, brings together orders of multiple

16   buyers and sellers of crypto assets and matches and executes those orders.

17          4.      Bittrex has carried out these functions despite the fact that the crypto assets it has made

18   available for trading on the Bittrex Platform have included crypto asset securities.  For years, Bittrex

19   made calculated business decisions to make assets available on the Bittrex Platform in order to increase

20   its own revenues, which are primarily based on trading fees from customers, while explicitly

21   acknowledging that its conduct could invite regulatory scrutiny.  Bittrex's strategy has been to elevate

22   increasing its profits over complying with the regulatory framework for securities markets.

23          5.      An important part of this long-running strategy has been Bittrex's coordinated

24   campaign, going back to 2017, to direct issuers of crypto assets to "scrub" their public statements of

25   any language that could raise questions from the SEC as to whether these crypto assets were offered

26   and sold as securities, while allowing those securities to be traded on its platform.  Bittrex's coordinated

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 2 -

"problematic statement cleanup" campaign was designed to attempt to conceal the true nature of the offerings from the public and regulators.

6.      This campaign included Bittrex directing certain issuers of crypto asset securities that Bittrex wanted to make available on the Bittrex Platform to first purge public statements of "investment-related terms" that Bittrex understood could make a crypto asset subject to regulation as a crypto asset security under the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and well-established principles of the U.S. federal securities laws.  In other words, Bittrex knew what statements to ask issuers to "scrub" because it understood the test to determine whether a crypto asset was being offered and sold as a security.

7.      From the launch of the Bittrex Platform in 2014 until late 2019, when he stepped down as CEO, Shihara directed Bittrex's operations and activities.  Specifically, Shihara led decisions regarding which crypto assets to make available for trading on the Bittrex Platform and directed Bittrex's "problematic statement cleanup" campaign.  Like Bittrex, Shihara—who was acutely aware of potential SEC scrutiny of these activities—was financially motivated to make more assets available for trading on the Bittrex Platform in order to increase Bittrex's revenues and, in turn, his own compensation, which totaled at least $130 million.

8.      Defendants placed their own financial interests ahead of the interests of the investing public by failing to comply with the legal requirement that they participate as regulated intermediaries with concomitant obligations to their customers, including important disclosure and review obligations designed to protect investors and promote the proper functioning of our capital markets.  In so doing, and because Defendants neither sought nor obtained any applicable exemptions from registration, Defendants have violated the registration provisions of the Exchange Act applicable to brokers, exchanges, and clearing agencies.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 3 -

## VIOLATIONS

9.      By engaging in the conduct set forth in this Complaint, Bittrex and Bittrex Global have acted as an exchange, and Bittrex has acted as a broker and clearing agency, without registering as an exchange, broker-dealer, or clearing agency, in violation of Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), 78q-1(b)], respectively.  Shihara has violated Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), 78q-1(b)] as a control person over Bittrex under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)].

10.     Unless Defendants are permanently restrained and enjoined, there is a reasonable likelihood that they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object in violation of the federal securities laws.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

11.     The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

12.     The Commission seeks a final judgment: (a) pursuant to Exchange Act Section 21(d)(1) [15 U.S.C. § 78u(d)(1)], permanently enjoining Defendants from violating Exchange Act Section 5, and Bittrex and Shihara from violating Exchange Act Sections 15(a) and 17A(b); (b) pursuant to Sections 21(d)(3), (5), and (7) of the Exchange Act, (i) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon on a joint and several basis; (ii) prohibiting Bittrex and Shihara from continuing to use means or instrumentalities of interstate commerce to accept and display orders in crypto asset securities from U.S. persons, act as broker or dealer with respect to crypto asset securities, or perform the functions of a clearing agency with respect to crypto asset securities, without registering with the SEC; and Bittrex Global from continuing to use means or instrumentalities of interstate commerce to accept orders in crypto asset securities from U.S. persons, without registering with the SEC; and (iii) imposing civil money penalties on Defendants.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 4 -

1

## JURISDICTION AND VENUE

2    13.    This Court has jurisdiction over this action pursuant to Exchange Act Section 21(d) [15

3    U.S.C. § 78u(d)].

4    14.    Defendants, directly or indirectly, have made use of the means or instrumentalities of

5    transportation or communication in interstate commerce or of the mails in connection with the

6    transactions, acts, practices, and courses of business alleged herein.

7    15.    Venue is proper in the Western District of Washington pursuant to Exchange Act

8    Section 27(a) [15 U.S.C. § 78aa(a)].  Bittrex is headquartered in this District and conducts its operations

9    from this District, Bittrex personnel provide services to Bittrex Global from this District, including

10   maintaining technology shared by Bittrex and Bittrex Global, and Shihara resides in this District.

11

## DEFENDANTS

12   16.    **Bittrex** is a Delaware corporation founded in 2014 with its principal place of business

13   in Seattle, Washington.  Bittrex has operated a crypto asset trading platform servicing U.S. customers

14   since 2014.  Bittrex is a subsidiary of Aquila Holdings, Inc., a Delaware corporation.  On or around

15   March 31, 2023, Bittrex announced that it would be winding down its operations in the United States

16   effective April 30, 2023.  As part of the wind down process, customers were permitted to trade crypto

17   assets, including crypto asset securities, through April 14, 2023, and will be permitted to withdraw fiat

18   funds and crypto assets, including crypto asset securities, through April 27, 2023 and April 29, 2023,

19   respectively.

20   17.    **Bittrex Global** is a limited liability company organized under the laws of Liechtenstein.

21   In 2019, Bittrex Global launched a crypto asset trading platform that purports to prohibit U.S.

22   customers.  Like Bittrex, Bittrex Global is a subsidiary of Aquila Holdings, Inc.  Bittrex personnel in the

23   United States provide a variety of services to Bittrex Global pursuant to service agreements between

24   Bittrex and Bittrex Global.  Bittrex also provides Bittrex Global with the technology to operate its

25   trading platform, including a single matching engine and order book that Bittrex Global shares with

26   Bittrex, both of which are maintained by Bittrex personnel in the United States.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 5 -

18.     **Shihara**, a resident of Redmond, Washington, co-founded Bittrex in 2014 and served as its CEO until approximately November 2019.  Shihara was a member of Bittrex's board of directors from at least 2016 through at least August 2020, and the chair of Bittrex's "Token Review Committee" (discussed in Section III.A below) from 2017 to approximately November 2019.  During his time as CEO, Shihara was responsible for the day-to-day operation and management of Bittrex, including the hiring and management of employees and outside advisors including attorneys, and was also responsible for financing activities.  Shihara was also involved in creating Bittrex's website, from which the Bittrex Platform is accessed by customers.

## STATUTORY AND LEGAL FRAMEWORK

### *What Is a "Security"?*

19.     The Exchange Act defines "security" to include a wide range of assets, including "investment contracts."

20.     Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.  As the U.S. Supreme Court noted in *Howey*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  328 U.S. at 299.  Courts have found a variety of novel or unique investment vehicles constituted investment contracts, including those involving interests in orange groves, animal breeding programs, cattle embryos, mobile phones, enterprises that exist only on the Internet, and certain crypto assets (which crypto asset market participants at times also label "cryptocurrencies").

### *The Exchange Act Includes Important Registration Requirements to Regulate and Control Transactions in the Securities Markets.*

21.     The Exchange Act governs how securities are transacted in the U.S. securities markets and imposes obligations on how various intermediaries, including broker-dealers, exchanges, and clearing agencies, operate in those markets, to protect investors who transact in those markets.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 6 -

22.     To fulfill the purposes of the Exchange Act, Congress enacted a regime that requires registration of, and imposes disclosure obligations on, certain defined participants in the national securities markets, including but not limited to securities exchanges, brokers and dealers, nationally recognized statistical ratings associations, security-based swap dealers, self-regulatory organizations, and clearing agencies, and subjects those participants to SEC and other rules governing their activities.

23.     As Section 2 of the Exchange Act [15 U.S.C. § 78b] explains, in enacting the Exchange Act, Congress found that those obligations are essential to the proper functioning of the national securities markets and the national economy:

> [T]ransactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are effected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto … [to] perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions.

24.     Congress also determined that "[t]he prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors."  15 U.S.C. § 78q-1.

**Registration of Exchanges**:

25.     In enacting registration provisions for national securities exchanges, Congress found in Section 2(3) of the Exchange Act [15 U.S.C. §78b(3)] that:

> Frequently the prices of securities on such exchanges and markets are susceptible to manipulation and control, and the dissemination of such prices gives rise to excessive speculation, resulting in sudden and unreasonable fluctuations in the prices of securities which (a) cause alternately unreasonable expansion and unreasonable contraction of the volume of credit available for trade, transportation, and industry in interstate commerce, (b) hinder the proper appraisal of the value of

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 7 -

securities and thus prevent a fair calculation of taxes owing to the United States and to the several States by owners, buyers, and sellers of securities, and (c) prevent the fair valuation of collateral for bank loans and/or obstruct the effective operation of the national banking system and Federal Reserve System.

26.     Accordingly, Section 5 of the Exchange Act [15 U.S.C. § 78e] requires an organization, association, or group of persons that meets the definition of "exchange" under Section 3(a)(1) of the Exchange Act, unless otherwise exempt, to register with the Commission as a national securities exchange pursuant to Section 6 of the Exchange Act.

27.     Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(1)] defines "exchange" to mean "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange."

28.     Exchange Act Rule 3b-16(a) [17 C.F.R. § 240.3b-16(a)] defines certain terms in the definition of "exchange" under Section 3(a)(1) of the Exchange Act, including "[a]n organization, association, or group of persons," as one that: "(1) [b]rings together the orders for securities of multiple buyers and sellers; and (2) [u]ses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of a trade."  Exchange Act Rule 3b-16(b) excludes certain systems from Exchange Act Rule 3b-16(a).

29.     A system that meets the criteria of Exchange Act Rule 3b-16(a) and is not excluded under Exchange Act Rule 3b-16(b) must register, pursuant to Section 5 of the Exchange Act, as a national securities exchange under Section 6 of the Exchange Act or operate pursuant to an appropriate exemption.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 8 -

30.    Registration of a trading platform as an "exchange" under the Exchange Act is a bedrock Congressional enactment that permits the SEC to carry out its role of oversight over the national securities markets.

31.    Exchanges properly registered as such under the Exchange Act must enact a set of rules to govern their and their members' behavior, and these rules are subject to review by the SEC under Section 19 of the Exchange Act [15 U.S.C. § 78s].  This review process is designed to ensure that each of these securities marketplaces continues to operate in a manner consistent with the Exchange Act as its practices and procedures evolve over time, in part to protect investors and the integrity of securities markets that affect national commerce and the economy.

**Registration of Broker-Dealers**:

32.    Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] generally requires brokers and dealers to register with the SEC, and brokers and dealers must also join "self-regulatory organizations" ("SROs") as members.  SROs require members to adhere to rules governing their activities.

33.    Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others."

34.    The regulatory regime applicable to broker-dealers is a cornerstone of the U.S. federal securities laws and provides important safeguards to investors and market participants.  Registered broker-dealers are subject to comprehensive regulation under the Exchange Act and under the rules of each SRO of which the broker-dealer is a member.  These regulations and rules include recordkeeping and reporting obligations, Commission and SRO examination, and general and specific requirements aimed at addressing certain conflicts of interest, among other things.  All of these rules and regulations are critical to the soundness of the national securities markets and to protecting public investors who interact with broker-dealers when transacting in securities on regulated exchanges.

35.    To preserve fair and orderly markets, avoid conflicts of interests, and protect investors, Section 11(a) of the Exchange Act [15 U.S.C. § 78k(a)] generally prohibits broker-dealers that are members of exchanges from effecting transactions on that exchange for their own accounts.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 9 -

**Registration of Clearing Agencies**:

36.     Section 17A(b) of the Exchange Act [15 U.S.C. § 78q-1(b)] generally makes it unlawful "for any clearing agency, unless registered in accordance with this subsection, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce to perform the functions of a clearing agency with respect to any security."

37.     Section 3(a)(23)(A) of the Exchange Act [15 U.S.C. § 78c(a)(23)(A)] defines the term "clearing agency" as "any person who acts as an intermediary in making payments or deliveries or both in connection with transactions in securities or who provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities," as well as "any person … who (i) acts as a custodian of securities in connection with a system for the central handling of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates, or (ii) otherwise permits or facilitates the settlement of securities transactions or the hypothecation or lending of securities without physical delivery of securities certificates."

38.     The regulatory regime applicable to clearing agencies provides important safeguards to investors and market participants.  Registered clearing agencies are subject to comprehensive regulation under the Exchange Act and the rules thereunder.  These regulations and rules include recordkeeping obligations and require SEC examination.  Clearing agencies properly registered as such under the Exchange Act must enact a set of rules to govern their and their members' behavior, and these rules are subject to review by the SEC.  All of these rules and regulations are critical to the protection of investors, the safeguarding of securities and funds, and the maintenance of fair competition.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 10 -

*Registration of Exchanges, Broker-Dealers, and Clearing Agencies Is Essential to the Proper Functioning of the U.S. Securities Markets.*

39.     In traditional national securities markets such as those for equity securities, the functions described above—those of "exchanges," "broker-dealers," and "clearing agencies"—have been carried out by separate legal entities that are independently registered (or exempt from registration) and regulated by the SEC.  Separation of these core functions aims to minimize conflicts between the interests of securities intermediaries and investors.  Registration provides the means for the SEC to understand the business of the securities intermediaries and their relationship with investors in order to protect those investors and the securities markets, and to prevent fraud or other abuses.

40.     Investors in traditional national securities markets do not generally trade directly with national securities exchanges or clearing agencies but instead are customers of broker-dealers.  Only broker-dealers (or natural persons associated with a broker-dealer) may become members of a national securities exchange.  In addition, broker-dealers who have customers must become members of the Financial Industry Regulatory Authority ("FINRA"), an SRO that imposes its own set of rules and oversight over broker-dealers, particularly with regard to protecting retail investors.

41.     National securities exchanges and clearing agencies must be approved for registration by the SEC, become SROs, and subject all of their proposed rules and changes to those rules to review by the Commission.

42.     As noted, the Exchange Act also subjects registered intermediaries to important record keeping and inspection requirements.  For example, Section 17 of the Exchange Act [15 U.S.C. § 78q] requires registered exchanges, broker-dealers, and clearing agencies to make and keep records as the SEC prescribes by rule, and subject those records to reasonable periodic, special, or other examinations by representatives of the SEC.

43.     These provisions ensure fair and orderly markets to protect investors, and provide for oversight over the national securities markets, given the importance of these markets to the economic health of the nation.  These provisions also seek to ensure, among other things, that investors'

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 11 -

securities orders are handled fairly and transparently, that securities transactions result in settlement finality, and that investors' assets are protected and can be recovered if necessary. They are also aimed at ensuring that the SEC and investors have a robust level of disclosures and protections against fraud and conflicts of interest, and they make securities market intermediaries subject to rigorous external oversight, regulatory exams, independent auditing, and other review and examination functions.

## BACKGROUND ON CRYPTO ASSETS AND CRYPTO TRADING PLATFORMS

### *What Is a "Crypto Asset"?*

44.     As used herein, the terms "crypto asset," "digital asset," or "digital token" generally refer to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets sometimes referred to colloquially as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens."

45.     A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks." These systems typically rely on cryptographic techniques for secure recording of transactions.

46.     Some crypto assets may be "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain—though other crypto assets may also be represented on that same blockchain. Like other crypto assets, native tokens may also be sold and traded for consideration.

### *Consensus Mechanisms and Validation of Transactions on a Blockchain*

47.     Blockchains typically employ a "consensus" mechanism that, among other things, aims to achieve agreement among the blockchain's network of computers as to a data value or on the state of the ledger.

48.     A consensus mechanism describes the particular protocol used by a blockchain to agree on, among other things, which ledger transactions are valid, to update the blockchain, and potentially to compensate certain participants including with additional crypto assets. There can be multiple sources

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 12 -

1  for the compensation under the terms of the blockchain protocol, including from fees charged to those

2  transacting on the blockchain, or through the creation or "minting" of additional amounts of the

3  blockchain's native crypto asset through the validation of transactions (which may dilute the value of

4  the existing tokens).

5      49.     "Proof of work" and "proof of stake" describe the two major "consensus mechanisms"

6  used by blockchains.  Proof of work, the consensus mechanism used by the Bitcoin blockchain,

7  involves computers, or validator nodes, attempting to "mine" a "block" of transactions, in part, by

8  guessing a pre-determined number.  The first miner to successfully guess this number earns the right to

9  update the blockchain and to be rewarded with the blockchain's native crypto asset (*e.g.*, for the Bitcoin

10 blockchain, the reward is in bitcoin).  Proof of stake, the consensus mechanism currently used on

11 Ethereum, involves selecting block validators from crypto asset holders who have committed or

12 "staked" a minimum number of crypto assets as part of the validation process.  On Ethereum, rewards

13 are earned in the blockchain's native crypto asset, ether.

14      *The Offer and Sale of Crypto Assets*

15      50.     Persons have offered and sold crypto assets in fundraising events in exchange for

16 consideration, including but not limited to through "initial coin offerings" or "ICOs," "crowdsales," or

17 public "token sales."  In some instances, the entities offering or selling the crypto assets may release a

18 "whitepaper" or other marketing materials describing a project to which the asset relates, the terms of

19 the issuance, and any rights associated with the asset.

20      51.     Some issuers continue to sell the crypto assets after the initial offer and sale, and in

21 some offerings the asset may also be obtained by purchasing it on secondary markets, including but not

22 limited to crypto asset trading platforms.

23      *Crypto Asset Trading Platforms*

24      52.     Generally speaking, crypto asset trading platforms—like the Bittrex Platform, which is

25 described in more detail below—are marketplaces that offer a variety of services relating to crypto

26 assets, often including brokerage, trading, and settlement.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 13 -

53.     Crypto asset trading platforms allow their customers to exchange crypto assets for fiat currency (legal tender issued by a country, like U.S. Dollars) or to trade certain crypto assets for other crypto assets.  "Off-chain" transactions are those where the trades are tracked in the internal recordkeeping mechanisms of the platform, while "on-chain" transactions are those where the crypto asset is transferred from one blockchain address to another.

54.     Crypto asset trading platforms typically require customers to deposit with the platform in advance any crypto assets they will seek to sell there, frequently resulting in the platform possessing and controlling such assets as the legal owner and thus functioning as a central securities depository. The customers' crypto assets are then typically tracked and maintained on internal ledgers maintained by the crypto asset trading platforms, which typically have no legal obligation to segregate a particular customer's crypto assets at a separate blockchain address.

55.     The graphic user interfaces employed by crypto asset trading platforms—on websites, apps, or other software—typically emulate and function like traditional securities trading screens:  They show order books of the various assets available to trade, as well as historical trading information (such as high and low prices on the platform, trading volumes, and market capitalizations).

56.     However, unlike in traditional securities markets, crypto asset trading platforms (including the Bittrex Platform, as more fully described below) typically solicit, accept, and handle customer orders for securities; allow for the interaction and intermediation of multiple bids and offers resulting in purchases and sales; act as an intermediary in making payments or deliveries, or both; and maintain a central securities depository for the settlement of securities transactions.

57.     By contrast, investors participate on registered national securities exchanges through broker-dealer intermediaries.  The exchange sends executed trades to a registered clearing agency that takes responsibility for ensuring participants' collective safekeeping of securities and settlement finality among those participants and, in doing so, protects investors' beneficial interests.  Thus, registered national securities exchanges typically do not assume possession or control of the underlying assets being traded.  By contrast, crypto asset trading platforms also usually settle transactions by updating

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 14 -

their internal records with each investor's positions, a function that is typically carried out in the traditional securities markets by clearing agencies—not by the exchanges.

58.    Likewise, crypto asset trading platforms typically perform roles traditionally assigned to broker-dealers in traditional securities markets, without following or even recognizing the legal obligations and restrictions on activities that accompany status as a broker-dealer.  For example, unregistered and non-compliant crypto asset trading platforms often do not adequately disclose the risk that they have the ability and financial incentive to trade crypto asset securities against their own customers, which could put their customers on the losing side of each trade.

59.    By functioning in roles similar to traditional intermediaries like broker-dealers—but without registering in those capacities and thereby failing to adhere to their concomitant duties and obligations to investors—crypto asset trading platforms like the Bittrex Platform harm the interests of the investing public.

60.    For example, a registered national securities exchange is required to have detailed and transparent standards and procedures for listing and delisting a security.  These rules are designed, among other reasons, to provide an issuer in danger of falling below the listing standards with reasonable notice of the potential delisting and an opportunity to remedy the defect.  In addition, a number of rules are designed to ensure that actual and potential delistings are made known to the public, so that investors have material information about the businesses in which they invest.

61.    By contrast, a crypto asset platform that fails to register in any capacity declares itself free from any obligation to follow those provisions in the Exchange Act, including the types of rules described above, that are designed to protect investors, promote the public interest, and provide truthful and material information to investors.  As a result, investors are at the whim of the crypto asset platform to give them information about their standards and procedures for listing (and de-listing) investments, about the investments themselves, including whether any particular listed crypto asset may potentially be delisted, and the platform's operations.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 15 -

62.     A private conversation in or around June 2017 between a Bittrex employee and one of Bittrex's three founders illustrates the type of investor harm that can result from a crypto asset platform failing to follow or even recognize these obligations.  The employee complained to the founder:  "I hate people bitching that we don't email them about market removals…I LOST SO MUCH CAUSE I DIDn'T KNOW."  The founder responded that his preferred response to those investors was "go f*** yourself" or at a minimum to tell them to "track your own damn investment or get a broker to do it for you."

### The DAO Report

63.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (the "DAO Report"), advising "those who would use … distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in the DAO Report were offerings of investment contracts and, therefore, of securities.

64.     The DAO Report also advised that "any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption from such registration," and "stress[ed] the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces."  The DAO Report also found that the trading platforms at issue there "provided users with an electronic system that matched orders from multiple parties to buy and sell [the crypto asset securities at issue] for execution based on non-discretionary methods" and therefore "appear to have satisfied the criteria" for being an exchange under the Exchange Act.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 16 -

## FACTS

**I.      THE BITTREX PLATFORM**

65.      Bittrex was founded in 2014 by Shihara and two other individuals.  Shihara served as Bittrex's CEO from the time of its founding until late 2019, and as a member of Bittrex's board of directors from at least 2016 through at least August 2020.  Bittrex is headquartered in Seattle, Washington and, at its peak, had approximately 300 employees.

66.      In 2014, Bittrex launched the Bittrex Platform, an online platform that allows customers to buy, sell, and trade certain crypto assets.  On its website, Bittrex describes the Bittrex Platform as a "digital currency exchange offering spot market trades between many digital currency and fiat markets" and as a "crypto exchange for the future."

67.      From 2014 to the present (the "Relevant Period"), the Bittrex Platform made available more than 300 crypto assets for trading.

68.      Through Bittrex's website, customers could open accounts, deposit funds and crypto assets, enter orders, and trade crypto assets 24 hours a day, seven days a week.  Customers could also trade crypto assets through mobile trading applications and Bittrex's application programming interface or "API" (a software intermediary permitting two different computer programs to communicate).

69.      During the Relevant Period, the Bittrex Platform was available to both retail and institutional customers, including U.S. residents.  Institutional customers enjoyed additional "trading benefits" such as unlimited withdrawals, instant ability to engage in fiat trading, expedited credit for deposits, priority support, and additional API integration functionality.

70.      From 2017 to 2022, Bittrex earned more than $1.3 billion in revenues from transaction fees charged to customers for these crypto asset trading and related services.  From these revenues, Shihara was paid at least $130 million in bonuses and profit distributions.

71.      As noted above, Bittrex has announced plans to wind down its operations in the United States effective April 30, 2023.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 17 -

## II. THROUGH THE BITTREX PLATFORM, BITTREX AND BITTREX GLOBAL PROVIDE EXCHANGE SERVICES TO U.S. CUSTOMERS, AND BITTREX ALSO PROVIDES BROKERAGE AND CLEARING SERVICES TO U.S. CUSTOMERS.

72.     Neither Bittrex nor Bittrex Global has ever registered with the Commission as a national securities exchange, and Bittrex has never registered with the Commission as a broker-dealer or clearing agency.  No exemption from registration applies to either Bittrex or Bittrex Global. Nonetheless, throughout the Relevant Period, Bittrex (along with Bittrex Global starting in 2019) has acted as an exchange, and Bittrex has also acted as a broker and clearing agency, including through the following conduct:

### A.     Bittrex Solicits Customers.

73.     During the Relevant Period, Bittrex regularly solicited customers to open accounts at Bittrex and access the Bittrex Platform, including through posts on Bittrex's website and on social media.

74.     For example, Bittrex posted on Twitter information about crypto assets available to trade on the Bittrex Platform, trading features of the Bittrex Platform, and links to Bittrex product announcements.

75.     Moreover, certain Bittrex personnel regularly posted about Bittrex on their personal Twitter accounts, including re-tweeting information published on Bittrex's Twitter handle.

76.     Bittrex regularly posted comments in the Bittrex forum on the social media platform Reddit, including posts or comments referring customers to Bittrex's trading support services and providing updates about the status of the Bittrex Platform.

77.     Bittrex has also marketed monetary incentives and promotions aimed at attracting more investors to the Bittrex Platform.  For example, in or around March 2020, Bittrex launched the "Bittrex Referral Program," which "rewards" existing Bittrex customers who refer new customers to Bittrex by allowing them to "earn 10% on all commissions of the quote currency from every trade made" by the customer they referred.  In addition, as recently as the fourth quarter of 2022, Bittrex launched a "New

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 18 -

User Reward Program," which provided a "$10 sign up bonus" to be paid to referrers with respect to new customers.

**B.  Bittrex Holds and Controls Customers' Funds and Crypto Assets.**

78.    During the Relevant Period, Bittrex required that its customers, before placing orders to buy or sell crypto assets, transfer their crypto assets into digital wallets and their funds into bank accounts, both controlled by Bittrex.  Specifically, to deposit crypto assets into a Bittrex trading account, customers must transfer their crypto assets from an existing digital wallet to a Bittrex-controlled digital wallet.  Similarly, to deposit fiat currency into a Bittrex trading account, customers must make a deposit to a Bittrex-controlled bank account using a wire transfer, bank transfer, or other means.

79.    Certain "terms of service" available on Bittrex's website during the Relevant Period informed customers that "Bittrex controls the private keys for the blockchain addresses for deposited" crypto assets and that customers may not "claim ownership of any particular [crypto asset] based on the blockchain address, blockchain transfer record or other basis" because they have "authorize[d] Bittrex to take temporary control of" the crypto assets.[1]

80.    The terms of service also stated that customers' crypto assets and fiat currency "are tracked and maintained on internal ledgers maintained by Bittrex" and that "Bittrex has no obligation to segregate [a particular user's] fiat currency in a separate bank account or to segregate any of [a particular user's crypto assets] at a separate blockchain address."  The terms of service further stated that "[f]iat currency and [crypto assets] are fungible with other like fiat currency and [crypto assets], and, to the extent [customers] are entitled to withdraw or otherwise receive any funds or [crypto assets], [they] are entitled to a quantity of fiat currency or [crypto assets] but not any particular fiat currency or [crypto assets]."

---

[1] A "private key" is a password known only to the person who controls a crypto asset, which is tied to the "address" (a long string of letters and numbers on the blockchain, similar to a bank account number) with which the crypto asset is associated.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 19 -

C. **Through the Bittrex Platform, Bittrex and Bittrex Global Together Maintain and Provide a Marketplace for Trading Crypto Assets.**

81.     According to Bittrex's website, the Bittrex Platform provides a "custom-built trading engine" (also known as a matching engine) that ensures customer "orders are executed in real-time."

82.     Customers could trade during the Relevant Period crypto asset "pairs," which consist of both a base asset and a quote asset, where the base asset is quoted in terms of the value of the quote asset in the trading pair.  For example, for the trading pair "BTC-USD," the base asset, bitcoin, is quoted in U.S. Dollars.

83.     During the Relevant Period, Bittrex maintained individual order books for each trading pair, which all customers could access via the Bittrex Platform or its API.  All order books resided on a centralized server maintained by Bittrex.  As discussed below, during the Relevant Period, Bittrex and Bittrex Global shared a single order book (for those trading pairs that are available on both the Bittrex Platform and the Bittrex Global platform) and matching engine.

84.     As demonstrated below, the design and functionality of the Bittrex Platform is similar to those of properly registered national securities exchanges, including its (i) display and order book, (ii) order entry and order types, and (iii) order matching and trading rules.

i.     *Display and Order Book*

85.     Bittrex's website (www.bittrex.com) provides a user-friendly interface for trading crypto assets on the Bittrex Platform.  The Bittrex Platform displays current and historical pricing information and other information relevant for trading crypto assets that is akin to what users see on traditional securities platforms.

86.     A tab or link on the Bittrex website called "Markets" leads customers to a page listing the hundreds of crypto asset trading pairs available for trading on the Bittrex Platform.  This page provides customers with the current price for the base asset of each trading pair in terms of the quote asset, the estimated USD value of the quoted asset, the high and low price for each trading pair over

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 20 -

1   the previous 24 hours, the percentage change in price during that same period, and the total value of all

2   trading of that crypto asset trading pair that occurred over that period.

3          87.    The crypto assets listed on the "Markets" page appear by full name and ticker symbol

4   and are displayed in descending order from largest to smallest based on the previous 24-hour trading

5   volume.  The "Markets" page also displays approximately five crypto asset trading pairs under the

6   category of "trending"; these are the trading pairs that have had the highest volume of trading over the

7   previous 24 hours and/or the highest percentage of gains or losses in value over that same period.

8          88.    Another link on the Bittrex Platform website called "Trade" leads customers to the

9   order books for the crypto asset trading pairs available for trading on the Bittrex Platform.  One side of

10   the order book displays the current buy orders in descending order from highest bid price to lowest,

11   while the other side of the order book displays the sell orders in ascending order from lowest asking

12   price to the highest.

13          89.    The "Trade" page also displays charts showing the platform's trading volume in a

14   selected crypto asset over specified periods of time (*i.e.*, 1 day, 5 days, 1 month, etc.), last-sale prices,

15   open orders, and the platform's computation of the current mid-market price in that asset (*i.e.*, the

16   middle point between the highest bid and lowest offer) and the spread (*i.e.,* the difference between the

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 21 -

highest bid and lowest offer). Below is an example of the user interface display on the Bittrex Platform:



        *ii.     Order Entry and Order Types*

90.     From the "Trade" page, a user can enter a buy or sell order by inputting a price and quantity of the asset and the website will calculate the total cost of the transaction including any transaction fee.  In order to proceed with a trade, the user is then prompted to create an account or, for existing account holders, to log in using their credentials.

91.     Users can then place various types of buy and sell orders, including market orders (*i.e.*, an order to buy or sell a crypto asset immediately at the best available price), limit orders (*i.e.*, an order to trade a specified quantity of an asset at a specified rate or better), or various conditional orders. When placing orders, customers are required to input the following information: token symbol, size, price, and time-in-force.

92.     The crypto assets on the "Trade" page may be purchased in exchange for U.S. Dollars or certain crypto assets, including bitcoin.  To place an order on the order book, a trader must have an available balance of the relevant crypto asset or fiat currency in his or her account to cover the total value of the order plus any applicable fees.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 22 -

93.     Bittrex's order book resides on a centralized server maintained by Bittrex and can be accessed by customers from Bittrex's website.

### iii.     Order Matching and Trading Rules

94.     Bittrex provides on its website "detailed trading rules for operating" the Bittrex Platform.  For example, the Bittrex order book prioritizes orders according to price and then time.  Buy orders are prioritized in decreasing order of price with the highest bid placed at the top of the order book, and sell orders are prioritized in increasing order of price with the lowest ask placed at the top of the order book.  Orders with same price are filled in a first in, first out manner.  Conditional orders are stored separately from the order book on a reserved basis.  Bittrex places the order on the order book when an asset's price meets the pre-specified condition and price.

95.     Bittrex also imposes certain trading limits, which include a minimum order size of 10,000 satoshis (each satoshi is one hundred millionth of a bitcoin).  While there is no maximum trade size, customers must have sufficient funds or crypto assets to cover an order at the time it is placed and all funds and crypto assets are placed on reserve until the order is executed or cancelled.

96.     Bittrex's terms of service inform customers that, upon placement of an order, their Bittrex account will be updated to reflect the order and the order will be included in Bittrex's order book for matching with orders from other customers.  Customers are also informed that if all or a portion of their order is matched with another Bittrex customer, Bittrex will execute the trade and update the customer's Bittrex account accordingly.

### iv.     Bittrex and Bittrex Global Share an Order Book and Matching Engine.

97.     Bittrex Global operates a crypto trading platform similar to the Bittrex Platform but purports to restrict U.S. customers from accessing the platform.

98.     In late 2022, Bittrex Global made available for trading on its platform approximately 148 of the crypto assets that are available on the Bittrex Platform, including the crypto assets known as "OMG" and "DASH," which, as discussed in Section III.B below, were offered and sold as securities.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 23 -

99. During the Relevant Period, Bittrex provided support, including shared personnel, to Bittrex Global for a wide variety of services, including customer onboarding and services related to the selection of crypto assets made available for trading.

100. During the Relevant Period, Bittrex and Bittrex Global combined their customers' orders into a single, shared order book. Bittrex Global's website displays the order book it shares with the Bittrex Platform.

101. The combined order book has a single matching engine with the pre-programmed rules described above, which results in a combined liquidity pool for the hundreds of crypto assets that are made available on both platforms.

102. As a result, an order from a Bittrex customer could match with an order from a Bittrex Global customer.

103. The formation and operation of a combined liquidity pool reflects an agreement by Bittrex and Bittrex Global to act in concert to provide a market place and facilities—the Bittrex Platform—for bringing together buyers and sellers of crypto assets, including crypto asset securities.

104. During the Relevant Period, Bittrex and Bittrex Global shared control over the combined liquidity pool and market place.

105. Pursuant to a licensing agreement, Bittrex has provided Bittrex Global the right to use the technology underlying the shared order book and matching engine, with Bittrex personnel in the United States responsible for maintaining the technology.

106. As such, though Bittrex and Bittrex Global act in concert in providing this market place and facilities, Bittrex exercises operational control and unilateral discretion and decision-making over the Bittrex Platform.

**D.    Bittrex Settles Customers' Trades.**

107. Pursuant to trading rules posted on Bittrex's website, "Bittrex settles all filled orders immediately, by debiting and crediting the relevant balances of assets in both traders' accounts."

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 24 -

108.     During the Relevant Period, Bittrex held all crypto assets traded on the Bittrex Platform in Bittrex-controlled wallets and settled trades by debiting and crediting Bittrex's internal ledgers.  If a customer submitted a request to withdraw funds or crypto assets, Bittrex would transfer the funds or assets from the Bittrex-controlled bank account or digital wallet to the customer's designated account or digital wallet.

**E.     Bittrex Charges Fees on Executed Trades.**

109.     Bittrex charges both the buyer and seller of each executed trade a varying fee or "commission" depending on the trading pair, the price of the executed order, the user's 30-day trading volume, and other factors.  As of February 2023, Bittrex's fee rate ranges between 0.05% and 0.35% of the principal amount traded.  Bittrex's website states:  "[T]rading fees are reduced according to the USD value of [the customer's] total volume traded by [a customer's] account over the previous 30 days."  Bittrex "reward[s] user[s] who drive liquidity to Bittrex" and Bittrex's website states, "[t]he more you trade, the more you save."

## III.     THE CRYPTO ASSETS TRADED ON THE BITTREX PLATFORM INCLUDE ASSETS THAT WERE OFFERED AND SOLD AS SECURITIES.

110.     Throughout the Relevant Period, the Bittrex Platform has made available for trading crypto assets that were offered and sold as investment contracts, and thus securities, under Section 3(a)(10) of the Exchange Act and *Howey*.  Set forth in Section III.B below are specific details regarding six examples of crypto asset securities that have at various times been made available by Bittrex for trading on the Bittrex Platform—a non-exhaustive list of such crypto asset securities.

111.     In an effort to grow the Bittrex Platform and boost its own trading profits, Bittrex—without registering with the SEC in any capacity—made strategic decisions to add new crypto assets to the Bittrex Platform even though the assets had characteristics of securities.  Even before the SEC issued the DAO Report, Bittrex was in fact highly cognizant of the risk that it was permitting investors to trade in securities available on the Bittrex Platform.  In order to avoid scrutiny by the SEC, Bittrex engaged in a coordinated effort with the issuers of those crypto assets to delete—or "scrub"—from the

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 25 -

1  issuers' offering and marketing materials any "investment-related terms" that would reveal that these

2  assets were offered and sold as securities, such as "price prediction[s]" and statements related to

3  "expectation of profit"—without actually altering the economic substance of the offerings.

4       **A.    In an Effort to Maximize Its Trading Profits, Bittrex Added Crypto Assets to the**
         **Bittrex Platform Despite Regulatory Concerns, While Coordinating a Campaign**
5        **to "Scrub" Potentially Problematic Public Statements About These Assets.**

6       112.   Bittrex had a strong financial incentive to make additional crypto assets available for

7  trading on the Bittrex Platform because Bittrex's primary source of income was trading fees paid by

8  Bittrex customers (which amounted to over $1.3 billion from 2017 to 2022).  And adding new assets,

9  according to a Bittrex employee responsible for managing the listing process for such assets, "kept user

10  interest up."

11      113.   As a Bittrex shareholder, Shihara similarly had a personal financial incentive to add new

12  assets to the Bittrex Platform because increased trading fees earned by Bittrex meant more revenues for

13  Bittrex.  This also resulted in higher compensation to Shihara, whose compensation was directly tied to

14  Bittrex's revenues.  Indeed, between April 2017 and March 2020, Shihara received at least $130 million

15  in bonuses and profit distributions.

16      114.   Bittrex and Shihara had in place monthly targets for the number of new crypto assets

17  that would be made available on the Bittrex Platform.

18      115.   When deciding whether to include an asset on the Bittrex Platform, Bittrex assessed

19  whether the financial benefits of doing so outweighed the risk that the asset in question would be

20  subject to scrutiny by regulators, including specifically the SEC.  For example, in or around March

21  2017, Shihara told the other Bittrex co-founders with regards to a particular crypto asset:

22              the problem is that its going to be seen by the SEC as a security.  im
              meeting with these guys face to face to get specifics on how much they
23              want to raise, who they are raising it from, and what they expect the after
              market to be.  its a big enough opportunity that we might want to roll the
24              dice on the sec investigation.  we have a couple of paths forward but one
              idea was to have them take a position in bittrex and own the risk of an
25              SEC investigation with us.

26

i.    *Until 2017, Bittrex Did Not Have a Formal Process or Policy in Place for Determining Whether to Make a Particular Crypto Asset Available on the Bittrex Platform.*

116.    For the first several years of its operation, Bittrex's "compliance review" for prospective crypto assets primarily consisted of informal review of the whitepaper published by the issuer of the crypto asset and a request that the issuer provide Bittrex with any legal analysis it had performed as to the asset.

117.    In late 2017, Bittrex for the first time established a formal process for determining which assets to admit to the Bittrex Platform which included analyzing whether the assets were offered and sold as securities.  As an initial step, issuers would submit a form on Bittrex's website initiating a "preliminary review" of the asset by Bittrex.  Bittrex would then use this form to determine which crypto assets should proceed to a "full evaluation."

118.    The "full evaluation" stage was conducted by Bittrex's "Token Review Committee" (the "Committee").   The Committee was formed in 2017 and was composed of at least five members with Shihara as its chair.  As part of the "full evaluation," the Committee conducted an additional review of the asset, including gathering information from the issuer of the asset such as a legal opinion from counsel retained by the issuer as to whether the asset was offered and sold as a security, and then voted on whether to include the asset on the Bittrex Platform.

119.    In 2017, Bittrex engaged two law firms to conduct legal analyses of whether crypto assets were offered and sold as securities and to advise Bittrex on whether to make the assets available for trading on the Platform.

120.    In or around August 2017—shortly after the SEC issued the DAO Report—Shihara, along with two other members of the Committee, prepared a "coin compliance check list" concerning the crypto assets then available for trading on the Bittrex Platform.  Shihara instructed the other Committee members that the checklist should include reviewing marketing materials for words like "DAO, shareholder, shares, profit, dividends" that would cause the SEC to "want to investigate," as reflected in the below email:

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 27 -

> From: Bill Shihara <bill@bittrex.com>
> Date: Thursday, August 10, 2017 at 11:33 AM
> To: ███████████████████████████████████
> Subject: RE: Coin Compliance
>
> I can't make the meeting but here are some things for the check list:
>
> 1. Was this an ICO?
> 2. Did Bittrex host the ICO?
> 3. Would a regulator skim this and want to investigate?
>    a. Does it say DAO, shareholder, shares, profit, dividends?
> 4. Did this go through a compliance review?
>    a. Do we have a regulatory memo from the team?

121.    Bittrex was aware that if a crypto asset had been marketed as an investment, it would be more likely to satisfy the legal test for a security.  For example, in or around July 2017, Shihara instructed an issuer that it "should not market [its token] as any kind of investment.  Stick to utility token so none of us get into trouble."

### ii.    Bittrex Coordinated with Issuers of Crypto Assets to "Scrub" Public Documents in an Effort to Avoid "Unwanted Attention from the SEC."

122.    To further its dual goals of making more crypto assets available on the Bittrex Platform and avoiding regulatory scrutiny, starting in at least May 2017, Bittrex routinely directed that crypto asset issuers "scrub" their offering and marketing materials of "investment-related terms," including language that would "get unwanted attention from the SEC."  Bittrex regularly asked issuers to remove "problematic statements" from their marketing materials—statements indicating that the asset was marketed as a security—as a prerequisite for making the issuers' crypto assets available for trading on the Bittrex Platform.  Bittrex unofficially dubbed this practice the "problematic statement cleanup."

123.    The "problematic statement cleanup" was nearly always done *after* the initial offering of the crypto asset—*i.e.*, *after* the crypto asset had already been offered and sold to investors.  In other

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 28 -

words, the issuers of the crypto assets had already marketed, offered, and sold the crypto assets to the investing public by using the very "problematic statements" that Bittrex recognized were "investment-related terms" that indicated the assets could be securities.  In requiring issuers to "scrub" their documents, Bittrex did not actually change the economic reality of those offers and sales, but rather simply attempted to remove or "scrub" any evidence of these public statements without changing the actual characteristics of the offering or asset even assuming the deletions were successful.

124.    For example, in a discussion on Slack between Bittrex and the issuer for the crypto asset security known as "NGC" in or about April 2018—months after the NGC ICO—NGC's issuer told Bittrex:

> We have removed everything related to growth, indication as "investment," coin price or any posts in relation to projections, growths or forecasts . . . . This was pure legacy and we are moving fast to ensure delivery of our roadmap . . . . Also we updated the roadmap and whitepaper.  We removed all old links that were posted in threads over the last 4 months.  Everything is deployed to production, our entire team feels that everything is removed related to the raised concerns.

125.    In another example, in connection with making the crypto asset security known as "TKN" available for trading on the Bittrex Platform, Shihara reminded the TKN issuer team (on the very same day that it completed its initial public sale of TKN tokens) to "scrub" its documents of "investment related terms":

> On 2 May 2017 11:42 am, "Bill Shihara" <bill@bittrex.com> wrote:
> Hi guys!
>
> Congratz on the crowdsale.  Were you able to follow up on the action items from the last meeting?
>
>   1. Scrub the docs of investment related terms
>   2. Memo from your legal team on why this isn't a security
>
> I'd like to move onto our plans to list TKN and partner further.
>
> Bill

126.    As part of the "problematic statement cleanup," Shihara and other Bittrex employees also reviewed issuers' whitepapers and marketing materials, including social media communications,

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 29 -

and then instructed the issuers, usually in messages through private Slack channels, to remove or "scrub" "problematic statements." As chair of the Committee until at least November 2019, Shihara directed the "problematic statement cleanup."

127.    As part of the "scrubbing" campaign, Bittrex even provided its employees with a "cheat sheet" as a guide to identifying and addressing "problematic features" and "problematic statements." The "cheat sheet," excerpted below, was affixed to the checklist that Bittrex used to document its review of issuer applications and accompanying documentation, as well as the final recommendation of the Committee:

CHEAT SHEET

Common Problematic Features
- Tokens providing passive income (e.g. dividends, buy back and burning of tokens).
- Tokens used/advertised for illegal activities and purposes (e.g. gambling, narcotics, darknet markets).
- Issues with money transmission laws (e.g. sending coins w/o wallet via text message).

Common Problematic Statements
- Public price prediction statements or expectation of profit (e.g. Twitter, Medium, and Website statements).
- Tokens marketed as shares and implying ownership.
- PoW and PoS rewards described as token holders receiving "interest."

128.    Other examples of Bittrex's "problematic statement cleanup" include:

a.    On or about May 24, 2018, two Bittrex employees told a different issuer team: "[O]ur attorney was a little concerned about any statements on your social media that can be related to price forecasting … we can work with you folks to clean up any statements viewed as problematic … things that can be considered pumping price is speculating about price or volume in social media. Make sure stuff like that is cleaned up."

b.    On or about July 26, 2018, a Bittrex employee told the issuer team for a crypto asset: "please be sure to review all social media postings and remove any tweets, or retweets of items that are speculative or encouraging increasing the price of the token trading on exchanges … Please go through the feed and clean up anything problematic/speculative."

c.    On or about August 20, 2018, a Bittrex employee told a different issuer team: "when we look at listing projects, we also review social media feeds, white paper and website for problematic statements that are speculative in nature. The

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 30 -

following are statements/comments identified by our outside counsel that they would like to see removed or cleaned up."

129.     Bittrex made dozens of crypto assets available for trading on the Bittrex Platform after directing such "problematic statement cleanup" of the issuer's public statements, including the crypto asset securities NGC and TKN, as well as the crypto asset security known as "IHT."

### iii.     Bittrex Removed from the Bittrex Platform Certain Problematic Assets and Later Made Them Again Available on the Platform in an Effort to "Remain Relevant."

130.     In April 2019, SEC staff issued the "Framework for 'Investment Contract' Analysis of Digital Assets."  Shortly thereafter, starting in April 2019, Bittrex removed from the Bittrex Platform a number of crypto assets, including crypto assets that had been subject to Bittrex's "problematic statement cleanup."

131.     However, in an effort to "remain relevant" among other crypto trading platforms, Bittrex later restored for trading certain crypto asset securities that it had previously removed from the Bittrex Platform due to regulatory concerns, including DASH and OMG.

### iv.     Bittrex Made Available for Trading a Number of Crypto Assets that Bittrex Recognized Had the Characteristics of Securities.

132.     Bittrex made numerous crypto assets available for trading on the Bittrex Platform, while ignoring factors indicating that various crypto assets were likely offered and sold as securities.

133.     For example, as part of its evaluation of the crypto asset security known as "MANA," Bittrex recognized that the token had multiple factors that indicated it was likely offered and sold as a security, including that the issuer "raised approximately $5M USD from investors … [who] … received a discount ranging from 5 to 15%," and that the issuer purportedly prohibited U.S. persons from participating in the offering because the issuers had "not yet made a final determination as to the status of MANA Tokens under U.S. federal securities laws."  Shihara and other Committee members nevertheless voted to approve MANA for admission to the Bittrex Platform.

134.     Similarly, in deciding to make the crypto asset security known as "POWR" (which Shihara described at the time as #3 on his "token priority list") available on the Bittrex Platform,

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 31 -

Bittrex ignored clear indications that POWR was marketed, offered, and sold as a security.  In an e-mail to the Committee on or about October 11, 2017, a Bittrex employee told Shihara that there were "some controversial statements for [the POWR] offering," including the "Asset Germination Events" described in the Power issuer's whitepaper, which defined such events as: "the sale or crowdfunding of an autonomous renewable energy asset which allocates ownership and distribution of income."  Shihara acknowledged but ignored the issuer's "controversial statements," and Bittrex subsequently made the crypto asset security POWR available for trading on the Bittrex Platform.

**B.**     **The Bittrex Platform Makes Available for Trading Assets that Were Offered and Sold as Securities.**

135.     Each unit of a particular crypto asset on the Bittrex Platform trades at the same price as another unit of that same asset.  Because these assets are interchangeable (*e.g.*, any OMG or fraction thereof is just like any other), all tokens of the same issuance increase or decrease in value in the same amounts and to the same extent, such that one token is equal in value to any other one token of the same name and issuance.  The purchase of any particular token does not appear to give an investor any special rights that are not available to any other investor in that type of token, such as separately managed accounts, or to capital appreciation or returns that are independent of the returns that may inure to other investors in the same token.

136.     The tokens on the Bittrex Platform are available for sale broadly, to any person who creates a trading account with the Bittrex Platform, regardless of whether that person treats it as anything other than as an investment.  In other words, the Bittrex Platform does not restrict crypto asset purchasers to those who might purchase the token for purported consumptive use or who acquire it for any other purported non-investment purpose.  To the contrary, the "Trade" page displays changes in prices for the crypto assets similarly to trading platforms that allow investors to transact in securities registered under the Exchange Act.  (Again, the difference is that, unlike with the Bittrex Platform, investors transacting in registered securities on trading platforms are doing so through regulated brokers in regulatory-compliant securities markets, not directly with exchanges).

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 32 -

137.    The Bittrex Platform does not restrict how many units of a crypto asset any given investor may purchase.  Investors are not required to purchase quantities tied to any purported non-investment "use," if any, that may exist for the asset.

138.    The assets available for sale on the Bittrex Platform are transferable, and eligible for resale on the Bittrex Platform or other crypto asset trading platforms immediately upon purchase and without any apparent restrictions on resale.

139.    It is therefore not surprising that many of the tradeable crypto assets on the Bittrex Platform have characteristics indicating that they may be available to U.S. investors who make an investment of money in a common enterprise with a reasonable expectation of profits derived from the efforts of others.

140.    Indeed, Bittrex made available for trading on the Bittrex Platform crypto assets that have been the subject of prior SEC enforcement actions, including but not limited to EOS, Enigma, Unikrn, SALT, and HYDRO.

141.    For purposes of prevailing on the Exchange Act claims set forth herein, the SEC need only establish that Bittrex transacted in a single crypto asset security.  Nevertheless, set forth below are specific details regarding a non-exhaustive list of six examples of crypto asset securities available for trading on the Bittrex Platform:

### i.    OMG

142.    The so-called OMG Network, previously known as OmiseGO, was founded in 2017. In or around December 2020, Genesis Block Ventures ("GBV"), a Hong Kong-based venture capital firm, acquired the OMG Network.  In or around February 2021, the OMG Network partnered with another entity to develop the so-called Boba Network.  In or around August 2021, the OMG Network changed its name to the "OMG Foundation" and the following year became the "BOBA Foundation."

143.    The OMG token was issued by the OMG Network as a "proof-of-stake" token on the OMG Network.  The OMG Network held an ICO on or about June 24, 2017, raising approximately $25 million through the sale of OMG tokens to the public in exchange for ether.  The OMG Network

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 33 -

issued a maximum supply of approximately 140.2 million OMG tokens, and sold approximately 65.1% of this supply to the public in the ICO.

144.    Today, OMG tokens are available for buying, selling, and trading on several crypto asset trading platforms in exchange for fiat currency (namely U.S. Dollars) or certain crypto assets.  OMG was made available for trading on the Bittrex Platform in or around July 2017.  After being removed from the Bittrex Platform in June 2019, OMG was again made available for trading on or about April 9, 2021.  OMG was also available for trading on the Bittrex Global platform.

145.    From the time of its offering and continuing through the Relevant Period, OMG has been offered and sold as an investment contract and therefore a security.  After it was listed on Bittrex for trading, the ever-changing management of the OMG Network continued to tout its efforts to grow the value of OMG and the investment opportunities OMG presented.

*Purchasers of OMG invested in a common enterprise.*

146.    The OMG Network pools the proceeds from OMG token sales to fund the development, marketing, business operations, and growth of the OMG Network, as reflected in OMG's "Crowdfunding Whitepaper," which used the following chart to explain how funds raised during the ICO would be used to develop the network:



147.    Specifically, the OMG whitepaper explained that the "[m]ajority of the funds raised will go towards the development of open source software.  Overall fund usage will be split approximately 2:1 ratio between network and end-user application development."  The whitepaper also detailed how

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 34 -

1  the "budget" would be used, which included items such as "[c]onstruct and roll-out blockchain,

2  including full node client," and "[c]onstruct and roll-out decentralized custody of funds."

3    148. The stated distribution of the OMG tokens tied the fortunes of the OMG token holders

4  together and to the fortunes of the promoters.  For instance, the OMG tokens were allocated as

5  follows: 65.1% for purchase by the public; 20% for "future costs and uses including use for network

6  validation as part of the development and execution of the project" as a "reserve"; 9.9% for OMG

7  "team members and key contributors who worked to develop the ideas, supporting structures and

8  actual implementation of the OmiseGO Project"; and 5% for an airdrop to ether token holders to

9  "encourage incentive alignment with the Ethereum mainnet."  Even after the ICO, and through

10  changes in management, the promoters of OMG continued to tout the connected fortunes of OMG

11  token holders and the promoters.

12    149. The price of all OMG tokens goes up or decreases together.

13    *Investors in OMG had a reasonable expectation of profits based on the efforts of others.*

14    150. In addition to the public statements cited above, in connection with the ICO and

15  continuing after OMG was listed on the Bittrex Platform, OMG's promoters disseminated information

16  that led OMG token holders to reasonably expect to profit from the promoters' efforts to grow the

17  OMG Network.

18    151. For example, the whitepaper touted the experience of the parent holding company

19  (Omise Holdings Pts. Ltd.), the OMG Network team, and advisors that would contribute to building a

20  successful blockchain network—the usage of which would derive value to the OMG token holders.

21  The whitepaper stated that "[o]ur technical team is led by experienced professionals who have track

22  records in high growth technology startups" and that they had the "best setup to implement this

23  project" given the parent holding company's "established track record in building a fast-growing fintech

24  startup in the payments and value-transfer landscape."

25    152. Further, materials available at the time of the ICO indicated that the development of the

26  platform by the OMG Network team could lead to profits for OMG token holders.  For instance, the

Complaint                  Securities and Exchange Commission
SEC v. Bittrex, Inc., et al.             New York Regional Office
Case No. 23-cv-580           100 Pearl Street, Suite 20-100
                    New York, New York 10004
- 35 -               (212) 336-1100

1   whitepaper provided that "[a]t the OmiseGo Network layer, token holders will be eligible to earn

2   transaction fees for interchange payments and decentralized exchange.  Activity 'on-chain' will pay

3   transaction fees to token holders for validating the network."

4   153.   Moreover, the OmiseGo website at the time of the ICO indicated that OMG token

5   holders could anticipate receiving a share of the fee revenue generated on the platform, and a document

6   purporting to establish the terms under which users purchased OMG during the ICO clarified that

7   potential for profit was linked to efforts of the OMG Network team ("[W]hile the individuals and

8   entities . . . assigned to [create the network] will make reasonable efforts to develop and complete

9   OmiseGO, *it is possible that such development may fail and User's OMG may become useless and/or valueless due to*

10  *technical, commercial, regulatory or any other reasons*" (emphasis in original)).

11  154.   Even after the OMG Network released a beta version of its platform in mid-2020

12  (which did not exist at the time of the ICO), the OMG Network team continued to emphasize their

13  commitment to developing the network.  For instance, in or around June 2020 (more than two years

14  after OMG was listed on the Bittrex Platform), the OMG Network team expressed an intended focus

15  on future marketing for the platform:  "We've always followed the mantra that our work will speak for

16  itself in the market place and we've gone very light on the marketing—focusing instead on top-notch

17  engineering and solid business development."  In or around October 2020, the OMG Network's CEO

18  wrote that for the remainder of 2020 the OMG Network "team remains focused on onboarding our

19  CeFi partners to build out the Layer-2 value transfer use-case and improve the protocol and UX" and

20  that the "goal is to get OMG Network technology embedded into a network of merchants and

21  enterprises, so it becomes the go-to protocol for value transfer."

22  155.   Similarly, while the management of the OMG Network continued to change hands, the

23  new teams still stated publicly that they would focus on making efforts to achieve growth for OMG.

24  For example, at the time of the acquisition by GBV in or around December 2020, the OMG Network

25  stated, "Today, @genesisblockhk acquires OMG Network.  We'll work together to grow our ecosystem

26  and accelerate the adoption of OMG Network as the value transfer layer for #Ethereum!"  And in

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 36 -

November 2021, the new team touted, "OMG was trading around $3-4 when the current team took over.  Fair to say quite a bit of value has been created since then between OMG and BOBA."

156.    Upon acquisition of the OMG Network in December 2020, GBV promised to continue to "promote the accelerated growth of OMG Network, and further enhance the adoption of OMG blockchain in Asia and beyond."

157.    These statements led reasonable OMG investors to expect that the demand for OMG would likely increase based on the OMG Network's efforts to increase demand for its technology, thereby potentially resulting in a price increase for OMG.

## ii.    DASH

158.    Dash is a blockchain protocol that was launched on or about January 18, 2014 by founder Evan Duffield.  According to its website, www.dash.org, Dash is a crypto payment platform forked from the Bitcoin source code.

159.    "DASH" is the native token of the Dash blockchain and is the token used to pay transaction fees required to propose transactions on the blockchain.  The platform has built proprietary mobile and desktop wallet applications available on the Google Play store and Apple's App Store.  There is a maximum supply of approximately 18.92 million DASH tokens.

160.    Dash's initial distribution of DASH tokens was in the form of rewards to miners that provided value to the DASH network by mining blocks for the blockchain.

161.    Today, DASH tokens are available for buying, selling, and trading on several crypto asset trading platforms in exchange for fiat currency (namely, U.S. Dollars) or certain crypto assets, including bitcoin.  DASH has been available for trading on the Bittrex Platform since 2014.  After being briefly removed on or about December 29, 2020, DASH was again made available for trading on the Bittrex Platform on or about September 1, 2021.  DASH has also been available for trading on the Bittrex Global platform.

162.    From the time of its offering and continuing through the Relevant Period, DASH was offered and sold as an investment contract and therefore a security.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 37 -

*Purchasers of DASH invested in a common enterprise.*

163. Today, Dash claims to be run by a subset of its users, which are called "masternodes."[2] Masternodes are servers that provide a second layer of services and governance on the Dash blockchain on top of the services provided by standard nodes. Ten percent of the block rewards that are generated from mining each month are sent to the Dash Treasury to fund improvements to the Dash platform and DASH token. The bulk of the 10% of the block rewards are distributed to DCG (Dash Control Group), an entity controlled by the Masternodes. (The Masternodes and the regular nodes split the remaining 90% of the block rewards, with the Masternodes receiving a little over half of that 90%.). The Masternodes vote on all funding proposals, so the Masternodes are in essence voting to fund DCG, since DCG submits the majority of the proposals that get approved and funded from the Dash treasury. The Masternodes also indirectly control DCG through the Masternodes' voting control over the trust which is the sole shareholder of DCG. DCG's improvements to the Dash platform and the DASH token increase the DASH token's value, thereby benefitting all token holders. Accordingly, the fortunes of the investors (*i.e.*, the non-Masternode token holders) are tied to the fortunes of the Masternodes and DCG.

164. Below is a breakdown of how rewards are purportedly distributed on the Dash platform:

---

[2] A "node" on a blockchain generally means one of the computers that run the blockchain software to validate and store the history of transactions on the network. Only those who stake 1,000 DASH and have the sufficient server capacity to provide the advanced services offered by Dash can become a "masternode" owner.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 38 -



165.    The price of all DASH tokens increases or decreases together.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 39 -

*Investors in DASH had a reasonable expectation of profits based on the efforts of others.*

166.   From the founding of the Dash platform, Dash has created a business model and disseminated information that led DASH holders to reasonably expect to profit from Dash's efforts to develop, expand, and grow the protocol.

167.   For instance, Duffield purportedly launched DASH to improve on Bitcoin's relatively slow transaction times and privacy issues.  To address this, he invented an algorithm used for calculations on the DASH blockchain, which Dash touts as "one of the safest and more sophisticated cryptographic hashes in use by modern cryptocurrencies."  Subsequently, Duffield also invented "InstantSend," which Dash touts as enhancing DASH's speed by allowing users to transfer DASH without waiting for the transactions to be confirmed on the blockchain, and "PrivateSend," which Dash touts as enhancing DASH's privacy by making transactions more difficult to trace.

168.   Further, DCG uses the DASH it receives from the Dash treasury to fund performance enhancements and to add features to the Dash platform.  For instance, DCG works to advance DASH as a medium of payment.  Dash's website states that DASH can be spent at "thousands" of retailers through a "DashDirect" consumer app and, in or around May 2022, Dash tweeted, "DCG is a [Dash Funded Organization] with a dedicated team working for the Dash network that is responsible for the main development of Dash.  Its mission is to provide greater financial freedom by delivering and improving financial solutions which are secure, reliable, decentralized, and usable for all."

169.   Dash also promotes its token's superiority over other tokens due to the attributes it has developed, namely greater scalability of the protocol (which increases usability), short processing times, and low transaction costs.  Accordingly, as the use of DASH expands, the demand for DASH will increase, and its value will rise.

170.   Finally, the value of DASH is further enhanced by the fact that the token has a limited supply and is deflationary in nature.  For example, the Dash website explains that the block reward is reduced by approximately 7% every 210,240 blocks (approximately every 380 days).

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 40 -

iii.    **ALGO**

171.    Algorand is a blockchain protocol founded by Silvio Micali.  The Algorand blockchain uses a consensus algorithm it calls "pure proof-of-stake," in which each user's ability to influence the choice of a new block is proportional to its stake (number of tokens) in the system.

172.    "ALGO" is the native token of the Algorand blockchain, and has a maximum supply of 10 billion ALGO minted at the launch of the Algorand network.  Because ALGO is the native token of the Algorand blockchain, those utilizing the Algorand blockchain need to hold (and potentially stake) certain amounts of ALGO.

173.    The Algorand Foundation Ltd. (the "Algorand Foundation") conducted an initial ALGO token sale on or about June 19, 2019, selling 25 million tokens at $2.40 per ALGO, raising approximately $60 million.  In advance of the token sale, the Algorand Foundation promoted the token sale on Twitter, and included a link to its website.

174.    The Algorand Foundation promoted the June 19, 2019 token sale in part with a refund policy that allowed ALGO investors to return the ALGO to the Algorand Foundation one year later at 90% of the original purchase price.  The Algorand Foundation explained the economic rationale behind the refund policy by noting its own belief in and commitment to the value of ALGO, stating:  "We believe in the underlying value of the Algorand blockchain, the Algo, and the potential of the borderless economy.  Our goal is to invest in the growth, sustainability and performance of that economy."

175.    In other words, in promoting the ALGO token sale, the Algorand Foundation tied the potential growth of the Algorand blockchain to potential demand for the ALGO token itself, and to its own commitment to preserving a price floor for ALGO.

176.    In or around August 2019, the Algorand Foundation publicly offered ALGO investors an early refund opportunity, and ALGO investors returned a total of approximately 20 million ALGO tokens to the Algorand Foundation in exchange for a refund that was 85% of the original purchase price.  In or around June 2020, ALGO investors who did not refund their ALGO tokens in August

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
- 41 -                                                        (212) 336-1100

2019 were publicly offered a second refund window.  ALGO investors returned a total of approximately 5 million ALGO tokens for a refund that was 90% of the original purchase price.

177.    Through its rewards programs and incentive structures, the Algorand Foundation continued distributing tokens after the June 2019 token sale.  As of September 2022, approximately 6.9 billion ALGO were in circulation.

178.    Today, ALGO is available for buying, selling, and trading on crypto asset trading platforms in exchange for fiat currency (namely, U.S. Dollars) or certain crypto assets, including bitcoin. ALGO was available for trading on the Bittrex Platform and the Bittrex Global platform from approximately April 2020, and is currently available on both platforms.

179.    From the time of its offering and continuing through the Relevant Period, ALGO was offered and sold as an investment contract and therefore a security.

*Purchasers of ALGO invested in a common enterprise.*

180.    Today, two entities are responsible for Algorand:  (1) the Algorand Foundation, an organization purportedly focused on Algorand "protocol governance, token dynamics and supporting grassroots, open-source development on the Algorand ecosystem," which was incorporated in Singapore; and (2) Algorand, Inc., a company purportedly focused on "layer-1 development of the Algorand Protocol and enabling Enterprise adoption of Algorand blockchain technology."

181.    The Algorand Foundation and Algorand, Inc. purportedly collaborate on projects and initiatives for the Algorand community.

182.    Shortly before the June 19, 2019 ALGO token sale, Steven Kokinos, the CEO of Algorand, Inc., posted a publicly-available article stating:  "(a) We will be holding our founder's tokens for the long term and will not be selling them.  (b) We will use our founder's tokens to participate in consensus and assist in securing the network, though we will never represent more than 49% of the voting.  (c) We will use our founder's tokens to support the ecosystem and encourage development."

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 42 -

183.    The Algorand Foundation purportedly owns 500 million ALGO tokens and the participation and governance rewards associated with those tokens.  Also, members of the Algorand Foundation's board of directors and its advisory committees receive ALGO as compensation.

184.    In addition to the tokens it owns, as of September 2022, the Algorand Foundation also controls over 3 billion ALGO tokens in wallets publicly identified as for "Community & Governance Rewards," "Ecosystem Support," and "Foundation Endowment," signaling to the public that the Algorand Foundation would use the ALGO tokens to support the ALGO economy or ecosystem as well as to reward itself and participants in this ecosystem.

185.    The price of all ALGO tokens goes up or decreases together.

*Investors in ALGO had a reasonable expectation of profits based on the efforts of others.*

186.    The publicly available information disseminated by Algorand, Inc. and the Algorand Foundation led ALGO investors to reasonably expect to profit from Algorand, Inc.'s and the Algorand Foundation's efforts to grow the Algorand protocol, which would in turn potentially increase demand for, and therefore the value of, the ALGO token itself.

187.    In public statements on Twitter, as well as on their respective websites, Algorand, Inc. and the Algorand Foundation promote the Algorand protocol.

188.    Until approximately May 14, 2022, the Algorand Foundation promoted that ALGO investors could receive participation rewards (purportedly a form of staking by delegation) by "participation in the Algorand ecosystem via holding Algo in an online wallet."

189.    As of approximately May 14, 2022, the Algorand Foundation publicly stated that it would replace the participation rewards that ALGO holders were entitled to receive with so-called governance rewards.  The Algorand Foundation described "Governance" as a way for investors to make investment returns on their ALGO purchases—stating it is "a decentralized program which allows Algo holders to vote on the future of Algorand" and "the best way to earn rewards for holding Algo, with APY% of 10.02% - 14.05% seen in previous periods."

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 43 -

190.    The Algorand, Inc. and Algorand Foundation websites tout their teams' technical experience and expertise in the areas of cryptography and business development.  For example, Algorand, Inc.'s website states:  "Blending technical mastery and professional stability, the Algorand team consists of internationally recognized researchers, mathematicians, cryptographers, and economists along with proven business leaders from global technology companies."

191.    In a March 2022 report, the Algorand Foundation publicly stated that it had started a new program to incentivize the "growth of the ecosystem, which is the fundamental need of a maturing blockchain.  The program includes a series of loans to help the growth of our DeFi network and to expand the institutional investments in the ecosystem … The Algorand Ecosystem team facilitates the development and growth of the ecosystem and developer pipeline including undiluted funding, technical onboarding and standardization conventions for ASAs, Wallets and AVM."

192.    Algorand, Inc. and the Algorand Foundation also take steps to incentivize third parties to participate in and attract users to the ALGO protocol.  For example, in or around February 2022, the Algorand Foundation announced a $10 million incentive for developers that can make the Algorand blockchain compatible with applications built on the Ethereum blockchain.

193.    Also in or around February 2022, the Algorand Foundation announced a section of its website called AlgoHub, "a virtual community designed to grow the pipeline of #Algorand developers."

194.    These statements led reasonable ALGO investors throughout the Relevant Period to expect that the demand for ALGO would likely increase based on Algorand, Inc.'s and Algorand Foundation's efforts to increase demand for the Algorand technology, thereby resulting in a price increase for ALGO.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 44 -

iv.   **TKN**

195.    In 2017, Monolith Studio, based in London, England, announced the launch of "TokenCard," purporting to be "the first debit card powered by smart contracts incorporating the VISA payments network with Ethereum." TokenCard also created and issued the TKN token.

196.    According to TokenCard's whitepaper, TokenCard would be usable anywhere VISA debit cards could be used, including at ATMs. The whitepaper further explained that TokenCard would allow users to fund their card with ether and up to five other crypto assets which users would select. The whitepaper noted that there would be a 1% licensing fee assessed to card swipes which would be used to fund the TokenCard smart contract.

197.    In the whitepaper, TokenCard stated that it would create a fixed number of TKN prior to an ICO for TKN, and would not create any more TKN thereafter. The whitepaper stated that TKN holders would be entitled to a proportion of the licensing fees accrued by the TokenCard smart contract. TKN holders purportedly also received a number of benefits from the TokenCard smart contract, including free debit card usage for TKN-backed swipes and discounted fees.

198.    In 2017, TokenCard conducted an ICO of TKN and raised approximately $16.7 million through offers and sales of TKN. Shortly after the ICO, at some point during the period between May 2 and May 7, 2017, Bittrex first made TKN available on the Bittrex Platform. Bittrex removed TKN from the Bittrex Platform on or about December 8, 2017.

199.    From the time of its offering and throughout the period it was listed on the Bittrex Platform, TKN was offered and sold as an investment contract and therefore a security.

*Purchasers of TKN invested money in a common enterprise.*

200.    TokenCard's whitepaper stated that proceeds from the TKN sale would be pooled to develop TokenCard's business, noting that "[f]unds raised during the crowdsale [ICO] will be used solely for the development and benefit of the Token platform." The whitepaper also stated that the funds would be used specifically to "finance development, partnership programs, float … operations, regulatory and most importantly, marketing and customer acquisition."

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 45 -

201.    The price of all TKN tokens goes up or decreases together.

*Investors in TKN reasonably expected to profit from the efforts of others.*

202.    TokenCard's whitepaper indicated that investors could expect a direct return on their TKN investment through the efforts of the company and its affiliates.  For example, the whitepaper made the following statements regarding the expected growth and success of TKN:

- "TKN is designed to be the single token one might consider in order to reap the benefits of the coming industry growth;" and

- "[W]e intend to put as much money and time into these as we possibly can in order to maximize the value of TokenCard and TKN and dominate this post-bank era."

203.    The whitepaper described a mechanism called "Cash and Burn" that, functionally, amounted to a pro-rata sharing in fees generated on the platform.  Per this mechanism:

> Fees from card swipes will be assessed in the token being used to fund the swipe.  These fees will be sent directly to the TKN Asset Contract. Over time, this contract will accrue tokens in proportion to the tokens held and used by TokenCard customers around the world.  At any time, a holder of TKN can "Cash and Burn" the TKN for her pro-rata share of each token held by the TKN Asset Contract.

204.    According to the whitepaper, "Cash and Burn" ensured that the TKN token would have a market value at or above the assets contained in the TKN smart contract, noting further that if the value dropped below those assets, "arbitrageurs will purchase TKN and burn it, yielding a dividend."  The whitepaper promised that through this mechanism, TKN holders would get "higher average returns and lower volatility than they would trying to invest individually in tokens."  The whitepaper further described the "Cash and Burn" feature as follows:

### 7.2   Cash and Burn

A TKN holder can redeem her **current pro-rata** claim on the accumulated assets by calling TKN's **burn** function. Doing so will permanently destroy the TKN, forgoing any share of future accumulated assets and leaving remaining TKN holders with a proportionally larger claim on future assets, but the same claim on existing assets.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 46 -

1

         **v.   NGC**

2       205.    NAGA Development Association Ltd. ("NAGA") is a corporation formed in Belize in

3 or around October 2017, in partnership with the NAGA Group AG, a German holding company

4 founded in 2015 that was purportedly listed on the German Stock Exchange.

5       206.    NGC is an ERC-20 token that NAGA issued on the Ethereum blockchain.  NAGA

6 claimed that "NGC is a decentralized cryptocurrency for trading and investing in financial markets,

7 virtual goods and cryptocurrencies."

8       207.    NAGA conducted what it described as a NGC "pre-sale" in or around November 2017

9 and an NGC "initial token sale" in or around December 2017, in which it raised approximately $25

10 million from more than 36,000 investors.

11      208.    To promote its NGC token sale, NAGA issued a whitepaper to prospective investors.

12 In the whitepaper, NAGA described that a total of 400 million NGC tokens would be issued on the

13 Ethereum blockchain via a smart contract, and that this would be a "hard cap," such that no additional

14 NGC would be created.  NAGA stated in the whitepaper that "issuing a token allows NAGA to be

15 backed by investors from all over the world who will have access to NGC right after its creation."  It

16 also described its plans to be "traded on major exchanges."

17      209.    According to the whitepaper, 55% of the tokens were to be offered during the pre-sale

18 and initial token sale.  The remaining 45% were to be divided among NAGA's team and advisors, and a

19 reserve pool purportedly meant to ensure sufficient liquidity and help create a market for NGC.

20      210.    NGC was made available for trading on the Bittrex Platform from approximately May

21 22, 2018 through approximately June 14, 2019.

22      211.    From the time of its offering and throughout the period it was listed on the Bittrex

23 Platform, NGC was offered and sold as an investment contract and therefore a security.

24

25

26

Complaint                                Securities and Exchange Commission
SEC v. Bittrex, Inc., et al.                   New York Regional Office
Case No. 23-cv-580                     100 Pearl Street, Suite 20-100
                                         New York, New York 10004
- 47 -                                         (212) 336-1100

1    *Purchasers of NGC tokens invested in a common enterprise.*

2    212.    NAGA described to investors that it would pool the funds it raised in the token sales to

3    build and promote the NAGA ecosystem, noting it wanted investors to share in the potential profits

4    from the efforts it would fund with these proceeds, *i.e.*, to "be able to participate in its future growth

5    through this form of funding, as compared to traditional venture funding."

6    213.    NAGA described in detail how the proceeds from the funds raised from investors

7    supposedly would be used to build its ecosystem:

| Allocation of Raised Funds | |
|---|---|
| User Acquisition / Marketing | 50% |
| Salaries & Wages | 6% |
| Regulatory License Acquisition | 4% |
| Research & Development | 7% |
| Bank-grade Security & Code Audit | 8% |
| IT team & Infrastructure | 4% |
| Licensing & Regulatory Compliance | 8% |
| External Legal Services | 3% |
| Blockchain Engineering & Testing | 3% |
| Other Costs | 7% |

18    214.    The price of all NGC tokens goes up or decreases together.

19    215.    NAGA's distribution of tokens among investors and NAGA's team and advisors

20    aligned their incentives in building a successful NGC platform, as any increase in NGC's market price

21    would yield profits to NAGA's team and advisors as well as other NGC investors.

22    *Investors in NGC had a reasonable expectation of profits based on the efforts of others.*

23    216.    NAGA marketed NGC such that NGC investors reasonably expected to profit from

24    NAGA's efforts to grow its platform.  NAGA's whitepaper contained explicit statements indicating

25    that token holders should expect an increase in token price based on the efforts of the company in

26    developing the business and its "ecosystem."

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 48 -

217.    NAGA described in its whitepaper that it would work to develop the NGC platform, thereby "building the value of the ecosystem for the benefit of long time holders and token sale participants."  NAGA further explained that "NGC is backed and additional NGC demand is accelerated and generated by the multi-hundred million publicly listed NAGA AG."  In fact, NAGA tied the purported success of its publicly traded German partner to the success it expected to achieve with the NGC token, positing "if [NAGA Group AG's] stock already did 400% after three months, what will its token do?"

218.    In a section of its whitepaper entitled "Why the NAGA Initial Token Sale Will Be a Success Story," NAGA touted the strength of its team and resources in growing the value of the NGC token.

219.    NAGA described how the "extensive experience" of its team in developing trading platforms would assist the growth of the platform.  NAGA also expressed its confidence that the NGC token price would "grow exponentially," due to its efforts at growing the number of users of its platform.

### vi.    IHT

220.    I-House Token or "IHT" was launched through Aladdin Fintech Company Ltd. ("Aladdin"), an LLC formed in the Cayman Islands in or around February 2018.  Aladdin described IHT as a "Global Real Estate Blockchain Cloud Platform" with a mission to integrate global real estate markets with the blockchain.  The company's whitepaper described that "[t]hrough joining blockchain and real estate, the real estate developer, financial institutions and their users can be connected and the transaction of real estate can be made a part of the 'digital credit society,'" and further promised that all "owners and investors will become beneficiaries of i-house.com real estate blockchain."

221.    Aladdin conducted an ICO of the IHT token in or around January 2018, raising approximately $40 million.  The token was thereafter available on the Bittrex Platform from approximately October 2, 2018 through approximately June 7, 2019.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 49 -

222.     From the time of its offering and throughout the period it was listed on the Bittrex Platform, IHT was offered and sold as an investment contract and therefore a security.

*Purchasers of IHT invested money in a common enterprise.*

223.     The IHT whitepaper stated that the IHT platform was not yet developed and that the proceeds from the token sale would be used to fund development of various aspects of the platform and business.  Investor funds raised during the ICO were pooled in a designated digital wallet address to fund the business, which included creating and supporting a platform for the IHT token, and business development and operations.

224.     Specifically, according to IHT's Bittrex listing application, investor funds would be pooled and used as follows:

- 10% legal fees on token sale raising
- 10% domestic and international publicity and ecological construction
- 15% existing R&D team's operation
- 15% recruiting new R&D operators
- 50% prepaying the tokenized assets to speed up assets acquisition

225.     Moreover, at least 15% of tokens would be reserved for Aladdin staff and employees for compensation purposes or incentives.

226.     The price of all IHT tokens goes up or decreases together.

*Investors in IHT reasonably expected to profit from the efforts of others.*

227.     The whitepaper outlined a plan and timeline for development and growth of various aspects of the supposed business model, including an official "launch event" in Hong Kong, "Blockchain Summit Forum" marketing events in the United States and elsewhere, and global expansion.

228.     The whitepaper also highlighted the purported expertise of the team behind IHT, including its technical and engineering expertise.  Members of the team were also marketed as experts

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 50 -

1  in "blockchain," with titles such as "blockchain consultant" and "Chief Blockchain Officer" with

2  purportedly deep industry knowledge and experience.

3      229.    Moreover, the whitepaper indicated that real estate developers and financial institutions

4  have shown "great enthusiasm" and are "willing to actively participate in the i-house.com project and

5  look forward to the i-house.com blockchain project IHT on-line as soon as possible."

6      230.    After the ICO, the company continued to make statements highlighting the efforts it

7  was taking to develop the business using proceeds from the token sale.  For example, in April 2018,

8  following a period of decline in the crypto asset market, the CEO and founder of Aladdin/I-House

9  reiterated IHT's plans for expansion into global markets and noting that "[o]ur hope is that investors

10  will not worry about market fluctuations and continue to support IHT.  Our vision for the world's first

11  real estate blockchain transaction cloud platform, is to become a leader in the blockchain industry and

12  to develop our own unique business model, despite market influxes."  He concluded:  "We will

13  continue to work hard no matter what lies ahead to position IHT as a leader in the blockchain

14  industry."  The company also offered a "reward" program that encouraged IHT investors to "lock up"

15  their IHT tokens and rewarded this "lock up" with additional IHT tokens.

16  **IV.    BITTREX AND BITTREX GLOBAL WERE REQUIRED TO REGISTER AS A
        NATIONAL SECURITIES EXCHANGE, AND BITTREX WAS ALSO REQUIRED
17      TO REGISTER AS A BROKER-DEALER AND CLEARING AGENCY.**

18      231.    Throughout the Relevant Period, Bittrex, and since 2019 Bittrex and Bittrex Global,

19  used the means and instrumentalities of interstate commerce to bring together the orders of multiple

20  buyers and sellers of crypto assets that were offered and sold as securities using a trading facility

21  programmed with non-discretionary rules for orders to interact and buyers and sellers to agree upon the

22  terms of trades in these securities.  As a result, Bittrex and Bittrex Global, as a group of persons,

23  maintained and provided a market place for bringing together purchasers and sellers of securities.

24  Bittrex and Bittrex Global were therefore required to register with the Commission as a national

25  securities exchange or operate pursuant to an exemption to such registration, but did not do so.

26

232.     Throughout the Relevant Period, Bittrex used means and instrumentalities of interstate commerce to engage in the business of effecting transactions in securities for the account of others by, for example, soliciting potential investors in crypto asset securities, holding itself out as a place to buy and sell crypto asset securities, facilitating trading in crypto asset securities by opening customer accounts and handling customer funds and crypto asset securities (which it commingled and treated as fungible) through Bittrex-controlled accounts and digital wallets, and being compensated for doing so. Bittrex was therefore required to register with the Commission as a broker-dealer, but did not so register.

233.     Throughout the Relevant Period, Bittrex served as an intermediary in settling transactions in crypto asset securities occurring on the Bittrex Platform.  Bittrex also acted as a custodian of securities by allowing crypto asset securities to be deposited in Bittrex-controlled wallets, creating a system for the central handling of securities whereby securities were treated as fungible and customer accounts debited and credited by Bittrex to settle its customers' transactions.  Bittrex was therefore required to register with the Commission as a clearing agency, but did not so register.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 5**
**(Bittrex and Bittrex Global)**

234.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 233.

235.     By engaging in the acts and conduct described in this Complaint, Bittrex and Bittrex Global together met the definition of "exchange" and, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States, to effect transactions in a security, or to report any such transaction, without registering as a national securities exchange under Exchange Act Section 6 [15 U.S.C. § 78f], and without being exempted from such registration.

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 52 -

236.     By reason of the conduct described above, Bittrex and Bittrex Global, directly or indirectly, violated, are violating, and, unless enjoined, will continue to violate Exchange Act Section 5 [15 U.S.C. § 78e].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 15(a)**
**(Bittrex)**

237.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 233.

238.     By engaging in the acts and conduct described in this Complaint, Bittrex, a person other than a natural person under the Exchange Act, is a broker and made use of the mails and the means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without registering as a broker, and without being exempted from such registration.

239.     By reason of the conduct described above, Bittrex, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

**THIRD CLAIM FOR RELIEF**
**Violations of Exchange Act Section 17A(b)**
**(Bittrex)**

240.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 233.

241.     By engaging in the acts and conduct described in this Complaint, Bittrex, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce to perform the functions of a clearing agency with respect to securities, without registering in accordance to Section 17A(b) of the Exchange Act and without being exempted or excluded from such registration.

242.     By reason of the conduct described above, Bittrex, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 17A(b) [15 U.S.C. § 78q-1(b)].

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 53 -

**FOURTH CLAIM FOR RELIEF**
**Violations of Exchange Act Sections 5, 15(a), and 17A(b)**
**(Shihara as Control Person over Bittrex)**

243.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 233.

244.     As alleged above, Bittrex violated Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), 78q-1(b)].

245.     Shihara was a control person of Bittrex for purposes of Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] at least through November 2019.

246.     At all relevant times, Shihara exercised power and control over Bittrex, including by managing and directing Bittrex, and by directing and participating in the acts constituting Bittrex's violations of the securities laws.

247.     By reason of the foregoing, Shihara is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for Bittrex's violations of Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), 78q-1(b)].  Shihara is, therefore, jointly and severally liable with and to the same extent as Bittrex for violations of Section 5, 15(a), and Section 17A(b) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with any of them, from violating, directly or indirectly, Section 5 of the Exchange Act [15 U.S.C. § 78e]; and Bittrex and Shihara, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with any of them, from violating Sections 15(a) and 17A(b) of the Exchange Act [15 U.S.C. §§ 78o(a), 78q-1(b)];

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 54 -

**II.**

Ordering Defendants to disgorge on a joint and several basis all ill-gotten gains, with prejudgment interest thereon, pursuant to Sections 20(a), 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(a), 78u(d)];

**III.**

Prohibiting, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Bittrex and Shihara from continuing to use means or instrumentalities of interstate commerce to (i) accept and display orders in crypto asset securities from U.S. persons, (ii) act as broker or dealer with respect to crypto asset securities, or (iii) perform the functions of a clearing agency with respect to crypto asset securities, without registering with the Commission; and Bittrex Global from continuing to use means or instrumentalities of interstate commerce to accept orders in crypto asset securities from U.S. persons;

**IV.**

Ordering Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

Complaint
SEC v. Bittrex, Inc., et al.
Case No. 23-cv-580

Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100

- 55 -

1

## V.

2    Granting any other and further relief this Court may deem just and proper for the benefit of

3    investors.

4    ## JURY DEMAND

5    The Commission demands trial by jury.

6    Dated: New York, New York
          April 17, 2023

7

8                                                    By: s/Jorge G. Tenreiro
                                                     Jorge G. Tenreiro*

9                                                    By: s/Ladan F. Stewart
10                                                   Ladan F. Stewart*

11                                                   By: s/Christopher J. Carney
                                                     Christopher J. Carney*
12

13                                                   By: s/Ben N. Kuruvilla
                                                     Ben N. Kuruvilla*

14

15                                                   *Conditionally admitted pursuant to
                                                     Local Rule 83.1
                                                     SECURITIES AND EXCHANGE
16                                                   COMMISSION
                                                     New York Regional Office
17                                                   100 Pearl Street, Suite 20-100
                                                     New York, New York 10004
18                                                   (212) 336-1100
19                                                   Email: tenreiroj@sec.gov
                                                     stewartla@sec.gov
20                                                   carneyc@sec.gov
                                                     kuruvillabe@sec.gov
21

22                                                   *Attorneys for the Plaintiff*

23    Of Counsel:    David L. Hirsch

24                   Mark R. Sylvester
                     Pamela Sawhney
25                   Daphna Waxman

26