THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

BITTREX, INC., BITTREX GLOBAL
GMBH, and WILLIAM HIROAKI
SHIHARA,

Defendants.

NO. 2:23-cv-00580 (RSM)

**DEFENDANT
BITTREX GLOBAL GMBH'S
MOTION TO DISMISS**

<u>**NOTED ON MOTION CALENDAR:**</u>
**FRIDAY, SEPTEMBER 22, 2023**

**ORAL ARGUMENT REQUESTED**

BITTREX GLOBAL GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ..............................................................................................3

    I.     Bittrex Global Operates a Foreign Trading Platform for Foreign
          Customers ......................................................................................3

    II.    Bittrex Global Is Registered with a Foreign Regulator ........................4

    III.   Bittrex Global Does Not Operate or Control the Bittrex US
          Platform ........................................................................................4

    IV.   The SEC Filed Its Complaint Four Weeks After First Contacting
          Bittrex Global ...............................................................................5

LEGAL STANDARD ....................................................................................................6

ARGUMENT ...............................................................................................................7

    I.     The SEC's Complaint Does Not Allege That Bittrex Global
          Effected Transactions in Any "Security"..........................................7

          A.    *"Investment Contracts" Require Privity Between the*
               *Investor And The Party From Whose Efforts The Investor*
               *Expects To Profit* .............................................................8

          B.    *The SEC Fails to Allege that Bittrex Global Customers*
               *Purchased or Sold "Investment Contracts"* .........................11

    II.    The SEC's Action is Barred By The Major Questions Doctrine .......................15

    III.   The SEC's Claim Violates Due Process and Fair Notice ....................15

    IV.   The SEC Fails to Allege That Bittrex Global Acted as an
          Exchange for Domestic Securities Transactions ...............................20

          A.    *The SEC Fails to Allege that Bittrex Global Acted as an*
               *"Exchange" Subject to U.S. Registration Requirements*........20

          B.    *The SEC Fails to Allege a Domestic Violation of the*
               *Exchange Act* .................................................................23

CONCLUSION............................................................................................................25

BITTREX GLOBAL GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - i

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*180 Land Co. LLC v. City of Las Vegas*,
   833 F. App'x 48 (9th Cir. 2020) ........................................................21

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ...............................................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................6

*Barron v. Reich*,
   13 F.3d 1370 (9th Cir. 1994) .............................................................4

*Biden v. Nebraska*,
   No. 22-506 (U.S. June 30, 2023) .....................................................15

*Bittner v. United States*,
   143 S. Ct. 713 (2023) ........................................................16, 18, 20

*Chavez v. United States*,
   226 F. App'x 732 (9th Cir. 2007) .....................................................11

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) .........................................................................21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014).............................................................24

*SEC v. Edwards*,
   540 U.S. 389 (2004)..........................................................................10

*Eclectic Props. E., LLC v. The Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) .............................................................6

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)....................................................................15, 19

*FDIC v. Clementz*,
   2013 WL 6212166 (W.D. Wash. Nov. 27, 2013) ...............................4

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
  189 F.3d 971 (9th Cir. 1999) ...................................................................4

*Hocking v. Dubois*,
  885 F.2d 1449 (9th Cir. 1989) .................................................13, 14, 18

*Intercontinental Exch., Inc. v. SEC*,
  23 F.4th 1013 (D.C. Cir. 2022) ......................................................... 22-23

*Khoja v. Orexigan Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ..................................................................4

*Lemelson v. Wells Fargo Bank, N.A.*,
  2022 WL 17092790 (W.D. Wash. Nov. 21, 2022) ..................................6

*McCormick v. Shively*,
  267 Ill. App. 99, 1932 WL 32593 (1932) ................................................9

*Morrison v. Nat'l Austl. Bank Ltd*,
  561 U.S. 247 (2010).......................................................................... 23-25

*New Prime Inc. v. Oliveira*,
  139 S. Ct. 532 (2019)............................................................................10

*Parmelee v. Dunnington*,
  2012 WL 527522 (W.D. Wash. Feb. 16, 2012) .....................................11

*SEC v. Belmont Reid & Co.*,
  794 F.2d 1388 (9th Cir. 1986) ...............................................................13

*SEC v. Benger*,
  934 F. Supp. 2d 1008 (N.D. Ill. 2013) ..................................................24

*SEC v. C.M. Joiner Leasing Corp.*,
  320 U.S. 344 (1943)..............................................................................10

*SEC v. Hui Feng*,
  935 F.3d 721 (9th Cir. 2019) .................................................................11

*SEC v. Kik*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2000)....................................................13

*SEC v. R.G. Reynolds Enters., Inc.*,
  952 F.2d 1125 (9th Cir. 1991) ...............................................................11

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - iii

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

*SEC v. Rubera*,
   350 F.3d 1084 (9th Cir. 2003) ...................................................................11

*SEC v. United Benefit Life Ins. Co.*,
   387 U.S. 202 (1967) ...................................................................................10

*SEC v. Variable Annuity Life Ins. Co.*,
   359 U.S. 65 (1959) .....................................................................................10

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ........................................................................... *passim*

*Somers v. Apple, Inc.*
   729 F.3d 953 (9th Cir. 2013) ...................................................................21

*State v. Heath*,
   153 S.E. 855 (N.C. 1930) .............................................................................9

*Stoyas v. Toshiba Corp.*,
   896 F.3d 933 (9th Cir. 2018) ............................................................... 23-24

*Taylor v. Yee*,
   780 F.3d 928 (9th Cir. 2015) .......................................................................7

*Tcherepnin v. Knight*,
   389 U.S. 332 (1967) ...................................................................................10

*Tigano v. United States*,
   527 F. Supp. 3d 232 (E.D.N.Y. 2021) .......................................................21

*United States v. Brandel*,
   853 F. App'x 88 (9th Cir. 2021) ................................................................10

*United Cal. Bank v. THC Fin. Corp.*,
   557 F.2d 1351 (9th Cir. 1977) .....................................................................8

*United States v. S. Ind. Gas & Elec. Co.*,
   245 F. Supp. 2d 994 (S.D. Ind. 2003) .......................................................16

*Upton v. SEC*,
   75 F.3d 92 (2d Cir. 1996).............................................................................16

*Utility Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014).....................................................................................15

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - iv

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

*In re Voyager Digital Holdings, Inc.*,
    2023 WL 2470938 (Bankr. S.D.N.Y. Mar. 11, 2023) ...........................................19

*Warfield v. Alaniz*,
    569 F.3d 1015 (9th Cir. 2009) ...........................................................................11

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)........................................................................................15

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)............................................................................................15

*Woodward v. Terracor*,
    574 F.2d 1023 (10th Cir. 1978) .........................................................................13

**Statutes & Rules**

15 U.S.C. § 77b ...........................................................................................................8

15 U.S.C. § 78c ...............................................................................................7, 20, 22

15 U.S.C. § 78e ....................................................................................................7, 23

17 C.F.R. § 240.3b-16 ...............................................................................................20

**Other Authorities**

Brief for Petitioner, *SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) (No. 843), 1946 WL 50582 ................................................9

*Procedures Relating to the Commencement of Enforcement Proceedings and
    Termination of Staff Investigations*,
    Exchange Act Release No. 9796 (Sept. 27, 1972)................................................5

*Supplemental Information and Reopening of Comment Period for Amendments to
    Exchange Act Rule 3b-16 Regarding the Definition of "Exchange"*,
    Exchange Act Release No. 34-97309 (April 14, 2023) .......................................21

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - v

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

Defendant Bittrex Global GmbH ("Bittrex Global") by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Civil Rule 7, respectfully moves this Court to enter an order dismissing the Complaint as to Bittrex Global in its entirety, with prejudice.

## PRELIMINARY STATEMENT

This case is not about fraud. It is not about deception. It is not about theft or misuse of customer funds. Rather, this case is about the SEC's attempt to deploy unprecedented, erroneous interpretations of the Securities Exchange Act of 1934 (the "Exchange Act") to force digital asset trading platforms, including foreign ones, to register as "national securities exchanges" with the SEC. In other words, this is a case about agency overreach.

The SEC's overreach is twofold. First, is the attempt to use the Exchange Act to police conduct that the Act was never intended to regulate. The Exchange Act obligates exchanges that effect domestic transactions in "securities" to register with the SEC, but it does not define "securities" to include exchange-traded digital assets. Digital assets are properly and more naturally considered commodities subject to regulation by the SEC's sister agency, the CFTC, under the Commodity Exchange Act. The SEC's attempt to shoehorn trading of digital assets— and more specifically, secondary trading—into the Exchange Act's definition of "securities" is not supported by the statutory text and conflicts with prior SEC statements and actions.

Second, and of particular significance to Bittrex Global, is the SEC's attempt to enforce its erroneous interpretation of the Exchange Act against a foreign entity, subject to regulation by a foreign government, that has never solicited U.S. persons as customers and never held itself out as available to U.S. persons as customers. The SEC does not allege that Bittrex Global had a single U.S. customer. Indeed, Bittrex Global was formed five years after the launch of its affiliate, Bittrex, Inc. ("Bittrex US"), for the purpose of serving non-U.S. persons. It is legally distinct from Bittrex US and operates on technology and servers based outside the U.S. The SEC's contention that Bittrex Global is subject to U.S. regulation is based merely on the allegation that Bittrex Global

BITTREX GLOBAL GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 1

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

contracted with Bittrex US for the right to use technology that enabled Bittrex Global's foreign customers to cross orders with Bittrex US customers.  The notion that this alone subjects Bittrex Global to U.S. regulation is likewise without precedent.

Ultimately, the SEC's lone claim against Bittrex Global—for failure to register as a U.S. national securities exchange—fails for four reasons.

*First*, the SEC's claim against Bittrex Global is premised on the notion that secondary transactions in three tokens (DASH, ALGO and OMG) constitute "securities" under the Exchange Act.  This would be so only if such transactions constitute "investment contracts," but "investment contracts" exist only where an investor is in contractual privity with a party from whose efforts the investor expects to profit.  Here, however, the SEC does not (and cannot) allege that Bittrex Global customers transacting in DASH, ALGO or OMG, in secondary trading, are in contractual privity with the token's promoters or issuers.

*Second*, the "major questions" doctrine provides that substantial policy questions must be decided by a clear act of Congress, and not the unilateral act of an agency.  The regulation of digital assets is precisely the sort of substantial policy question that requires clear guidance from Congress, and the Exchange Act does not meet that standard.  Simply put, the Exchange Act's inclusion of the term "investment contract" in the definition of "security" does not clearly reflect Congress's desire that the SEC exercise broad powers over digital assets.

*Third*, due process requires that a reasonable person know what is expected under the law, yet here, the law was not reasonably clear that secondary transactions in digital assets— transactions that lack contractual privity between the investor and "issuer" or promoter—could constitute "investment contracts" and therefore "securities" under the Exchange Act.  Not only has no Supreme Court or circuit court decision ever so held, the SEC provided no comprehensible guidance and, to the contrary, acted in numerous ways that are inconsistent with its allegations here, exacerbating the due process concern.

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 2

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

*Fourth*, even if secondary transactions in DASH, ALGO and OMG constitute "securities," Bittrex Global would be required to register with the SEC only if it is acting as part of a group operating an "exchange" subject to U.S. law.  The SEC's Complaint does not state such a claim, because only Bittrex US is alleged to have "maintained" or "provided" the exchange at issue. Furthermore, the Exchange Act does not have extraterritorial application, cabining the SEC's enforcement powers to only *domestic* violations of the Act.  Whether a violation is domestic turns on the location of the transactions giving rise to the violation, yet the SEC fails to allege *where* transactions in those three tokens occurred.

Accordingly, the SEC's claim against Bittrex Global must be dismissed.

## STATEMENT OF FACTS

### I.   Bittrex Global Operates a Foreign Trading Platform for Foreign Customers

Bittrex Global is a foreign limited liability company, organized under the laws of Liechtenstein and created for the purpose of operating a cryptocurrency trading platform for foreign customers.  ¶ 17.[1]  A cryptocurrency trading platform allows customers to trade digital assets (also referred to as cryptocurrency, crypto assets, or tokens) for other digital assets or traditional currency.  ¶ 53.  Typically, customers of such a trading platform open an account with the provider of the platform, deposit assets into their account (either digital assets or traditional fiat currency), and then use those assets to buy and sell digital assets.  ¶¶ 53, 54.

Bittrex Global has only foreign customers.  ¶ 17.  Its foreign customers use a trading platform launched by Bittrex Global in 2019, *id.*, that is described herein as the "Bittrex Global Platform."  This platform is described in the Complaint as being distinct from the platform operated by Bittrex Global's U.S. affiliate, Bittrex US (the "Bittrex US Platform").  ¶¶ 1, 16.

---

[1]  The Complaint is cited as "¶ __."  Unless otherwise noted, citations have been omitted in case quotations throughout.  For the Court's convenience, publicly available sources cited herein are attached to the June 30, 2023 Declaration of Eric A. Hirsch ("Hirsch Decl."), filed herewith.

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 3

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

## II.        Bittrex Global Is Registered with a Foreign Regulator

Around the time of Bittrex Global's founding, Liechtenstein promulgated modern cryptocurrency laws, including the 2019 Law on Tokens and TT [Trustworthy Technologies] Service Providers ("TVTG"), that provide for the regulation and registration of cryptocurrency exchanges.  The United States has not passed such a law, although discussions about doing so are currently taking place in Congress.[2]

Under Liechtenstein's TVTG, Bittrex Global is registered with the Liechtenstein Financial Markets Authority to operate as a TT Exchange Service Provider, TT Token Depositary and Token Issuer.[3]  In order to register, Bittrex Global was required to meet, and must annually certify that it continues to meet, the reliability, technical suitability, and minimum capital requirements specified by the TVTG (*see* TVTG Art. 13(b), (c) and (e)), employ appropriate "written internal proceedings and control mechanisms" (*see* TVTG Art. 13(g)) and implement specified internal control mechanisms (*see* TVTG Art. 13(h)).[4]

## III.       Bittrex Global Does Not Operate or Control the Bittrex US Platform

Bittrex Global and Bittrex US are affiliates that share a common parent but do not exercise control over one another.   ¶¶ 16-17.  The two affiliates operate distinct trading platforms, with Bittrex Global operating the Bittrex Global Platform and Bittrex US operating the Bittrex US Platform (defined in the Complaint as the "Bittrex Platform").  ¶¶ 1, 16, 17.   Bittrex US launched the Bittrex US Platform in 2014, five years before Bittrex Global was created.  ¶¶ 1, 3, 66.

---

[2] *See* Hirsch Decl. Ex. 1 (June 2, 2023 Digital Asset Market Structure Discussion Draft, House Committee on Financial Services & House Committee on Agriculture).

[3]  Hirsch Decl. Ex. 12. On a motion to dismiss, this court may take judicial notice of documents on file with foreign governments, records and reports of administrative bodies, documents on file with the SEC, news reports reflecting information of which the market was aware, and documents incorporated by reference into the Complaint.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1001 (9th Cir. 2018); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994); *FDIC v. Clementz*, 2013 WL 6212166, at *2 (W.D. Wash. Nov. 27, 2013).

[4] *See* Hirsch Decl. Ex. 2 (English translation of cited TVTG provisions).

---

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 4

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

Bittrex US exercises "operational control" and "unilateral discretion and decision-making" over the Bittrex US Platform.   ¶ 106.   In addition, Bittrex US personnel "maintain[] the technology" of the order book and matching engine used to facilitate transactions on the Bittrex US Platform.  ¶ 105.  In contrast, Bittrex Global is *not* alleged to control the Bittrex US Platform or maintain the underlying technology.  Rather, Bittrex Global is alleged to have contracted with Bittrex US for the right to use the shared order book and matching engine maintained by Bittrex US.  ¶¶ 100, 101, 105.[5]  To obtain access to Bittrex US's order book and matching engine, Bittrex Global allegedly entered into a "licensing agreement" with Bittrex US.  ¶ 105.  As a result of this contractual relationship, a Bittrex Global customer's order could be matched with an order placed by a Bittrex US customer.  ¶ 102.

### IV.  The SEC Filed Its Complaint Four Weeks After First Contacting Bittrex Global

The SEC typically conducts investigations of persons or entities before instituting enforcement actions against them.[6]  Here, the SEC Staff did not request any documents or testimony from Bittrex Global prior to filing the lawsuit.  The SEC Staff's first contact with Bittrex Global concerning this case occurred on March 21, 2023, after it misdirected a "Wells Notice" expressing the Staff's intent to recommend suing Bittrex Global to Bittrex US's counsel.  The SEC proceeded to file this lawsuit four weeks later, on April 17, 2023.  Just prior to filing, the SEC Staff had been in discussion with Bittrex Global's counsel concerning the timing of Bittrex Global's response to the Wells Notice.  The Commission's decision to file this lawsuit rendered making such a response futile.

---

[5] The Complaint does not allege the physical location of the servers on which the shared order book and matching engine operate, so for purposes of resolving the motion to dismiss, the Court cannot assume or infer that the transactions occurred in the United States.  In fact, the servers on which these functions operate are located in the Netherlands.

[6] *See, e.g.*, *Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations*, Exchange Act Release No. 9796 (Sept. 27, 1972), *available at* https://www.sec.gov/divisions/enforce/wells-release.pdf.

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 5

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

The Complaint asserts a single claim against Bittrex Global, alleging that it acted as an unregistered securities exchange in violation of Section 5 of the Exchange Act.  ¶¶ 234-36. Notwithstanding that Bittrex Global is a foreign company providing a foreign trading platform for foreign customers, the SEC alleges that it is part of a "group" operating an exchange subject to U.S. regulation because it shared an order book and matching engine with Bittrex US, permitting trading in assets the SEC alleges are "securities" under U.S. law.  ¶ 231.  The SEC specifically alleges that three digital assets available for trading by Bittrex Global customers are "securities" under U.S. law:  DASH, OMG and ALGO.  ¶¶ 141, 161, 178.

DASH, OMG and ALGO were launched in 2014, 2017, and 2019, respectively.  *Id.*  None were registered as securities by their founders or promoters, and in the years following their launch the SEC did not publicly express the view that any of these assets were "securities."  The first time the SEC publicly expressed this view was nearly a decade after DASH launched, when it filed this lawsuit against Bittrex Global.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the Court should assume the truth of factual allegations that are "well-pleaded," it should not accept as true any "legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678-79.  Only allegations based on facts are entitled to the presumption of truth—the Court is not required to presume the truth of allegations that do nothing more than "simply recite the elements of a cause of action."  *Eclectic Props. E., LLC v. The Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014); *see also Lemelson v. Wells Fargo Bank, N.A.*, 2022 WL 17092790, at *2 (W.D. Wash. Nov. 21, 2022).  Dismissal is proper where "there is no cognizable legal theory, or an

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 6

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

absence of sufficient facts alleged to support a cognizable legal theory." *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015) (quoting *Navarro v. Block*, 250 F.3d 797, 732 (9th Cir. 2001)).

## ARGUMENT

### I. The SEC's Complaint Does Not Allege That Bittrex Global Effected Transactions in Any "Security"

The SEC alleges that Bittrex Global violated Section 5 of the Exchange Act, which provides:

> It shall be unlawful for any broker, dealer or exchange, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States **to effect any transaction in a security**, or report any such transaction, unless such exchange . . . is registered as a national securities exchange . . . .

15 U.S.C. § 78e (emphasis added). The term "security" is defined in the Exchange Act by reference to a list of instruments that include, among many others, any "note," "stock," "bond," or "investment contract." 15 U.S.C. § 78c(a)(10). Here the SEC contends that Bittrex Global acted as an exchange effecting transactions in "investment contracts," and more specifically, transactions in "investment contracts" concerning DASH, ALGO, or OMG tokens. *See* ¶¶ 110, 144, 161, 178.

The SEC's position fails because an "investment contract" requires contractual privity between the investor and the person or group in whose efforts he is investing. In other words, an investment contract requires a *contract* between the investor and another party, and that contract would be considered an *investment contract* only if it obligates the other party (e.g., the "issuer" or promoter) to take future actions to drive profit for the benefit of the investor with whom they are in privity. *In every case finding an "investment contract" to date, such contractual privity has existed.* Here, in contrast, customers are alleged to buy and sell DASH, ALGO or OMG tokens in secondary trading, from anonymous buyers and sellers, and are not alleged to have contractual rights against the promoters or "issuers" of the tokens or any other party who is obligated to do

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 7

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

anything to drive profits for the customer.  The customer may well have an investment, but not an "investment contract."

A.   *"Investment Contracts" Require Privity Between the Investor And The Party From Whose Efforts The Investor Expects To Profit*

The touchstone for what constitutes a "security" is the statutory text of the Exchange Act, and in this case, the term "investment contract."  The Supreme Court first construed the term "investment contract" under the federal securities laws in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).[7]  In *Howey*, the respondents were corporations that had sold parcels of farmland to investors as part of a plan to cultivate oranges and split the profits among the landowners.  *Howey*, 328 U.S. at 295.  Each investor would receive a share of the collective profit; not profit from only those specific oranges grown on his parcel.  To this end, "each prospective customer [was] offered both a land sales contract and a service contract"—the land sales contract provided for the purchase of land, and the service contract gave the respondents full discretion and authority over the cultivation of the groves and the marketing of the crops, and made the respondents "accountable" to the purchasers "for an allocation of the net profits."  *Howey*, 328 U.S. at 295-96.  The question before the Court was whether these contracts, taken together and considered in context, constituted an "investment contract."

The Court looked to the meaning of the term "investment contract" as of 1933, at the time of the Securities Act's passage, and determined that an "investment contract" means a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  *Id.* at 298-99.  In *Howey*, the investors' purchase of orange groves was not by itself a "security."  Only by considering the

---

[7] *Howey* considered the definition of "security" in the context of the Securities Act of 1933, but the meaning of "security" is the same under the Exchange Act.  *See* 15 U.S.C. § 77b(a)(1); *see also United Cal. Bank v. THC Fin. Corp.*, 557 F.2d 1351, 1356 (9th Cir. 1977) (stating that "[t]he two definitions" of "security" in the Securities Act and Exchange Act "are considered functional equivalents," including with respect to the term "investment contract").

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 8

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

real estate contract and the service contract together in context, did the transaction in *Howey* meet the definition of an "investment contract" and therefore a "security."

At the time *Howey* was decided, it was understood that the starting point for identifying an "investment contract" was an actual "contract" between the investor and the "promoter or a third party" whose efforts were expected to produce profits.  The SEC acknowledged in its brief to the Court that the existence of a contract between the investor and a promoter was essential.  Brief for Petitioner at *9, *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (No. 843), 1946 WL 50582, at *9 (the SEC's "proffered definition of an 'investment contract'" "includ[ed] any *contractual arrangement for the investment of money in an enterprise* with the expectation of deriving profit through the efforts of the promoters") (emphasis added).  The state courts whose pre-1933 Blue Sky jurisprudence *Howey* incorporated into the definition of "investment contract" likewise presupposed the existence of this essential contractual relationship between the investor and the promoter.  *See, e.g., State v. Heath*, 153 S.E. 855, 857 (N.C. 1930) (an "investment contract" "implies the apprehension of an investment *as well as a contract*") (emphasis added); *McCormick v. Shively*, 267 Ill. App. 99, 102, 1932 WL 32593, at *2 (1932) ("[O]nly such contracts shall be considered investment contracts as provide for the payment of money at a future time to the purchaser or holder of the contract.").

The *Howey* opinion reflects the Supreme Court's intention to preserve—rather than disturb—this common sense understanding that had been "crystallized by this prior judicial interpretation."  328 U.S. at 298.  As *Howey* recognized, there is a distinction to be made between an "investment," on the one hand, and an "investment contract" on the other.  An "investment" is the "placing of capital or laying out of money in a way intended to secure income or profit from its employment."  328 U.S. at 298 (quoting *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, 938 (Minn. 1920) for the meaning of "investment").  An "investment contract" requires there also

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 9

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

be a contract binding the investor to the person expected to generate that income or profit, as clearly existed in *Howey* itself.[8]

Given that (i) the term "investment contract" implies the existence of a *contract*, (ii) contractual privity between the investor and promoter was presupposed and undisputed in *Howey*, and (iii) such privity existed without exception in pre-1933 Blue Sky case law, it is perhaps unsurprising that in <u>every</u> Supreme Court case finding an "investment contract" under *Howey*, the investor has been in contractual privity with the promoter upon whose efforts the investor is relying for profit. *See, e.g.*, *SEC v. Edwards*, 540 U.S. 389, 391 (2004) (investors had a management contract with, and would be relying on efforts of, promoters of payphone venture); *Tcherepnin v. Knight*, 389 U.S. 332, 337 (1967) (investors had a contract in the form of "withdrawable capital shares" of savings and loan and would be relying on the "skill and efforts" of its management to receive share of profits in the form of dividends); *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 205 (1967) (investors had annuity contracts with life insurance company and relied on company to professionally manage their investment "with the object of producing capital gains as well as an interest return"); *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 71 (1959) (same); *see also SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348-49 (1943) (investors' purchase of an oil lease from promoter included reliance on promoters' contractual agreement to drill an oil well).

Similarly, every Ninth Circuit decision finding an "investment contract" under *Howey* has involved a binding contractual promise of future development, management, or performance obligations owed to the investor. *See, e.g.*, *United States v. Brandel*, 853 F. App'x 88, 90 (9th Cir.

---

[8] While *Howey* provides that an "investment contract" can take the form of a "contract, transaction or scheme," *Howey*, 327 U.S. at 298-99, there is no support for the notion that Congress intended the term "investment contract" to apply to a "scheme" lacking any contract. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("[I]f judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the single, finely wrought and exhaustively considered procedure the Constitution commands."). The *Howey* case did not present such facts, and the issue was not in dispute. Thus *Howey*'s reference to the term "scheme" is best understood as directing courts to consider not only the four corners of the contract at issue but also surrounding context and dealings that might be considered as part of one scheme.

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 10

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

2021) (investors entered into a joint venture agreement relying on defendants to present investment ideas); *SEC v. Hui Feng*, 935 F.3d 721, 727 (9th Cir. 2019) (investors' private placement memoranda with promoter obligated promoter to provide a fixed, annual return on investment); *Warfield v. Alaniz*, 569 F.3d 1015, 1020-21 (9th Cir. 2009) (investors had contract in the form of a "charitable gift annuity" and were relying on promises to make annuity payments and a charitable donation upon death); *SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003) (investors purchased pay phones from promoter accompanied with service agreements whereby promoter promised to "install, service and maintain" the pay phones); *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1129 (9th Cir. 1991) (investors purchased investment program from promoter where promoter promised a high rate of return, and separately, a contract for the sale of gold accompanied with a refining contract that obligated promoter to refine ore and deliver gold to a reputable company for certification of purity).

In sum, *Howey* and its progeny stand for the unremarkable proposition that, in order for there to be an "investment contract," the investor must be in contractual privity with a party upon whose future performance obligations the investor will be relying for profit.

### B. The SEC Fails to Allege that Bittrex Global Customers Purchased or Sold "Investment Contracts"

The SEC alleges that Bittrex Global listed three tokens that are "investment contracts" and therefore "securities" under the Exchange Act:  DASH, OMG, and ALGO.[9]  ¶¶ 144, 161, 178. Under *Howey* and its progeny, the SEC must therefore plausibly allege that Bittrex Global customers who purchase (or sell) these tokens are transacting in "investment contracts" within the meaning of the Exchange Act.  The Complaint does not come close.

---

[9] The Complaint asserts that its list of tokens that are "securities" is "non-exhaustive." ¶ 141.  This vague and conclusory allegation that it may have claims based on other unidentified "securities" does not meet notice pleading standards as to any unidentified digital asset. *See Chavez v. United States*, 226 F. App'x 732, 736 (9th Cir. 2007) (affirming dismissal of claims that failed to "give sufficient notice . . . regarding the claims asserted against them"); *Parmelee v. Dunnington*, 2012 WL 527522, at *3 (W.D. Wash. Feb. 16, 2012) (dismissing complaint where the allegations "fail[ed] to place [the] defendant on notice of any claim").

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 11

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

Take, for example, DASH.  The SEC alleges that "DASH" (in ALL CAPS) is the native token of the "Dash Blockchain."  ¶ 159.  "Dash" (in small caps) is both a "blockchain protocol" and a "crypto payment platform."  ¶ 158.  In other words, DASH is alleged to be the token, while Dash is alleged to be associated computer code.  The Complaint goes on to allege that "DASH holders" have been led "to reasonably expect to profit from Dash's efforts to develop, expand and grow the protocol."  ¶ 166.  Thus, as alleged, a purchaser of a DASH token is hoping the token will increase in value based on the operation of inanimate computer code, Dash.  The Complaint further alleges that Dash (the computer code) is "run by a subset of [Dash] users, which are called 'masternodes,'" that these "masternodes" are "servers," and that these masternode servers control an "entity" called the "Dash Control Group." ¶ 163. Even taking these allegations as true, the Complaint does not allege that a Bittrex Global customer buying a DASH token is in contractual privity with "Dash," or with "masternodes," or with the "Dash Control Group," or with any other person or entity upon whose efforts the investor is relying for profit.  Accordingly, the purchaser of a DASH token holds no "investment contract."

The Complaint's allegations as to OMG and ALGO fare no better.  The Complaint alleges that the "OMG Network" and Algorand Foundation made representations about the OMG and ALGO tokens, respectively, but the Complaint fails to allege the nature of any contract between a customer buying such token on any trading platform and the issuer, promoter or any other entity accountable to that customer for driving future profit of the enterprise.  The Complaint alleges, for example, that the "OMG Network" featured "ever-changing management," ¶ 145, yet the Complaint does not identify the counterparty to any contract with a Bittrex Global customer, the contractual rights the investor in an OMG token bargained for, and whether such contractual rights were transferrable.

Notably, the SEC does not allege that Bittrex Global's customers purchased DASH, OMG and ALGO in initial coin offerings (ICOs) or otherwise directly from token promoters.  In an ICO,

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 12

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

the promoter or "issuer" may sell tokens pursuant to representations about how the issuer will use the money it receives in the ICO to increase the token's future value and/or utility.  In an ICO, the "investor" buys the token directly from the "issuer" and is therefore conceivably in contractual privity with the issuer.[10]   In contrast, buyers on the secondary market lack contractual privity with the issuer or promoter.  They may therefore have made an investment, but they have not acquired a security.  *See, e.g.*, *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (finding no "investment contract" in gold purchase where investors were speculating on fluctuations in the gold market rather than relying on the efforts of seller to increase value); *In re Am. Diamond Co.*, 1977 WL 10907, at *4-5 (SEC No Action Letter) (Aug. 15, 1977) (SEC concluded there was no "investment contract" and therefore no "security" where seller intended to advertise "the value of diamonds as an investment," but was "not contractually bound to provide any further services to the Buyer" after the transaction); *see also Woodward v. Terracor*, 574 F.2d 1023, 1026 (10th Cir. 1978) (declining to find an investment contract in context of a real estate transaction where there was "no contractual obligation to the plaintiffs other than to deliver title once purchase terms were met").

To the extent the SEC is contending that a digital asset sold as an "investment contract" in an ICO automatically retains that status in subsequent secondary transactions, the Ninth Circuit has foreclosed that argument.  In *Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989), the plaintiff (Hocking) purchased a condominium in Hawaii and an associated service contract that pooled rental income from a group of condos for collective profit.  Had Hocking purchased the condo and rental pool directly from the developer, there would have been "no doubt" that he had purchased a "security" under *Howey*.  885 F.2d at 1456.  Hocking, however, had acquired the real estate on the secondary market pursuant to representations from a real estate broker (Dubois) concerning

---

[10]   Several district courts applying *Howey* to digital assets have found "investment contracts" in the context of ICOs.  *See, e.g.*, *SEC v. Kik*, 492 F. Supp. 3d 169 (S.D.N.Y. 2000).

---

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

both the property and the availability of the rental pool.  Sitting *en banc*, the Ninth Circuit reversed the panel's conclusion that his secondary market purchase was necessarily an investment contract, concluding that "[s]uch a per se rule would be ill-suited to the examination of the economic reality of each transaction required by *Howey*."  *Hocking*, 885 F.2d at 1462.

    *Hocking* is important in two respects.  First, it expressly holds that "investment contracts" do not automatically retain such status in secondary trading.  Rather, the facts and circumstances of the secondary transaction are determinative.  *Id.* at 1457 ("Before applying the *Howey* test to the facts of this case, *we must determine what exactly Dubois offered to Hocking* [on the secondary market].") (emphasis added).  Thus, whether DASH, OMG or ALGO were offered as "securities" in their ICOs does not control the question of whether Bittrex Global customers transacted in DASH, OMG or ALGO securities on the secondary market.

    Second, *Hocking* is consistent with the fundamental notion that an "investment contract" can exist only where the investor is in contractual privity with the promoter or person assuming post-contractual performance obligations.  The Ninth Circuit acknowledged that Hocking purchased the condominium with the understanding that he would be able to—and that he ultimately did—enter into a contract with a management company upon whose efforts he would be relying for profit.  *Id.* at 1455 (Hocking purchased "a condominium and rental pool").  At the end of the day, the plaintiff in *Hocking* was in contractual privity with the party on whose efforts he was relying for profit.  Here, in contrast, such privity is lacking, and dismissal is therefore warranted because the SEC has failed to allege that Bittrex Global effected transactions in "securities." [11]

---

[11]   To the extent the Court denies Bittrex Global's motion to dismiss on this basis, Bittrex Global reserves the right, following discovery, to challenge the factual basis for the SEC's allegations that the transactions in digital assets at issue constitute "investment contracts" under *Howey* (e.g., whether, as a matter of fact, investors made investments in a common enterprise with the expectation of profit based on the efforts of others).

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 14

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

## II.   The SEC's Action is Barred By The Major Questions Doctrine

The major questions doctrine compels dismissal of this case because regulation of digital assets presents a substantial policy question, and the Exchange Act does not reflect clear Congressional intent to regulate secondary transactions in digital assets as "investment contracts" and therefore "securities."  *See Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (rejecting, absent "clear congressional authorization," EPA's "claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy"); *see also Biden v. Nebraska*, No. 22-506, slip op. at 19-25 (U.S. June 30, 2023); *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).  The SEC "must show a textual commitment of authority to" regulate secondary market transactions in digital assets, and because doing so will reshape a vast swath of the U.S. economy, "that textual commitment must be a clear one."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  Bittrex Global adopts by reference, as if set forth fully herein, the argument made in Bittrex US's moving brief that the major questions doctrine bars the SEC from pursuing this action.

## III.  The SEC's Claim Violates Due Process and Fair Notice

The SEC's claim violates due process because Bittrex Global did not have fair notice that secondary transactions in DASH, OMG and ALGO could constitute "investment contracts" and therefore "securities" under the Exchange Act.  In *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), the Supreme Court held that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *Id.* at 253.  Due process principles are violated "if the statute or regulation under which [punishment] is obtained 'fails to provide . . . fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *Id.*  The Exchange Act does not provide the requisite notice and, as described above, courts have provided notice only that "investment contracts" may exist where there is contractual privity between the investor and the promoter or other party upon whose efforts the investor will be relying for profit.  That critical element is missing here.

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 15

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

To the extent the SEC could have provided notice it failed to do so.  DASH, OMG and ALGO were publicly trading in the U.S. cryptocurrency markets for nine years, six years, and four years (respectively) prior to the filing of this Action, yet the SEC never publicly stated that these tokens were securities.  It never instituted enforcement proceedings against the promoters of these digital assets for the purported unregistered offering of securities.  Rather, it newly mints them "securities" in this very Complaint.  Indeed, the SEC Staff did not even *privately* inform Bittrex Global of their view of these tokens until after they expressed their intent to pursue this action.

Instead of providing clarity or guidance, the SEC has taken inconsistent positions that have exacerbated confusion and made it hard to comprehend what conduct is or is not permitted.  Where, as here, a regulator takes inconsistent positions and actions with respect to its enforcement authority in a particular area, parties cannot be said to have fair notice that their conduct was unlawful.  Earlier this year, in *Bittner v. United States*, 143 S. Ct. 713 (2023), the Supreme Court dismissed a Bank Secrecy Act claim based in part on the government's prior public guidance contradicting its subsequent enforcement position.  *See id.* at 725 (holding due process requires "fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed") (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)); *see also Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (vacating sanction based on absence of "reasonable notice that [company's] conduct might violate" the relevant SEC rule).  The SEC has been inconsistent on the very subject at issue here, in multiple ways.

*First*, the SEC flip-flopped on how *Howey* applies to secondary trading in one of the most heavily-traded digital assets, Ether.  *See United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 1011 (S.D. Ind. 2003) ("Confusion within the enforcing agency as to the proper interpretation of a regulation is . . . relevant evidence to show a lack of fair notice.").  In 2018—before Bittrex Global launched—the Director of the SEC's Division of Corporate Finance, William Hinman, delivered a speech on digital assets in which he stated that *Howey* requires a facts-and-

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 16

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

circumstances approach.  He left open the question of whether the initial offering of Ether constituted an offer of "securities," but stated that "current offers and sales of Ether are **not** securities transactions."[12]  In other words, then-Director Hinman stated that secondary transactions in Ether were not securities.  The SEC's then-Chair, Jay Clayton, affirmed in Congressional testimony that Mr. Hinman's speech accurately reflected the SEC's position.[13]  The SEC appears to have now changed course:  the current Chair, Gary Gensler, recently stated that "[e]verything other than Bitcoin," is a security.[14]  If the SEC cannot consistently apply the *Howey* test to secondary trading in one of the most heavily-traded digital assets, it cannot claim that Bittrex Global was reasonably on notice as to how to apply *Howey* to secondary trading in DASH, OMG, or ALGO.[15]

*Second*, in April 2021, the SEC approved the registration statement (on Form S-1) of Coinbase Global, Inc., the parent company of the largest cryptocurrency trading platform in the United States, clearing the way for Coinbase to become a publicly-traded company.  By allowing Coinbase's shares to be sold to investors, the SEC indicated that the Coinbase trading platform was operating in compliance with applicable regulations, or at the very least acknowledged that the state of the law at that time was that Coinbase's activities were not prohibited.  In the

[12] *See* Hirsch Decl. Ex. 3 (William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, U.S. Sec. & Exch. Comm'n (June 14, 2018), *available at* https://www.sec.gov/news/speech/speech-hinman- 061418 (emphasis added); *see also* Hester Peirce, Commissioner, *How We Howey* (May 9, 2019) (criticizing the SEC's approach to determining whether digital assets qualify as securities as a "Jackson Pollock approach to splashing lots of factors on the canvas without any clear message"), *available at* https://www.sec.gov/news/speech/peirce-how-we-howey-050919.

[13] *See* Hirsch Decl. Ex. 4 (Jay Clayton, *Testimony on Oversight of the U.S. Securities and Exchange Commission* (June 21, 2018), at 15 ("Our Corporation Finance Division Director recently further outlined the approach staff takes to evaluate whether a digital asset is a security."), *available at* https://www.sec.gov/news/testimony/testimony-oversight-us-securities-and-exchange-commission#_ftnref29).

[14] *See* Hirsch Decl. Ex. 5 (Ankush Khardori, "Can Gary Gensler Survive Crypto Winter? D.C.'s Top Financial Cop on Bankman-Fried Blowback," *Intelligencer* (Feb. 23, 2023), https://nymag.com/intelligencer/2023/02/gary-gensler-on-meeting-with-sbf-and-his-crypto-crackdown.html).

[15] The SEC alleges that its DAO Report, issued in 2017, provided guidance to the market as to how *Howey* applies to digital assets. ¶¶ 63-64.  The inadequacy of the DAO Report's guidance, however, is amply demonstrated by the SEC's subsequent inability to apply its own DAO guidance to Ether in the ensuing years.  Hirsch Decl. Ex. 6 (SEC, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017), https://bit.ly/3IpiWDt).

King & Spalding, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

registration statement the SEC approved for public filing, Coinbase stated that its crypto platform does not list assets that are securities, and for this reason, Coinbase is not registered with the SEC as a national securities exchange or as an alternative trading system.[16]  Notably, all three of the crypto assets that the SEC has placed at issue here—DASH, OMG, and ALGO—were touted by Coinbase before its S-1 filing as being available for trading on Coinbase's platform, which the SEC approved as listing non-securities assets.  *See* Hirsch Decl. Ex. 8-10 (Coinbase press releases announcing the listing of OMG, DASH, and ALGO).  In other words, the SEC approved Coinbase to sell its shares to the public even though it was fully aware that Coinbase was engaging in *exactly* the same conduct that the SEC now contends violates the law.  In light of the SEC's position as to Coinbase, a reasonable person would not have had fair notice that secondary trades in DASH, OMG and ALGO constitute securities.  As the Supreme Court observed in *Bittner*, "courts may consider the consistency of an agency's views when we weigh the persuasiveness of any interpretation it proffers in court."  143 S. Ct. at 722; *Hocking*, 885 F.2d at 1458 n.7 (disregarding SEC amicus brief where "the SEC apparently reversed its position on interpreting" the release at issue).

    *Third*, prior to the SEC's filing of this Complaint, Chair Gensler acknowledged the Commission's lack of statutory authority over digital asset trading platforms and conceded that Congressional action was required before the Commission would have any such authority.  Specifically, in May 2021, Chair Gensler testified that "it is only Congress that could really address it, . . . because right now the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the [CFTC] . . . .  *Right now, there is not a*

---

[16] Hirsch Decl. Ex. 7 (March 23, 2021 Coinbase Global, Inc., Registration Statement at 29-30) ("[W]e only permit trading on our core platform of those crypto assets for which we determine there are reasonably strong arguments to conclude that the crypto asset is not a security.").

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

*market regulator around these crypto exchanges . . . .*"[17]   Chair Gensler reiterated his position the next day in a television interview, stating that "we don't have a federal regime overseeing the crypto exchanges," describing what he characterized as a "gap in our system," and adding that "there is no federal authority to actually bring a regime to the crypto exchanges."  He noted that the SEC "will be working with Congress, *if they see fit* to try to bring some protection for people that want to invest in this speculative asset class."[18]   These statements communicated to the public that the SEC lacked authority to regulate digital asset exchanges and that the SEC's Chair hoped that Congress would act to develop regulation for the industry.  The only reasonable conclusion from this testimony and these statements was that secondary transactions in digital assets did not require registration because they were outside the scope of the federal securities laws.

The Supreme Court has noted that "clarity in regulation" is "essential to the protections provided by the Due Process Clause." *Fox*, 567 U.S. at 253.  Here there is the opposite, with regulators themselves unable to agree on what the Exchange Act means and how it should be applied.  *See In re Voyager Digital Holdings, Inc.*, 2023 WL 2470938, at *2 (Bankr. S.D.N.Y. Mar. 11, 2023) (rejecting SEC objection to plan confirmation, observing that "[r]egulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities that are subject to securities laws, or neither, or even on what criteria should be applied in making the decision" "despite the fact that cryptocurrency exchanges have been around for a number of years").  The SEC acted inconsistently for years, as described above, and has now decided to pursue "regulation by enforcement" that is emblematic of the type of unpredictable regulatory action that the Supreme

---

[17]  Hirsch Decl. Ex. 11 (*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, 117th Cong. 1 (May 6, 2021), 167 Cong. Rec. 44-837 (2021), at 12 (testimony of Gary Gensler) (emphasis added)).

[18]  *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), at timestamp 11:57, available at https://www.cnbc.com/2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html (emphasis added).

---

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 19

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

Court rejected in *Bittner*. *See Bittner*, 143 S. Ct. at 722 (finding government's prior public representations do not "fit[] easily with the government's current theory," and rejecting government's theory of liability). Accordingly, the due process clause bars this action.

### IV. The SEC Fails to Allege That Bittrex Global Acted as an Exchange for Domestic Securities Transactions

Even if secondary transactions in DASH, OMG or ALGO amount to "investment contracts" under the Exchange Act, the SEC fails to allege that Bittrex Global acted as an "exchange" required to register under the Act.

### A. *The SEC Fails to Allege that Bittrex Global Acted as an "Exchange" Subject to U.S. Registration Requirements*

The Exchange Act defines an "exchange" as "any organization, association, or group of persons . . . which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities . . . ." 15 U.S.C. § 78c(a)(1). Rule 3b-16 further states that an organization is operating an exchange "if such an organization, association, or group of persons (1) Brings together the orders for securities of multiple buyers and sellers; and (2) Uses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of a trade." 17 C.F.R. § 240.3b-16(a).

The SEC asserts that Bittrex US and Bittrex Global acted together as a "group of persons" that "maintained and provided" a marketplace for securities (¶ 231), but its allegations as to Bittrex Global fall short of this standard. As to Bittrex Global, the SEC alleges only that it is affiliated with a U.S. entity (Bittrex US) that operated a U.S.-based trading platform for U.S. customers (¶ 3); that Bittrex US "maintain[s]" the technology powering an order book and matching engine (¶ 105); that Bittrex Global contracted with its affiliate to obtain the "right to use" its affiliate's technology (*id.*); and that through the use of this technology, Bittrex Global's foreign customer

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 20

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

orders could be matched with those of Bittrex US customers in an unspecified location (¶ 102).[19] This is insufficient to subject Bittrex Global to U.S. registration requirements.

We are aware of no authority concluding that a foreign exchange becomes subject to U.S. registration requirements simply by virtue of licensing access to a domestic exchange's order book for the purpose of matching orders outside of the United States. Curiously, *just one business day before filing this lawsuit,* the SEC issued a release purporting to provide new guidance to the market that the mere sharing of an order book could result in both entities being considered as part of a "group" operating an "exchange." In its eve-of-filing release, the SEC stated that "if one entity agrees with another entity to combine aspects of each other's market places or facilities (e.g. order books, display functionalities, or matching engines) to bring together buyers and sellers of securities, both entities could be considered part of the group and thus an exchange."[20] While an agency's interpretation of its rules are ordinarily entitled to at least some deference, interpretations that are issued in order to achieve a tactical advantage in litigation are entitled to none. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (deference to agency interpretation of its regulation "is undoubtedly inappropriate . . . when it appears that the interpretation is nothing more than a convenient litigating position").

Here, the SEC alleges that Bittrex US (and not Bittrex Global) exercised "operational control" and "unilateral discretion and decision-making" over the Bittrex US Platform. ¶ 106. The

---

[19] The SEC also alleges that Bittrex Global and Bittrex "shared control" over the "combined liquidity pool" (¶ 104), but this allegation is vague and immediately contradicted by the very next paragraph, in which the SEC alleges that the single order book is maintained by Bittrex US and that Bittrex Global's "right to use" it is cabined by the terms of a "licensing agreement" (¶ 105). Since licensees do not ordinarily "control" technology they access by contract, the SEC's conclusory allegation to the contrary is not to be credited. *Somers v. Apple, Inc.* 729 F.3d 953, 964-65 (9th Cir. 2013) (affirming dismissal where legal theory was "implausible in the face of contradictory market facts alleged in her complaint"); *180 Land Co. LLC v. City of Las Vegas*, 833 F. App'x 48, 50 (9th Cir. 2020) (dismissing equal protection claim "because plaintiffs alleged contradictory facts"); *Tigano v. United States*, 527 F. Supp. 3d 232, 243 (E.D.N.Y. 2021) ("[A] court need not feel constrained to accept as truth conflicting pleadings . . . that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely . . . .").

[20] *Supplemental Information and Reopening of Comment Period for Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange"*, Exchange Act Release No. 34-97309 (April 14, 2023), at 24, *available at* https://www.sec.gov/rules/proposed/2023/34-97309.pdf.

SEC further alleges that Bittrex US (and not Bittrex Global) maintained the technology driving the shared order book and matching engine.  ¶ 105.  Bittrex Global's only connection is that it allegedly licensed the right to use this technology from Bittrex US, but more is needed.  To state a claim, the SEC must allege that Bittrex Global "maintained" or "provided" that marketplace, but instead the SEC alleges that Bittrex US (and not Bittrex Global) "maintain[ed]" the technology driving the single order book.  ¶ 105.  Accordingly, the Complaint alleges Bittrex US (and not Bittrex Global) brought orders together for purposes of matching.  Setting aside the SEC's self-serving, eve-of-litigation release, there has been no guidance (let alone court precedent) indicating that these facts would support the conclusion that Bittrex Global was acting as a "group" that "maintained" or "provided" a marketplace for securities transactions in the U.S.

The fact that Bittrex US and Bittrex Global are affiliates is insufficient to require registration.  *See Intercontinental Exch., Inc. v. SEC*, 23 F.4th 1013, 1024 (D.C. Cir. 2022) ("We do not suggest the term 'group of persons' is synonymous with corporate affiliation.").  In *Intercontinental Exchange,* the panel affirmed the SEC's exercise of jurisdiction over three companies (the "IDS companies") that were (a) domestic companies, (b) owned and controlled by a U.S.-registered exchange, and (c) directly maintaining and providing a "facility" bringing together buyers and sellers of securities.[21]  Here, in contrast, Bittrex Global is a foreign entity.  It is not owned or controlled by a U.S. exchange.  And it is not maintaining or providing any "facility" or "market place" bringing together buyers and sellers.  As alleged, Bittrex US (not Bittrex Global) "maintain[s]" the shared order book. ¶ 105.  As the court cautioned in *Intercontinental Exchange*, "the outer boundary of the term 'group of persons' remains murky, and vigilance is necessary to ensure the term is not stretched too far." *Intercontinental Exch.*, 23

---

[21] The term "facility" is defined in the Exchange Act as an exchange's "premises, tangible or intangible property whether on the premises or not, any right to the use of such premises or property or any service thereof for the purpose of effecting or reporting a transaction on an exchange . . . and any right of the exchange to the use of any property or service."  15 U.S.C. § 78c(a)(1).

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 22

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

F.4th at 1025.  Whatever the outer boundary may be, the SEC's position that a foreign entity regulated under foreign law must register in the U.S. because it licensed technology and services from a U.S. affiliate is well beyond it.

B.   <i>The SEC Fails to Allege a Domestic Violation of the Exchange Act</i>

The Exchange Act does not have extraterritorial application, meaning that the SEC may enforce only "domestic" violations of the Act.  *Morrison v. Nat'l Austl. Bank Ltd,* 561 U.S. 247 (2010).  In *Morrison*, the Supreme Court developed a transaction-based test to identify whether violations of Section 10(b) of the Exchange Act are domestic in nature.  *Id.* at 269-70.  Under *Morrison*, to state a domestic violation of Section 10(b), a plaintiff must "plausibly allege that the purchaser incurred irrevocable liability within the United States to take and pay for a security or that the seller incurred irrevocable liability within the United States to deliver a security.'"  *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 948-49 (9th Cir. 2018).

Bittrex Global is charged with a violation of Section 5 of the Exchange Act, for failure to register as a national exchange.  To determine whether its conduct would constitute a "domestic" violation of Section 5, a similar transaction-based test that is focused on the physical location at which purchasers and sellers incur irrevocable liability is required.  Whereas *Morrison* concluded that Section 10(b)'s regulation of the "purchase or sale" of securities requires a transaction-based test, Section 5 specifically regulates "transactions" in a security.  And just as "Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security," *Morrison*, 561 U.S. at 266, Section 5 does not punish operating an unregistered exchange, but only using such an exchange to "effect any transaction in a security."  15 U.S.C. § 78e.  *Morrison* held the transactions—the "purchase[s] or sale[s]"—regulated by Section 10(b) must be domestic transactions, and the same rationale is equally applicable to Section 5:  "Those . . . transactions are the objects of the statute's solicitude.  It is those transactions that the statute seeks to 'regulate'; it is the parties or prospective parties to those transactions that the statute seeks

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 23

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

to 'protec[t].'"  561 U.S. at 267; *cf. SEC v. Benger*, 934 F. Supp. 2d 1008 (N.D. Ill. 2013) (rejecting SEC's argument that a broker-dealer failed to properly register under the Exchange Act and applying *Morrison's* transaction-based test to conclude a broker-dealer that facilitated only foreign transactions was not required to register).

The SEC's claim against Bittrex Global—a foreign company serving foreign customers— ignores the transaction-based analysis that *Morrison* requires.  The Complaint alleges that Bittrex Global licensed access to a shared order book and matching engine, but it fails to allege the physical location of the shared order book, the matching engine, or the location at which digital assets changed hands pursuant to any such "matched" transactions involving a Bittrex Global customer.[22]  It is not enough to allege that U.S.-based persons could have been on the other side of those trades because the residency or location of the parties to the transaction is irrelevant.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69-70 (2d Cir. 2012) ("a purchaser's citizenship or residency does not affect where a transaction occurs" under *Morrison*); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) (dismissing Exchange Act claims brought by purchasers of shares of a foreign issuer on a foreign exchange where the buyer's order was placed in the U.S.); *see also Stoyas*, 896 F.3d at 949 (finding Second Circuit's analysis in *Absolute Activist* persuasive).  Rather, *Morrison*'s transaction-based test focuses on the location at which liability was irrevocably incurred, which is precisely what is missing from the SEC's complaint.

Notably, in *Morrison*, the Supreme Court specifically cautioned against broadly applying U.S. securities laws to foreign exchanges.  The Court commenced with the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply

---

[22] The shared order book and matching engine run entirely on servers located in the Netherlands.  The Court cannot take judicial notice of this fact on a motion to dismiss, but it need not do so in order to conclude that the SEC has failed to allege domestic violations by failing to allege the location of the transactions at issue.

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 24

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

only within the territorial jurisdiction of the United States." *Morrison*, 561 U.S. at 255. The Supreme Court went on to observe that the focus of the Exchange Act is on domestic exchanges: "We know of no one who thought the Act was intended to 'regulat[e]' *foreign* securities exchanges—or indeed who even believed that under established principles of international law Congress had the power to do so." *Id.* at 267 (emphasis in original). As Justice Scalia wrote:

> Like the United States, foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction. And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters.

561 U.S. at 269.

Liechtenstein has passed modern laws to regulate the digital asset space. Bittrex Global is licensed to operate pursuant to the laws of Liechtenstein, and there is no dispute that it is acting in compliance with its home laws. The U.S., in contrast, has not passed modern digital asset legislation, yet the SEC, through this Action, nonetheless demands that a foreign entity register as a national securities exchange *in the United States* without even alleging that it is effecting transactions in the United States. Absent such allegations, the SEC's Section 5 claim against Bittrex Global constitutes an extra-territorial application of the Exchange Act barred by *Morrison*.

////

////

////

////

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 25

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

## CONCLUSION

For the reasons set forth above, Bittrex Global respectfully requests that the Court enter an order dismissing the Complaint as to Bittrex Global in its entirety, with prejudice.

DATED this 30th day of June, 2023.

KING & SPALDING, LLP

s/Andrew Michaelson
ANDREW MICHAELSON, *(admitted pro hac vice)*
amichaelson@kslaw.com
LEIGH NATHANSON, *(admitted pro hac vice)*
lnathanson@kslaw.com
ERIC A. HIRSCH, *(admitted pro hac vice)*
ehirsch@kslaw.com

*Attorneys for Defendant Bittrex Global GmbH*

DATED this 30th day of June, 2023.

SUMMIT LAW GROUP PLLC

s/ David H. Smith
DAVID H. SMITH, WSBA #10721
davids@summitlaw.com

*Local Counsel for Defendant Bittrex Global GmbH*

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 26

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

## **WORD LIMIT CERTIFICATION**

I certify that this memorandum contains 9,321 words, in compliance with the Local Civil Rules and the Stipulated Motion and Order to Expand the Briefing Word Limits so-ordered by the Court on June 28, 2023.

DATED this 30th day of June, 2023.

SUMMIT LAW GROUP PLLC

*s/ David H. Smith*
**David H. Smith**, WSBA #10721
*davids@summitlaw.com*

BITTREX GLOBAL, GMBH MOTION TO DISMISS
CASE NO. 2:23-CV-00580-RSM - 27

KING & SPALDING, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 556-2100

1

## <u>CERTIFICATE OF SERVICE</u>

2

    I, **Lisa Britton,** hereby certify that on June 30, 2023, I filed a true and correct electronic

3

original of the foregoing document with the Clerk of the Court for the United States District Court-

4

Western District of Washington-at Seattle by using the CM/ECF system.  Participants in this case,

5

#2:23-cv-00580 (RSM), who are registered CM/ECF users will be served by the CM/ECF system.

6

    DATED this 30th day of June, 2023, at Seattle, Washington.

7

8
                             SUMMIT LAW GROUP, PLLC

9
                             *s/Lisa Britton*

10
                             **Lisa Britton,** Legal Assistant
                             *lisab@summitlaw.com*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

                                                  KING & SPALDING, LLP
                                                1185 AVENUE OF THE AMERICAS
                                                     NEW YORK, NEW YORK 10036
                                                           TEL: (212) 556-2100

28