# Exhibit 1

*Digital Asset Market Structure Discussion Draft*
**House Committee on Financial Services & House Committee on Agriculture
Section-by-Section**

## TITLE I—DEFINITIONS; RULEMAKING; PROVISIONAL REGISTRATION

**Sec. 101. Definitions under the Securities Act of 1933.**

Section 101 provides for definitions under the Securities Act of 1933.

**Sec. 102. Definitions under the Commodity Exchange Act.**

Section 102 provides for definitions under the Commodity Exchange Act.

**Sec. 103. Definitions under this Act.**

Section 103 provides for definitions under this Act.

**Sec. 104. Joint rulemakings.**

Section 104 provides for joint rulemakings between the Securities and Exchange Commission (SEC) and the Commodity Futures Trading Commission (CFTC), including joint rulemakings related to defining key terms in the Act and the oversight of dually registered exchanges.

**Sec. 105. Provisional Registration of CFTC intermediaries.**

Section 105 permits a digital commodity exchange, digital commodity broker, or a digital commodity dealer to file a provisional registration statement with the CFTC. Filing a provisional registration requires a filer to submit information regarding the company to the Commission, submit to inspection by the Commission, and provide disclosures and segregate customer assets. Filing a provisional registration provides limited relief from the requirements of this Act, until such time as the rules are written and permanent registration commences.

**Sec. 106. Provisional registration of SEC intermediaries.**

Section 106 permits a broker-dealer and alternative trading system (ATS) to file a provisional registration statement with the SEC. Filing a provisional registration requires a filer to submit information regarding the company to the Commission and submit to inspection by the Commission. Filing a provisional registration provides limited relief from the requirements of this Act, until such time as the rules are written and permanent registration commences.

## TITLE II—DIGITAL ASSET EXEMPTIONS

**Sec. 201. Exempted transactions in digital assets.**

1

Section 201 establishes an exemption from the securities laws for a digital asset issuer's sale of digital assets that meet the following conditions: 1) the issuer's total sales of the digital asset over the prior 12 months does not exceed $75 million; 2) a non-accredited investor's purchases of the digital asset from the issuer over the prior 12 months are less than the greater of 5% of the purchaser's annual income or 5% of their net worth; 3) the purchaser does not own more than 10% of the units of the digital asset after the completion of the transaction; and 4) the transaction does not involve equity or debt securities.

The digital asset issuer must file information with the Commission as prescribed by the Act. The digital asset issuer must file annual and semiannual reports until a defined period after the blockchain network is certified decentralized.  Any intermediaries involved in the offer or sale of a unit of a digital asset under this exemption must be registered with the SEC. A unit of a digital asset acquired from the digital asset issuer in reliance on this exemption is deemed a restricted digital asset.

### Sec. 202. Requirements to transact in certain digital assets.

Section 202 sets out the conditions under which certain persons are permitted to engage in restricted digital asset transactions and digital commodity transactions.  Generally, restricted digital assets are permitted to trade on an ATS under the supervision of the SEC and digital commodities are permitted to trade on a Digital Commodity Exchange (DCE) under the supervision of the CFTC.

### Sec. 203. Enhanced disclosure requirements.

Section 203 provides for a new disclosure regime to be completed by a digital asset issuer, affiliated person, related person, or other appropriate entity.  The information required to be disclosed is focused on the nature of the risks surrounding digital assets, including source code, project economics, development plan, related and affiliated persons, and other risk factors.

### Sec. 204. Certification of certain digital assets.

Section 204 provides for a process for a blockchain relating to a digital asset to be certified as decentralized.  The certification process permits any person to certify to the SEC that the blockchain network meets the requirements of the Act.  The SEC is then provided an opportunity to rebut the assertion that the network meets the decentralization test.

## TITLE III—REGISTRATION FOR DIGITAL ASSET INTERMEDIARIES AT THE SECURITIES AND EXCHANGE COMMISSION

### Sec. 301. Treatment of digital commodities and other digital assets.

Section 301 excludes digital commodities and payment stablecoins from the definition of a security under the securities laws. This section aligns the definition of bank in the Exchange Act

2

with the Advisers Act and Investment Company Act and clarifies the activities of trust companies engaging in custody and safekeeping services.

**Sec. 302. Antifraud authority over payment stablecoins.**

Section 302 provides the SEC with authority over transactions with or involving payment stablecoins that occur on or with a SEC registered entity, as though those payment stablecoins are a security solely for purposes of the Commission's anti-fraud or anti-manipulation enforcement authorities. The SEC shall have no authority over the design, structure, or operation of payment stablecoins.

**Sec. 303. Eligibility of alternative trading systems.**

Section 303 specifies that the SEC may not exclude a trading platform from operating pursuant to an exemption as an ATS solely on the basis that the assets traded are digital assets. It also requires the SEC to revise regulations to exempt ATSs that offer digital assets, digital commodities, and payment stablecoins from registration as a national securities exchange and revise the ATS framework to permit disintermediated trading and real-time settlement consistent with what is necessary or appropriate in the public interest or for the protection of investors.

**Sec. 304. Customer protection rule modernization.**

Section 304 requires the SEC within 270 days to revise the Customer Protection Rule to provide that a registered broker-dealer is considered to have control of digital assets if the broker-dealer holds digital assets with a bank, if certain conditions are met, or establishes written policies and procedures demonstrating that the broker has exclusive control over the digital asset.

**Sec. 305. Modernization of recordkeeping requirements.**

Section 305 requires the SEC to promulgate rules that enable cryptographically secured distributed ledgers to satisfy the books and records requirements and to specify that registered transfer agents are able to use cryptographically secured distributed ledgers to meet obligations.

**Sec. 306. Modifications to existing rules for digital assets.**

Section 306 requires the SEC to complete a study and revise rules under Regulation National Market System, Regulation Systems Compliance and Integrity, and the Market Access Rule, among others, to modernize such rules for digital assets.

**Sec. 307. Treatment of certain digital assets in connection with federally regulated intermediaries.**

Section 307 adds digital assets to "covered securities" which are exempt from state blue sky law registration requirements.

**Sec. 308. Dual registration.**

3

Section 308 requires SEC-registered intermediaries offering or seeking to offer a cash or spot market in at least one digital commodity to register with the CFTC.

**Sec. 309. Exclusion for ancillary activities.**

Section 309 defines certain ancillary activities related to the operations and maintenance of blockchain networks and exempts such activities from direct SEC regulation, although not from the Commission's anti-fraud or anti-manipulation enforcement authorities.

Ancillary activities are defined as validating or providing incidental services with respect to a restricted digital asset, providing user-interfaces for a blockchain network, publishing and updating software, or developing wallets for blockchain networks.

### TITLE IV—REGISTRATION FOR DIGITAL ASSET INTERMEDIARIES AT THE COMMODITY FUTURES TRADING COMMISSION

**Sec. 401. Commission jurisdiction over digital commodity transactions.**

Section 401 sets out the new authority of the CFTC over certain transactions in digital assets. Specifically, the section provides the Commission with new exclusive regulatory jurisdiction over digital commodity cash or spot markets which occur on or with CFTC the new registered entities created in this Act: digital commodity exchanges, digital commodity dealers, and digital commodity brokers. This new authority complements the Commission's existing anti-fraud and anti-manipulation authority over all cash or spot market commodity transactions, including cash or spot market transactions in digital assets.

Section 401 provides the Commission with authority over transactions with or involving payment stablecoins that occur on or with a CFTC registered entity, as a payment stablecoin is a digital commodity.  The CFTC shall have no authority over the design, structure, or operation of such payment stablecoins.

**Sec. 402. Requiring futures commission merchants to use qualified digital commodity custodians.**

Section 402 requires Future Commission Merchants (FCM) to hold customers' digital commodities in a qualified digital commodity custodian (QDCC).

**Sec. 403. Trading certification and approval for digital commodities.**

Section 403 establishes the process by which a registered entity may determine that digital commodities are eligible to be traded on CFTC registered entities and through other CFTC registered intermediaries.

The process requires a registered entity to submit a certification to the Commission that the digital commodity meets the requirements of the Commodity Exchange Act, including the listing

requirements under section 404, and to provide disclosures about the functionality and operations of the digital commodity. The Commission then has up to 80 days to review the certification for its accuracy, completeness, and veracity.

### Sec. 404. Registration of digital commodity exchanges.

Section 404 provides for the registration and regulation of digital commodity exchanges (DCE).

Registration requires DCEs to comply with core principles, including listing standards, treatment of customer assets, trade surveillance, capital, conflicts of interest, reporting and system safeguards. Subject to the core principles, DCEs are allowed to list only those digital commodities that are not susceptible to manipulation and for which they have made public disclosures regarding source code, transaction history, and digital asset economics.

DCEs are also subject to comprehensive requirements to segregate customer funds, provide risk-appropriate disclosures to retail customers, and be members of a registered futures association and comply with any additional rules they impose.

### Sec. 405. Qualified digital commodity custodians.

Section 405 sets out the requirements for custodians to be qualified digital asset custodians, and thus eligible to hold the digital assets of customers of entities registered with the CFTC. While the Commission is not given authority to directly regulate custodians, it is provided authority to set minimum standards for those custodians holding customer digital assets within the CFTC regulated perimeter.

### Sec. 406. Registration and regulation of digital commodity brokers and dealers.

Section 406 provides for the registration and regulation of digital commodity brokers (DCB) and digital commodity dealers (DCD).

Registration requires DCBs and DCDs to comply with requirements pertaining to business conduct standards, fair dealing, customer disclosures, segregation of customer funds, conflicts of interest, minimum capital requirements, reporting and record keeping, and other requirements.

In addition, DCBs and DCDs are required to be members of a registered futures association and comply with any additional rules they impose.

### Sec. 407. Exclusion for ancillary activities.

Section 407 defines certain ancillary activities related to the operations and maintenance of blockchain networks and exempts such activities from direct CFTC regulation, although not from the Commission's anti-fraud, anti-manipulation, or false reporting enforcement authorities.

Ancillary activities are defined as validating or providing incidental services with respect to a digital commodity, providing user-interfaces for a blockchain network, publishing and updating software, or developing wallets for blockchain networks.

### Title V – Innovation and Technology Improvements

### Sec. 501. Codification of the SEC Strategic Hub for Innovation and Financial Technology (FinHub).

Section 501 establishes the SEC Strategic Hub for Innovation and Financial Technology (FinHub), which will assist the SEC with its approach to technological advancements, examine the impact that FinTech innovations have on capital markets, market participants, and investors, and coordinate the SEC's response to emerging technologies in financial, regulatory, and supervisory systems. FinHub will report to the Commission to ensure that each Commissioner can avail themselves of the expertise of the office. The Office shall submit an annual report to Congress on its activity.

### Sec. 502. Codification of LabCFTC.

Section 502 establishes LabCFTC in the CFTC, which will serve as an information source for the CFTC on financial technology (FinTech) innovation. The Office will report to the Commission to ensure that each Commissioner can avail themselves of the expertise of the office.

The Office will ensure the CFTC is more accessible to FinTech innovators and bolster the CFTC's understanding of new technologies. The Office will also serve as a forum for innovators seeking a better understanding of the CFTC's regulatory framework. The Office shall submit an annual report to Congress on its activity.

### Sec. 503. CFTC-SEC Joint Advisory Committee on Digital Assets.

Section 503 establishes a Joint CFTC-SEC Advisory Committee on Digital Assets composed of digital asset marketplace stakeholders. Among its many duties, the Joint Advisory Committee will provide recommendations to the CFTC and SEC regarding their respective promulgation of rules under the Act. The section also requires the CFTC and SEC to publicly respond to any recommendations made by the Joint Advisory Committee.

### Sec. 504. Modernization of the Securities and Exchange Commission Mission.

Section 504 amends the Securities Act of 1933, the Securities Act of 1934, and the Investment Advisers Act of 1940 by adding "innovation" to the factors the SEC must consider when issuing a rulemaking.

### Sec. 505. Study on decentralized finance.

Section 505 requires the SEC and the CFTC to conduct a study on decentralized finance (DeFi), which will include an analysis of the size, scope, role, nature, and use of DeFi protocols, the

benefits and risks of DeFi, how DeFi has integrated into the traditional financial markets, including the risks of DeFi integration, and the levels and types of illicit activities in DeFi compared to traditional financial markets. The report will be submitted to Congress one year after enactment. GAO shall also conduct a report on DeFi and submit it to Congress one year after enactment.

DeFi is defined as a system of software applications that (1) are created through smart contracts deployed to permissionless blockchain technology; and (2) allow users to engage in financial transactions in a self-directed manner such that no third-party intermediary effectuates such transactions or takes custody of a user's digital assets during any part of such transaction.

**Sec. 506. Study on non-fungible digital assets.**

Section 506 requires the Department of Commerce, in consultation with the White House Office of Science and Technology, the CFTC, and the SEC, to conduct a study on non-fungible digital assets (NFT), which will include an analysis of the size, scope, role, nature, and use of non-fungible digital assets, the similarities and differences between non-fungible digital assets and other digital assets, the benefits and risks of non-fungible digital assets, how non-fungible digital assets have integrated into traditional marketplaces, including the risks of such integration, and the levels and types of illicit activities in non-fungible digital asset markets. The report will be made publicly available one year after enactment.

**Exhibit 1: Summary of Title 2**

| Digital Asset Holder | Primary Transactions | Digital Asset Received | Secondary Transactions Can Occur If |
| --- | --- | --- | --- |
| Ordinary Persons | End User Distributions | Digital Commodities | Digital Commodity Exchange – Trades as Digital Commodities, subject to requirements:<br>• Functional Network<br>• Current Information |
| | Sales pursuant to Title II digital asset exemption | Restricted Digital Assets | Alternative Trading System – Trades as Restricted Digital Assets, subject to requirements:<br>• Current Information<br><br>Digital Commodity Exchange – Trades as Digital Commodities, subject to requirements:<br>• Functional Network<br>• Decentralized Network<br>• Current Information |
| Related Persons | Sales pursuant to Title II or applicable securities laws.<br><br>Distributions pursuant to applicable securities laws.<br><br>End User Distributions | Restricted Digital Assets | Alternative Trading System – Trades as Restricted Digital Assets, subject to requirements:<br>• Holding Period<br>• Current Information<br><br>Digital Commodity Exchange – Trades as Digital Commodities, subject to requirements:<br>• Holding Period<br>• Functional Network<br>• Decentralized Network<br>• Current Information |
| Affiliated Persons | Sales pursuant to Title II or applicable securities laws.<br><br>Distributions pursuant to applicable securities laws.<br><br>End User Distributions | Restricted Digital Assets | Alternative Trading System - Trades as Restricted Digital Assets, subject to requirements:<br>• Holding Period<br>• Current Information<br>• Volume Limitation<br>• Notice Requirement<br><br>Digital Commodity Exchange - Trades as Digital Commodities, subject to requirements:<br>• Holding Period<br>• Functional Network<br>• Decentralized Network<br>• Current Information<br>• Volume Limitation<br>• Notice Requirement |

8

# Exhibit 2

950.6

# Translation of Liechtenstein Law

**Disclaimer**

English is not an official language of the Principality of Liechtenstein. This translation is provided for information purposes only and has no legal force. The contents of this website have been compiled with the utmost care to reflect the current situation and the current state of knowledge. However, the provider of this website cannot accept any liability if any of its contents should be found to be inaccurate, incomplete or out of date.

| | |
|---|---|
| **English title:** | Law of 3 October 2019 on Tokens and TT Service Providers (Token and TT Service Provider Act; TVTG) |
| **Original German title:** | Gesetz vom 3. Oktober 2019 über Token und VT-Dienstleister (Token- und VT-Dienstleister-Gesetz; TVTG) |
| **Serial number (LR-Nr.):** | 950.6 |
| **First published:** | 1 January 2020 |
| **First publication no. (LGBl-Nr.):** | 2019-301 |
| **Last amended:** | 1 April 2021 |
| **Date of last amendment - publication no. (LGBl-Nr.):** | 2021-036 |
| **Translation date:** | 1 September 2021 |

0

TVTG                                              **950.6**

# Liechtenstein Legal Gazette

**2019**          **No. 301**          **published on 2 December 2019**

## Law

of 03 October 2019

## on Tokens and TT Service Providers
## (Token and TT Service Provider Act; TVTG)

I hereby grant my consent to the following resolution adopted by Parliament:[1]

## I. General provisions

### Art. 1

*Object and Purpose*

1) This law establishes the legal framework for all transaction systems based on Trustworthy Technology and in particular governs:

a)  The basis in terms of civil law with regard to Tokens and the representation of rights through Tokens and their transfer;

b)  The supervision and rights and obligations of TT Service Providers.

2) It aims:

a)  to ensure trust in digital legal communication, in particular in the financial and economic sector and the protection of users in TT Systems;

b)  to create excellent, innovation-friendly and technology-neutral framework conditions for rendering services concerning TT Systems.

---

[1]  Report and application, together with Comments from the Government No. 54/2019 and 93/2019

### Art. 2

*Definitions and designations*

1) The following definitions are established for the purposes of this Act:

a) "Trustworthy Technology (TT)": Technologies through which the integrity of Tokens, the clear assignment of Tokens to TT Identifiers and the disposal over Tokens is ensured;

b) "TT Systems": Transaction systems which allow for the secure transfer and storage of Tokens and the rendering of services based on this by means of trustworthy technology;

c) "Token": a piece of information on a TT System which:

1. can represent claims or rights of memberships against a person, rights to property or other absolute or relative rights; and

2. is assigned to one or more TT Identifiers;

d) "TT Identifier": an identifier that allows for the clear assignment of Tokens;

e) "TT Keys": a key that allows for disposal over Tokens;

f) "Users": people who dispose over Tokens and/or use the TT Services;

g) "Token Issuance": the public offering of Tokens;

h) "Basic Information": Information about Tokens to be offered to the public, enabling the user to make a judgement about the rights and risks associated with the Tokens as well as the TT service providers involved;

i) "TT Service Provider": a person who exercises one or more functions under letters k to u;[2]

k) "Token Issuer": a person who publicly offers the Tokens in their own name or in the name of a client;

l) "Token Generator": a person who generates one or more Tokens;

m) "TT Key Depositary": a person who safeguards TT Keys for clients;

n) "TT Token Depositary": a person who safeguards Token in the name and on account of others;

o) "TT Protector": a person who holds Tokens on TT Systems in their own name on account for a third party;

---

2  Article 2(1) letter i amended by LGBl. 2021 no. 36.

p)  "Physical Validator": a person who ensures the enforcement of rights in accordance with the agreement, in terms of property law, represented in Tokens on TT systems;

q)  "TT Exchange Service Provider": a person, who exchanges legal tender against Tokens and vice versa and Tokens for Tokens;

r)  "TT Verifying Authority": a person who verifies the legal capacity and the requirements for disposal over a Token;

s)  "TT Price Service Provider": a person who provides TT System users with aggregated price information on the basis of purchase and sale offers or completed transactions;

t)  "TT Identity Service Provider": a person who identifies the person in possession of the right of disposal related to a Token and records it in a directory.

u)  "TT Agent": a person who distributes or provides TT Services in Liechtenstein on a professional basis in the name of and for the account of a foreign TT Service Provider.[3]

2) The designations used in this Act to denote persons and functions include persons of male and female gender.

## II. Civil basis

### Art. 3

*Object and scope*

1) This chapter governs the qualification of Tokens and their disposal on TT Systems under civil law.

2) It applies if:

a) Tokens are generated or issued by a TT Service Provider with headquarters or place of residence in Liechtenstein; or

b) Parties declare its provisions to expressly apply in a legal transaction over Tokens.

3) Articles 4 to 6 and 9 also apply correspondingly to Tokens that do not represent any rights.

---

3  Article 2(1) letter u inserted by LGBl. 2021 no. 36.

### Art. 4

*Qualification of Tokens*

If Liechtenstein Law is applicable according to article 3, the Token is considered to be an asset located in Liechtenstein.

### Art. 5

*Power of Disposal and Right of Disposal*

1) The TT Key holder has the power of disposal over the Token.

2) It is further assumed that the person possessing the power of disposal over a Token also has the right to dispose of the Token. For every previous holder of the power of disposal, it is presumed that he was the person possessing the right of disposal at the time of his ownership.

3) If someone is the holder of a power of disposal without wanting to be the person possessing the right of disposal, he can rely on the person from whom he received the Token in good faith is the person possessing the right of disposal.

### Art. 6

*Disposal over Tokens*

1) Disposal is:

a)  the transfer of the right of disposal to the Token; or

b)  the justification of a securities or a right of usufruct to a Token.

2) Disposal over a Token requires that:

a)  the transfer of the Token is concluded in line with the regulations of the TT System, where a restricted in rem right to a Token can also be ordered without transfer, if this is apparent to third parties and clearly establishes the time of ordering;

b)  the transferring party and the recipient party unanimously declare that they are transferring the right of disposal to the Token or that they wish to justify a restricted in rem right; and

c)  the transferring party is the person possessing the right of disposal pursuant to article 5; article 9 remains unaffected.

3) If a Token is disposed over without reason or a subsequent reason fails to exist, the revocation shall be accomplished in accordance with the provisions of the Enrichment Law (§§ 1431 et seq. ABGB).

## Art. 7

### *Effects of Disposal*

1) Disposal over the Token results in the disposal over the right represented by the Token.

2) If the legal effect under (1) does not come into force by law, the person obliged as a result of the disposal over the Token must ensure, through suitable measures, that:

a)  the disposal over a Token directly or indirectly results in the disposal over the represented right, and

b)  a competing disposal over the represented right is excluded.

3) The disposal over a Token is also legally binding in the event of enforcement proceedings against the transferor and effective vis-à-vis third parties, if the transfer:

a)  was activated in the TT system prior to the commencement of the legal proceedings, or

b)  was activated in the TT the system after the initiation of the legal proceedings and was executed on the day of the proceeding's openings, provided that the accepting party proves that he was without knowledge of the proceedings openings or would have remained without knowledge upon the exercise of due diligence.

## Art. 8

### *Legitimacy and exemption*

1) The person possessing the right of disposal reported by the TT System is considered the lawful holder of the right represented in the Token in respect of the Obligor.

2) By payment, the Obligor is withdrawn from his obligation against the person who has the power of disposal as reported by the TT system, unless he knew, or should have known with due care, that he is not the lawful owner of the right.

### Art. 9

*Acquisition in Good Faith*

Those who receive Tokens in good faith, free of charge, for the purpose of acquiring the right of disposal or a restricted in rem right is to be protected in his acquisition, even if the transferring party was not entitled to the disposal over the Token unless the recipient party had been aware of the lack of right of disposal or should have been aware of such upon the exercise of due diligence.

### Art. 10

*Cancellation of Tokens*

1) If a TT Key is unaccounted for or a Token is otherwise not functional, the person who possessed the right of disposal at the time of the loss or when the Token became non-functional can apply for the Token to be cancelled in non-contentious proceedings.

2) For this purpose, the applicant must convince the court of their right of disposal and the loss of the TT Key or the non-functionality of the Token.

3) The respondent is the person obliged from the right represented in the Token.

4) The declaration that a Token is non-functional shall be published without delay in the Official Journal and at the discretion of the District Court in any other appropriate manner.

5) The applicant may also assert their right without the Token upon cancellation or demand the generation of a new Token at their own expense.

# III. Supervision of TT Service Providers

## A. General

### Art. 11

*Object and scope*

1) This chapter governs the registration and supervision of TT Service Providers with headquarters or place of residence in Liechtenstein and their rights and obligations.

2) It does not apply to the country, municipalities or municipal associations or public companies when acting as officials.

## B. Registration of TT Service Providers

### 1. Obligation and requirements of registration

### Art. 12

*Registration obligation*

1) Persons with headquarters or place of residence in Liechtenstein who wish to professionally act as TT Service Providers must apply to be entered into the TT Service Provider Register in writing (article 23) with the FMA before providing a service for the first time.

2) Token Issuers with headquarters or place of residence in Liechtenstein who issue Tokens in their own name or in the name of a client in a non-professional capacity must apply to be entered into the TT Service Provider Register in writing with the FMA before beginning their activity of Tokens in the amount of CHF 5 million or more will be issued within a period of twelve months.

3) Persons with headquarters or place of residence abroad who wish to provide TT Services using automatic teller machines in Liechtenstein must apply in writing to the FMA for entry in the TT Service Provider Register before the automatic teller machines are put into operation for the first time.[4]

---

4  Article 12(3) inserted by LGBl. 2021 no. 36.

## Art. 13

### *Registration requirements*

1) An entry in the TT Service Provider Register (article 23) requires the applicant to:

a) be capable of action;

b) be reliable (article 14);

c) be technically suitable (article 15);

d) have their headquarters or place of residence in Liechtenstein;

e) have the necessary minimum capital (article 16), where appropriate;

f) have a suitable organisational structure with defined areas of responsibility and a procedure to deal with conflicts of interest;

g) have written internal proceedings and control mechanisms that are appropriate in terms of the type, scope, complexity and risks of the TT Services provided, including ensuring sufficient documentation of these mechanisms;

e) have special internal control mechanisms (article 17), where appropriate;

i) have authorisation pursuant to the Trustees Act if they intend to act as a TT Protector; and

k) if they intend to conduct activity that is subject to an additional authorisation obligation in accordance with a law pursuant to article 5(1) of the Financial Market Supervision Act, for which the corresponding authorisation is available.

1a) (1) letters e to i do not apply to TT Agents.[5]

2) The government may rewrite the registration requirements in (1) subject to articles 14 to 17 in more detail by issuing an ordinance.

## Art. 14

### *Reliability*

1) A natural person is excluded from rendering a TT Service if:

a) they have not been convicted by a court for defrauding of creditors, detriment to third-party creditors, favouring of a creditor, or grossly negligent interference with creditor interests (§§ 156 to 159 of the

---

5  Article 13(1a) inserted by LGBl. 2021 no. 36.

Criminal Code, StGB), or have been sentenced for any other act to imprisonment of more than three years or a monetary penalty of more than 180 daily rates and the conviction has not been expunged; and[6]

b)  they have not been convicted in the ten years prior to their application due to severe or repeated violations of the provisions of the Law on Unfair Competition, the Consumer Protection Act or a law pursuant to article 5(1) of the Financial Market Supervision Act;

c)  they have been subject to a futile seizure in the five years prior to application;

d)  bankruptcy proceedings were opened in respect of them in the five years prior to application or an application to open insolvency proceedings was rejected due to insufficient assets to cover the cost; or[7]

e)  there is another reason which creates serious doubt concerning their reliability.

2) (1) letters a to d also applies for foreign decisions and proceedings if the underlying action is also a criminal offence pursuant to Liechtenstein law.

3) For legal persons, the requirements under (1) must be met by members of their bodies and shareholders, partners or holders who hold a qualified investment of 10 % or more in a legal person.

4) Upon request, the FMA may allow for exclusion under (1) and (2) if committing the same or similar offence when rendering the TT Service is not to be expected in consideration of the nature of the criminal offence and the personality of the person sentenced.

Art. 15

*Technical suitability*

Those who are sufficiently technically qualified due to their education or prior career for the task in question shall be considered technically suitable.

---

6  Article 14(1) letter a amended by LGBl. 2020 no. 414.
7  Article 14(1) letter d amended by LGBl. 2020 no. 414.

Art. 16

*Minimum capital*

1) Applicants who intend to act as TT Service Providers pursuant to article 2(1) letters l, n, o, p and r must have the appropriate minimum capital or a guarantee of the same value before starting their activity. Minimum capital is:

a)  for Token Issuers pursuant to article 12(1):

   1.  50,000 Francs to the extent that Tokens with a total value of up to and including 5 million Francs are issued during one calendar year;

   2.  100,000 Francs, if Tokens with a total value of more than 5 million Francs up to and including 25 million Francs are issued within a period of twelve months;

   3.  250,000 Francs to the extent that Tokens with a total value of more than 25 million Francs are issued during one calendar year;

b)  for TT Key Depositories: 100,000 Francs;

c)  for TT Token Depositories: 100,000 Francs;

d)  for TT Exchange Service Providers:

   1.  30,000 Francs, if transactions with a total value of more than 150,000 Francs up to and including 1 million Francs are carried out within a period of twelve months;

   2.  100,000 Francs, if transactions with a total value of more than 1 million Francs are carried out within a period of twelve months;

e)  for Physical Validators:

   1.  125,000 Francs if the value of the property, the contractual enforcements of which are guaranteed by the Physical Validator, does not exceed 10 million Francs;

   2.  250,000 Francs if the value of the property, the contractual enforcements of which are guaranteed by the Physical Validator, exceeds 10 million Francs.

2) The minimum capital requirements under (1) must be adhered to at all times.

3) Applicants who intend to provide multiple TT Services shall meet the highest minimum capital requirement under (1).

Art. 17

*Special internal control mechanisms*

1) Applicants who intend to act as TT Service Providers pursuant to article 2(1) letters k to t must have suitable internal control mechanisms before starting their activity which ensure the following:

a)  for Token Issuers:

1.  disclosure of basic information (articles 30 to 38) at any time during Token Issuance and for at least ten years afterwards;

2.  the prevention of abuse with regard to the option of Token recipients waiving basic information (article 31(1)(a));

3.  the execution of Token Issuance according to the conditions of the basic information;

4.  the maintenance of the provided services in the event of interruptions during the Token Issuance (business continuity management);

b)  for Token Generators, the use of suitable measures which ensure that:

1.  the right in the Token is correctly represented during the Token's lifetime;

2.  that the disposal over a Token directly results in the disposal over the represented right;

3.  a competing disposal over the represented right are excluded both under the rules of the TT system and the provisions of applicable law.

c)  for TT Key Depositories:

1.  establishing suitable security measures which in particular prevent the loss or abuse of TT Keys;

2.  the separate safekeeping of customers' TT Keys from the business assets of the TT Key Depositary; and

3.  the maintenance of the services in the event of interruptions (business continuity management);

d)  for TT Token Depositories:

1.  establishing suitable security measures which in particular prevent the loss or abuse of TT Keys;

2.  the separate safekeeping of customers' Tokens from the business assets of the TT Token Depositary; and

3. the clear assignment of Tokens to customers;

4. the execution of customers' orders in line with contracts;

5. the maintenance of the services in the event of interruptions (business continuity management);

e) for Physical Validators, their liability in the event that rights to property guaranteed by the Physical Validator cannot be enforced in accordance with the contract;

f) for TT Protectors:

1. establishing suitable security measures which in particular prevent the loss or abuse of TT Keys;

2 the separate safekeeping of customers' Tokens and business assets of the TT Protector; and

3. the clear assignment of Tokens to customers;

4. the execution of customers' orders in line with contracts;

5. the maintenance of the services in the event of interruptions (business continuity management);

g) for TT Exchange Service Providers:

1. the disclosure of comparable market prices of the traded Tokens;

2. the disclosure of the purchase and sale prices of the traded Tokens;

h) for TT Verifying Authorities, the use of suitable measures which ensure that the verification services it offers are rendered reliably;

i) for TT Price Service Providers:

1. the transparency of the published prices;

2. the avoidance of conflicts of interest when setting prices;

3. the disclosure of information to affected users regarding transactions concerning related parties.

k) for TT Identity Service Providers:

1. the use of suitable measures that allow for the identity of the person possessing the right of disposal to be established; in doing so, it must be ensured that:

aa) for natural persons or representatives of legal person present in person, their identity is determined based on official photo identification or by other evidence that has been or is to be document which is just as reliable; for representatives of legal persons, it must moreover be ensured that the necessary power of representation has been determined;

bb) for natural persons or legal persons not present in person, other identification methods are to be applied that allow for identification equivalent to under letter aa) to be determined;

2. the specific assignment of TT Identifiers to the lawful holder;

3. the secure storage of customer data.

2) The obligations arising from the internal control mechanisms under (1) must always be complied with.

## 2. Registration procedure

### Art. 18

#### *Registration application*

1) The registration application pursuant to article 12 must include the following information and documents:

a) name or company and address of the applicant;

b) information about the intended TT Service;

c) information about the TT Systems to be used during the planned TT Service;

d) information about the legal nature of the applicant, in the event that the applicant is a legal entity;

e) evidence that the requirements pursuant to articles 13 to 17 have been met;

f) further information and documents at the request of the FMA if necessary to assess the registration application.

2) The registration application and the information and documents under (1) may be submitted in electronic form to the FMA. The FMA may demand certificates to be submitted in the original, or be notarised or apostilled.

3) Changes in the information and facts under (1) must be reported to the FMA without delay. This notification to the FMA must be made prior to any public announcement.

4) The FMA may waive the submission of certain information and documents under (1) if it already has access to them, in particular because:

13

a)  the applicant already has authorisation according to the Financial Market Supervision Act;

b)  the applicant is already registered to render another TT Service than the one he is applying for; or

c)  the application has already been registered for the same TT Service.

5) The government shall regulate the registration application in more detail, in particular the evidence under (1)(e) by means of an ordinance.

### Art. 19

*Entry into the TT Service Provider Register*

1) Based on the complete application and the information or documents submitted, the FMA must verify whether the registration requirements have been met.

2) The FMA must decide on the full application within three months.

3) If all registration requirements have been met, the FMA must enter the applicant into the TT Service Provider Register (article 23) and inform the applicant of the entry by sending an excerpt from the TT Service Provider Register. The FMA may carry out registration subject to conditions and obligations; the conditions and obligations must be available.

4) If the registration requirements are not met, the FMA must establish this within the period specified in (2), notwithstanding a procedure according to article 46 and prohibit the exercise of the TT Service in question.

5) The TT Service applied for may only be exercised for the first time after having been entered into the TT Service Provider Register.

## 3. Expiration and removal

### Art. 20

*Expiration of Registration*

1) Registration in accordance with article 19 will expire if:

a)  the business has not commenced within a year;

b)  the business activity was not carried out for more than one year;

14

TVTG                                                                    **950.6**

c)   the registration is waived in writing;

d)   bankruptcy proceedings have been opened in respect of the TT Service Provider with legal effect or an application to open insolvency proceedings was rejected due to insufficient assets to cover the cost; or[8]

e)   the TT Service Provider's company has been deleted from the Commercial Register.

2) In justified circumstances the FMA may, upon application, extend the time-limits pursuant to (1) letters a and b.

3) The revocation of a registration must be communicated in writing to the TT Service Provider in question. After becoming legally effective the revocation must be published in the Official Journal at the expense of the TT Service Provider and must be noted in the TT Service Provider Register in accordance with article 23.

Art. 21

*Removal of the registration*

The FMA must remove a registration pursuant to article 19 if:

a)   the registration requirements are no longer met;

b)   the FMA was not aware of significant circumstances during registration;

c)   the registration as a TT Service Provider expired due to false information or for other reasons;

d)   a TT Service Provider systematically or seriously violates its legal obligations; or

e)   a TT Service Provider does not comply with the FMA's requests to restore the lawful status in accordance with (2).

2) The FMA requests the affected TT Service Provider to restore the legal status in the cases according to (1) letters a and b, setting a time-limit of at least four weeks. If the request cannot be sent to the TT Service Provider due to a lack of delivery address or a lack of legal bodies, the invitation will be published once in the Official Journal.

3) The revocation of a registration must be communicated in writing to the TT Service Provider in question. After becoming legally effective, the revocation must be published in the Official Journal at the expense of

---

8   Article 20(1) letter d amended by LGBl. 2020 no. 414.

the TT Service Provider and must be noted in the TT Service Provider Register in accordance with (23).

### Art. 22

*Effect of the expiration and removal of the registration*

1) With the expiration or removal of the registration pursuant to articles 20 and 21, the TT Service Provider must cease activity immediately.

2) The TT Service Provider must take the necessary precautions to ensure the interests of its clients are not impaired by the discontinuation of activities, and further, inform the FMA of these precautions immediately by providing a relevant description of the same.

3) If the FMA recognises that the precautions are insufficient, it must monitor implementation, and if necessary, commission an audit office to monitor implementation. The associated costs will be borne by the affected TT Service Provider.

### 4. TT Service Provider Register

### Art. 23

*Maintenance of the TT Service Provider Register*

1) The FMA must maintain a publicly accessible register in which the following information must be entered:
a)  the TT Service Providers registered in Liechtenstein, citing the date of registration;
b)  the scope of the registered TT Services pursuant to article 12 including any possible requirements with the date of the entry of the TT Service in question;
c)  the expiration or removal of the registration pursuant to articles 20 and 21.

2 The FMA must verify entries under (1) based on a notification pursuant to article 18(3) and update them immediately if necessary.

3) The FMA must make the TT Service Provider Register available free of charge on its website. In addition, the FMA must grant any person access to the TT Service Provider Register at its physical office location, so long as technically feasible.

### 5. Exercising of business activity

#### Art. 24

*Designation Protection*

1) Designations that indicate activity as a TT Service Provider, may only be used in the company, in the designation of the business purpose and in the company's advertising, by registered TT Service Providers.

2) The government can regulate the details of the designation protection by means of an ordinance.

#### Art. 25

*Safeguarding Requirements*

1) Tokens held on a fiduciary basis or in the name of the customer shall be deemed third-party assets in proceedings to secure rights or in the case of compulsory execution and insolvency proceedings of the TT Service Provider and shall be segregated in favour of the customer, subject to all claims of the TT Service Provider against the customer. The Tokens must be protected against claims of the TT Service Provider's other creditors, particularly in the event of bankruptcy proceedings, in the interest of the users. Tokens must be stored separately from the TT Service Provider's assets at all times.[9]

2) TT Keys which a TT Service Provider holds or keeps in safe custody for a customer in its own name or in the name of a third party shall be deemed third-party assets in proceedings to secure rights or in the case of compulsory execution and insolvency proceedings of the TT Service Provider and shall be segregated in favour of the customer, subject to all claims of the TT Service Provider against the customer. The TT Keys must be protected against claims of the TT Service Provider's other creditors, particularly in the event of bankruptcy proceedings, in the interest of the users.[10]

3) Upon request, during ongoing business operations, a TT Service Provider must present proof to the FMA showing that he has taken sufficient measures to comply with the requirements specified in (1). If the evidence is not provided or if the measures are insufficient, the FMA shall request that TT Service Provider furnish the necessary evidence or

---

9  Article 25(1) amended by LGBl. 2020 no. 414.
10  Article 25(2) amended by LGBl. 2020 no. 414.

take suitable and necessary precautions to remedy the existing defects. This must be carried out in accordance with an appropriate deadline set by the FMA. If the supporting documents are not submitted or precautions are not taken at all, or within the time frame stipulated by the FMA, the FMA may take further measures, in particular, those set out in article 43(5).

4) In the event of execution against the user's TT Service Provider, the user may raise an objection under public law (article 20 of the Execution Act) if the execution relates to the Tokens secured in accordance with (1) or the TT Keys secured in accordance with (2). Under the same conditions, in the event of bankruptcy proceedings in respect of the assets of the TT Service Provider, the user has the right to segregation (article 41 of the Insolvency Act).[11]

### Art. 26

#### *Storage of Records and Supporting Documents*

1) TT Service Providers must keep relevant records and supporting documents for supervisory purposes for at least ten years.

2) More specific legal obligations remain unaffected.

### Art. 27

#### *Outsourcing Functions*

1) The outsourcing of important operational functions is permitted if:

a)  the quality of the internal control of the TT Service Provider is not significantly impacted;

b)  the obligations of the TT Service Provider remain unchanged according to this Act; and

c)  the registration requirements according to this Act are not undermined.

2) In this context, an operational function is particularly important if it, only partially fulfilled or neglected, would significantly affect the TT Service Provider's ongoing compliance with its obligations under this Act or its financial performance.

---

11 Article 25(4) amended by LGBl. 2020 no. 414.

**950.6**

3) A TT Service Provider outsourcing functions must take adequate precautions to ensure that the requirements of this Act are met.

4) Special statutory regulations on the outsourcing of functions remain reserved.

## Art. 28

### *Reporting obligations*

1) TT Service Providers must inform the FMA immediately of:

a) all changes with regard to the registration requirements;

b) the cessation of business activities;

c) the removal of the TT Service Provider from the Commercial Register;

d) the existence of another reason for cancellation pursuant to article 20.

2) TT Service Providers must inform the FMA of all information about its business activity required to exercise supervision.

3) The government shall regulate reporting obligations, in particular the frequency and content of the notifications under (2) in more detail by means of an ordinance.

## Art. 29

### *Publication obligations*

TT Service Providers must publish the following in a way that can be accessed by the public at any time:

a) information about the TT Systems it uses;

b) a declaration on the suitability of the TT Systems it uses for the application purposes in question; and

c) information about any possible change in a TT System, including a relevant justification.

### 6. Basic information for Token Issuance

#### Art. 30

*Obligation to compile and publish basic information and to display the Token Issuance*

Subject to (31), before issuing Tokens Token Issuers must:

a)  prepare basic information according to the following provisions;

b)  publish the basic information in an easily accessible way; and

c)  report the Token Issuance to the FMA.

#### Art. 31

*Exceptions*

1) The obligations pursuant to article 30(a) and (b) shall not apply for public offerings of Tokens if:

a)  all recipient parties demonstrably declare that they waive the basic information before acquiring the Token;

b)  the offer is geared towards fewer than 150 users;

c)  the sale price of the total issue does not exceed 5 million Francs or the corresponding equivalent in another currency; or

d)  there is already an obligation to publish qualified information about the public offering of Tokens according to other laws.

2) No additional basic information needs to be published for any later public resale of Tokens if:

a)  the basic information pursuant to article 30 has already been published; and

b)  the issuer or the person responsible for preparing the basic information has approved its use in a written agreement.

#### Art. 32

*Form and language of the basic information*

1) Basic information must be prepared and published in a way that is easy to analyse and understand.

TVTG                                                                950.6

2) Basic information can be prepared and published in one or several documents.

3) If basic information consists of several documents, then the Token Issuer must prepare and publish a brief, easily understandable summary with information about the Token Issuer and the Tokens to be issued.

4) Basic information must be prepared and published in German or English.

Art. 33

*Content of the basic information*

1) Basic information must in particular include the following:

a)  information about the Tokens to be issued and associated rights;

b)  the name of the TT system used;

c)  a description of the purpose and nature of the legal transaction underlying the Token Issuance;

d)  a description of the purchase and transfer conditions for the Tokens;

e)  information about the risks associated with purchasing the Tokens;

f)  for the issuance of Tokens, the rights to property represent:

1.  evidence of a registered Physical Validator regarding ownership of the property; and

2.  a confirmation from a registered Physical Validator, that the rights registered in the issued Tokens are also enforceable in line with the basic information.

2) The basic information, moreover, includes a summary, which contains brief and generally understandable essential information in the language, in which the basic information was originally prepared. The summary must also include warnings that:

a)  it is to be understood as an overview of the subsequent basic information;

b)  the recipient party must read all of the basic information before purchasing; and

c)  persons who have assumed responsibility for the summary, including its translation, or who prepare the summary or translation can only however be made liable in the event that the summary is misleading, incorrect or inconsistent if read together with other parts of the basic information.

21

3) The basic information must include the names and roles (and, for legal persons, the company and headquarters) of those who are responsible for the content. The basic information must include a declaration by these persons that the information is correct to the best of their knowledge and that no significant information has been left out.

4) The basic information must also include the names and roles (and, for legal persons, the company and headquarters) of those who are responsible for the technical and legal functionality of the Token.

5) The Token Issuer must put an issuance date on the basic information and ensure it cannot be amended through suitable measures.

6) The government may regulate the content of the basic information in more detail by means of an ordinance.

### Art. 34

#### *Addendum to the basic information*

1) Every new material fact or every material error or inaccuracy with regard to the basic information that is determined after the basic information is first published must be named in an addendum to the basic information.

2) In addition, the summary and any translations of the summary must be supplemented by the information included in the addendum.

3) The government may regulate the addendum to the basic information in more detail by means of an ordinance.

### Art. 35

#### *Liability*

1) If any facts in the basic information that is to be prepared according to this Act are incorrect or incomplete, or if the basic information in accordance with these provisions was not prepared, the persons responsible under articles 33(3) and (4) shall be liable to every user for damages that arise as a result, provided they do not demonstrate that they took the due care of a prudent businessman when preparing the basic information. Only damage directly suffered is considered to be damage, not also loss of profit.

2) The persons named in (1) shall also be liable for their vicarious agents and for the persons they employ, provided they do not demonstrate that the took the due care according to the circumstances in their selection, instruction and supervision.

3) Liability under (1) and (2) can be neither be excluded nor restricted in advance to the detriment of users in the event of intent or gross negligence.

4) Liability shall only be borne for information in the summary including its translations if they are misleading, incorrect or inconsistent in connection with other parts of the basic information or do not convey all material information. The summary must include a clear warning in this respect.

## Art. 36

### *Severability*

If several persons are liable to pay compensation for a damage, each of them shall be held jointly and severally liable with the others so long as the damage is personally attributable to their own negligence and circumstances.

## Art. 37

### *Jurisdiction*

The Court of Justice shall have jurisdiction for claims of the transferee of Token regarding the legal relationship with the Token Issuer with headquarters within the country.

## Art. 38

### *Statute of limitations*

Any claim for damages against the persons who are responsible in accordance with the above provisions will be barred by the statute of limitations one year from the date on which the cause of action accrues, the cause of action accruing on the date the injured party is both aware of the damage and the identity of the party liable for the damage, expiring regardless, ten years from the date of the harmful act.

## C. Supervision

### Art. 39

*Jurisdiction*

The Financial Markets Authority (FMA) is responsible for the supervision of TT Service Providers and the execution of the associated statutory provisions.

### Art. 40

*Official secrecy*

1) The FMA, any other persons consulted by these authorities and bodies and all representatives of public authorities shall be subject to official secrecy without any time limits with respect to the confidential information that they gain knowledge of in the course of their official activities.

2) Confidential information within the scope (1) may be transmitted in accordance with this Act or special statutory provisions.

3) If bankruptcy proceedings have been opened or liquidation proceedings have been initiated in respect of a TT Service Provider by the decision of a court, confidential information which does not relate to third parties may be disclosed in civil law proceedings, provided this is necessary for the proceedings concerned.[12]

4) Without prejudice to cases covered by the requirements of criminal law, the FMA, all other administrative authorities, courts and bodies, natural persons or legal entities may only use confidential information that they receive in accordance with this Act only for purposes of fulfilling their responsibilities and tasks within the scope of this Act or for purposes for which the information was given, and/or in the case of administrative and judicial proceedings that specifically relate to the fulfilment of these tasks, provided this is required to do so. If the FMA, another administrative authority, court, body, or a person transmitting information, gives its consent; then the authority receiving the information may use it for other financial market supervision purposes.

---

12 Article 40(3) amended by LGBl. 2020 no. 414.

### Art. 41

*Cooperation Between National Authorities and Agencies*

The FMA works with other competent national authorities and agencies provided this is required to fulfil its duties under this Act.

### Art. 42

*Processing and transferring personal data*

1) The FMA and other competent national authorities and agencies may process personal data, including personal data regarding criminal sentences and offences of the persons subject to this Act, or have such processed, if this is necessary in order to fulfil its duties under this Act.

2) They may send personal data to each other or other competent authorities in other EEC member states if this is necessary in order to fulfil its duties under this Act.

3) They may send personal data to the competent authorities of third-party states if the data protection requirements under chapter V of Regulation (EU) 2016/679 have been met in addition to the requirements under (2).

### Art. 43

*FMA duties and authorisations*

1) In the course of its supervision, the FMA monitors compliance with the provisions of this Act and its associated ordinances.

2) The FMA is responsible for the following duties in particular:

a) registering TT Service Providers and the removal of registrations;

b) issuing information about the application of this Act or another Act listed in article 5(1) FMAG (Financial Markets Supervision Act) for clearly determined facts in connection with Trustworthy Technology;

c) maintaining the TT Service Provider Register in accordance with article 23;

d) the prosecution of contraventions in accordance with article 47(2).

3) The FMA has all necessary authority to perform its duties and may, in particular:

**950.6**

a) require TT Service Providers to provide all information and documents required for the execution of this Act;

b) order or carry out extraordinary audits;

c) make decisions and ordinances;

d) issue legally binding decisions and rulings;

e) carry out on-site inspections of TT Service Providers; and

f) correct false information that has been published by naming the TT Service Provider involve and issue warnings;

g) temporarily prohibit the exercising of a TT Service.

4) If the FMA becomes aware of violations of this Act or of other deficits, it shall take the measures necessary to bring about a lawful state of affairs and to eliminate the deficits.

5) The FMA may assign an expert as its observer to a TT Service Provider if the interests of users or creditors appear to be acutely endangered by mismanagement. The external audit office appointed may be entrusted with this responsibility. The observer shall monitor the activities of the governing bodies, in particular the implementation of the measures ordered, and shall report to the FMA on an ongoing basis. The observer shall enjoy the unrestricted right to inspect the business activities and the books and files of the TT Service Provider. The cost of the supervisor must be borne by the TT Service Provider, insofar as a reasonable relationship exists between the work associated with the activity and its expenses.

6) If there is reason to assume that a person is rendering TT Services without authorisation pursuant to this Act, the FMA may demand information and documents from the person concerned if this person is a subordinate person. In urgent cases, the FMA may order the immediate cessation of the activity without prior warning and without imposing a deadline.

7) The costs incurred due to misconduct shall be borne by those responsible in accordance with article 26 of the Financial Market Supervision Act.

8) The government may regulate the details of the tasks and powers of the FMA by means of an ordinance.

## Art. 44

*Supervision taxes and fees*

The Supervision taxes and fees are based on the Financial Market Supervision Act.

# D. Proceedings and Legal Remedies

## Art. 45

*Proceedings*

To the extent not otherwise specified in this Act, the provisions of the National Administration Act (LVG) shall apply to proceedings.

## Art. 46

*Legal remedy*

1) Decisions and decrees of the FMA may be appealed within 14 days of service to the FMA Complaints Commission.

2) Decisions and decrees of the FMA Complaints Commission may be appealed within 14 days of service to the Administrative Court.

# E. Penal Provisions

## Art. 47

*Offences and infractions*

1) The following persons shall be penalised by the District Court for offences with up to one year imprisonment or a fine of up to 360 daily rates:

a) those who render TT Services requiring registration contrary to article 12;

b) those who use a designation contrary to article 24 which suggests activity as a TT Service Provider;

c)  those whose registration as a TT Service Provider expired due to false information or other illegal matters; or

d)  those who systematically violate their legal obligations in a serious manner as a TT Service Provider.

2) If the action does not constitute a criminal offence within the jurisdiction of the courts, TT Service Providers shall be fined by the FMA by up to 100,000 Francs due to an infraction, if:

a)  they do not comply with the minimum capital requirements under article 16;

b) they do not have the internal control mechanisms listed in (17);

c)  they violate the reporting obligations under article 18(3) and article 28;

d)  they do not comply with the FMA requirements and conditions associated with registration pursuant to article 19(3);

a)  they violate the security obligations pursuant to article 25;

f)  they do not keep records, or keep insufficient records or do not store supporting documents contrary to article 26;

g)  they outsource important operational functions without meeting the requirements pursuant to article 27;

a)  they violate they publication obligations pursuant to article 29;

i) they violate their obligations in connection with the preparation and publication of basic information or the display of the Token Issuance pursuant to (30) ff.;

i)  they fail to comply with a decree or order issued to them by the FMA with reference to the threat of punishment under this article.

3) The FMA must impose fines against legal persons if the infractions under (2) are committed in execution of the course of business of legal persons (offences) by persons who have either acted alone or as a member of the Administrative Board, Management Board or Supervisory Board of the legal person or another management position within the legal person, based on which they:

a)  are authorised to outwardly represent the legal person;

b)  exercise supervisory powers in a management position; or

c)  otherwise exercise significant influence over the management of the legal person.

4) For infractions under (2) committed by the employees of the legal person, even if not culpably, the legal person is also responsible if the infraction is enabled or significantly facilitated as a result of the persons named in (3) failing to take the necessary and appropriate measures to prevent such offences.

5) The responsibility of the legal person for the offence and the punishability of the persons named in (3) or the employees named in (4) due to the same offence are not mutually exclusive. The FMA may refrain from pursuing a natural person if a fine has already been imposed on a legal person for the same violation and there are no other circumstances that oppose refraining from pursuing the natural person.

6) In the event of negligent conduct, the upper penalty limits in (1) and (2) above shall be halved.

## Art. 48

### *Responsibility*

Where violations are committed in the business operations of a legal person, the penal provisions shall apply to the members of management and other natural persons who acted or should have acted on its behalf. With all persons, including the legal entity, shall, however, be jointly and severally liable for monetary penalties, fines and costs.

## Art. 49

### *Announcing sanctions; binding effect of convictions*

1) The FMA may announce the imposition of lawful punishments at the expense of the party concerned if this fulfils the purpose of this Act and is proportionate.

2) A conviction under this Act shall not be binding for the civil court judge with regard to the assessment of guilt, unlawfulness and determination of damage.

# IV. Transitional and final provisions

### Art. 50

*Transitional provisions*

1) Persons who render a TT Service requiring registration pursuant to article 12 at the time that this Act comes into force undertake:

(a) to carry out their business in accordance with (25) to (38) in doing so, they may continue to use previous designations according to (24) until the expiry of the period according to letter b without registration; and

b) to apply for the entry into the TT Service Provider Register to the FMA within a period of twelve months after this Act comes into force; otherwise, the right to render TT Services under this Act shall expire.

2) The provisions regarding the basis for Tokens under civil law according to chapter II may also be applied by the parties for Tokens that were generated before this Act came into force according to article 3(2)(b).

3) The provisions on the basic information for Token Issuance according to articles 30 to 28 shall apply to Tokens that are publicly offered for the first time after this Act comes into force.

### Art. 51

*Entry into force*

Provided that the referendum deadline expires unutilised this Act shall enter into force on 01 January 2020, otherwise on the day after the announcement.


Representing the Reigning Prince:
signed *Alois*
Hereditary Prince


                                signed *Adrian Hasler*
                                Prime Minister

950.6

# Transitional provisions

950.6    **Law on Tokens and TT Service Providers
(Token and TT Service Provider Act; TVTG)**

# Liechtenstein Legal Gazette

2021                        No. 36              published on 26 January 2021

## Law
### of 3 December 2020
## amending the
## Token and TT Service Provider Act

. . .

## II.

### Transitional provision

Persons who at the time of entry into force[13] of this Act exercise an activity as a TT Agent subject to registration pursuant to article 12 must apply in writing to the FMA for entry in the TT Service Provider Register within a period of six months after entry into force of this Act; otherwise, the right to render TT Services as a TT Agent shall expire.

. . .

---

13 Entry into force: 1 April 2021.

# Exhibit 3

Case 2:23-cv-00580-RSM   Document 38-1   Filed 06/30/23   Page 47 of 123

## Speech

---

# Digital Asset Transactions: When Howey Met Gary (Plastic)



**William Hinman**
*Director, Division of Corporation Finance*

**San Francisco, CA**

**June 14, 2018**

## Remarks at the Yahoo Finance All Markets Summit: Crypto

Thank you Andy. I am pleased to be here today.[1] This event provides a great opportunity to address a topic that is the subject of considerable debate in the press and in the crypto-community – whether a digital asset offered as a security can, over time, become something other than a security.[2]

To start, we should frame the question differently and focus not on the digital asset itself, but on the circumstances surrounding the digital asset and the manner in which it is sold. To that end, a better line of inquiry is: "Can a digital asset that was originally offered in a securities offering ever be later sold in a manner that does not constitute an offering of a security?" In cases where the digital asset represents a set of rights that gives the holder a financial interest in an enterprise, the answer is likely "no." In these cases, calling the transaction an initial coin offering, or "ICO," or a sale of a "token," will not take it out of the purview of the U.S. securities laws.

But what about cases where there is no longer any central enterprise being invested in or where the digital asset is sold only to be used to purchase a good or service available through the network on which it was created? I believe in these cases the answer is a qualified "yes." I would like to share my thinking with you today about the circumstances under which that could occur.

Before I turn to the securities law analysis, let me share what I believe may be most exciting about distributed ledger technology – that is, the potential to share information, transfer value, and record transactions in a decentralized digital environment. Potential applications include supply chain management, intellectual property rights licensing, stock ownership transfers and countless others. There is real value in creating applications that can be accessed and executed electronically with a public, immutable record and without the need for a trusted third party to verify transactions. Some people believe that this technology will transform e-commerce as we know it. There is excitement and a great deal of speculative interest around this new technology. Unfortunately, there also are cases of fraud. In many regards, it is still "early days."

But I am not here to discuss the promise of technology – there are many in attendance and speaking here today that can do a much better job of that. I would like to focus on the application of the federal securities laws to digital asset transactions – that is how tokens and coins are being issued, distributed and sold. While perhaps a bit dryer

Case 2:23-cv-00580-RSM Document 38-1 Filed 06/30/23 Page 48 of 123

than the promise of the blockchain, this topic is critical to the broader acceptance and use of these novel instruments.

I will begin by describing what I often see. Promoters,[3] in order to raise money to develop networks on which digital assets will operate, often sell the tokens or coins rather than sell shares, issue notes or obtain bank financing. But, in many cases, the economic substance is the same as a conventional securities offering. Funds are raised with the expectation that the promoters will build their system and investors can earn a return on the instrument – usually by selling their tokens in the secondary market once the promoters create something of value with the proceeds and the value of the digital enterprise increases.

When we see that kind of economic transaction, it is easy to apply the Supreme Court's "investment contract" test first announced in *SEC v. Howey*.[4] That test requires an investment of money in a common enterprise with an expectation of profit derived from the efforts of others. And it is important to reflect on the facts of *Howey*. A hotel operator sold interests in a citrus grove to its guests and claimed it was selling real estate, not securities. While the transaction was recorded as a real estate sale, it also included a service contract to cultivate and harvest the oranges. The purchasers could have arranged to service the grove themselves but, in fact, most were passive, relying on the efforts of Howey-in-the-Hills Service, Inc. for a return. In articulating the test for an investment contract, the Supreme Court stressed: "Form [is] disregarded for substance and the emphasis [is] placed upon economic reality."[5] So the purported real estate purchase was found to be an investment contract – an investment in orange groves was in these circumstances an investment in a security.

Just as in the *Howey* case, tokens and coins are often touted as assets that have a use in their own right, coupled with a promise that the assets will be cultivated in a way that will cause them to grow in value, to be sold later at a profit. And, as in *Howey* – where interests in the groves were sold to hotel guests, not farmers – tokens and coins typically are sold to a wide audience rather than to persons who are likely to use them on the network.

In the ICOs I have seen, overwhelmingly, promoters tout their ability to create an innovative application of blockchain technology. Like in *Howey*, the investors are passive. Marketing efforts are rarely narrowly targeted to token users. And typically at the outset, the business model and very viability of the application is still uncertain. The purchaser usually has no choice but to rely on the efforts of the promoter to build the network and make the enterprise a success. At that stage, the purchase of a token looks a lot like a bet on the success of the enterprise and not the purchase of something used to exchange for goods or services on the network.

As an aside, you might ask, given that these token sales often look like securities offerings, why are the promoters choosing to package the investment as a coin or token offering? This is an especially good question if the network on which the token or coin will function is not yet operational. I think there can be a number of reasons. For a while, some believed such labeling might, by itself, remove the transaction from the securities laws. I think people now realize labeling an investment opportunity as a coin or token does not achieve that result. Second, this labeling might have been used to bring some marketing "sizzle" to the enterprise. That might still work to some extent, but the track record of ICOs is still being sorted out and some of that sizzle may now be more of a potential warning flare for investors.

Some may be attracted to a blockchain-mediated crowdfunding process. Digital assets can represent an efficient way to reach a global audience where initial purchasers have a stake in the success of the network and become part of a network where their participation adds value beyond their investment contributions. The digital assets are then exchanged – for some, to help find the market price for the new application; for others, to speculate on the venture. As I will discuss, whether a transaction in a coin or token on the secondary market amounts to an offer or sale of a security requires a careful and fact-sensitive legal analysis.

I believe some industry participants are beginning to realize that, in some circumstances, it might be easier to start a blockchain-based enterprise in a more conventional way. In other words, conduct the initial funding through a registered or exempt equity or debt offering and, once the network is up and running, distribute or offer blockchain-based tokens or coins to participants who need the functionality the network and the digital assets offer. This

SEC.gov | Digital Asset Transactions: When Howey Met Gary (Plastic)

allows the tokens or coins to be structured and offered in a way where it is evident that purchasers are not making an investment in the development of the enterprise.

Returning to the ICOs I am seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in *Howey* were not. Central to determining whether a security is being sold is how it is being sold and the reasonable expectations of purchasers. When someone buys a housing unit to live in, it is probably not a security.[6] But under certain circumstances, the same asset can be offered and sold in a way that causes investors to have a reasonable expectation of profits based on the efforts of others. For example, if the housing unit is offered with a management contract or other services, it can be a security.[7] Similarly, when a CD, exempt from being treated as a security under Section 3 of the Securities Act, is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and the potential to profit from changes in interest rates, the *Gary Plastic* case teaches us that the instrument can be part of an investment contract that is a security.[8]

The same reasoning applies to digital assets. The digital asset itself is simply code. But the way it is sold – as part of an investment; to non-users; by promoters to develop the enterprise – can be, and, in that context, most often is, a security – because it evidences an investment contract. And regulating these transactions as securities transactions makes sense. The impetus of the Securities Act is to remove the information asymmetry between promoters and investors. In a public distribution, the Securities Act prescribes the information investors need to make an informed investment decision, and the promoter is liable for material misstatements in the offering materials. These are important safeguards, and they are appropriate for most ICOs. The disclosures required under the federal securities laws nicely complement the *Howey* investment contract element about the efforts of others. As an investor, the success of the enterprise – and the ability to realize a profit on the investment – turns on the efforts of the third party. So learning material information about the third party – its background, financing, plans, financial stake and so forth – is a prerequisite to making an informed investment decision. Without a regulatory framework that promotes disclosure of what the third party alone knows of these topics and the risks associated with the venture, investors will be uninformed and are at risk.

But this also points the way to when a digital asset transaction may no longer represent a security offering. If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.

And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise. The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception. Applying the disclosure regime of the federal securities laws to the offer and resale of Bitcoin would seem to add little value.[9] And putting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions. And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would seem to add little value. Over time, there may be other sufficiently decentralized networks and systems where regulating the tokens or coins that function on them as securities may not be required. And of course there will continue to be systems that rely on central actors whose efforts are a key to the success of the enterprise. In those cases, application of the securities laws protects the investors who purchase the tokens or coins.

I would like to emphasize that the analysis of whether something is a security is not static and does not strictly inhere to the instrument.[10] Even digital assets with utility that function solely as a means of exchange in a decentralized network could be packaged and sold as an investment strategy that can be a security. If a promoter were to place Bitcoin in a fund or trust and sell interests, it would create a new security. Similarly, investment

Case 2:23-cv-00580-RSM    Document 38-1    Filed 06/30/23    Page 50 of 123

contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.

Let me emphasize an earlier point: simply labeling a digital asset a "utility token" does not turn the asset into something that is not a security.[11] I recognize that the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security.[12] But, the economic substance of the transaction always determines the legal analysis, not the labels.[13] The oranges in *Howey* had utility. Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts.[14] Promoters sold the receipts to U.S. investors to finance the aging and blending processes of Scotch whisky. The whisky was real – and, for some, had exquisite utility. But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky for consumption. They were selling investments, and the purchasers were expecting a return from the promoters' efforts.

Promoters and other market participants need to understand whether transactions in a particular digital asset involve the sale of a security. We are happy to help promoters and their counsel work through these issues. We stand prepared to provide more formal interpretive or no-action guidance about the proper characterization of a digital asset in a proposed use.[15] In addition, we recognize that there are numerous implications under the federal securities laws of a particular asset being considered a security. For example, our Divisions of Trading and Markets and Investment Management are focused on such issues as broker-dealer, exchange and fund registration, as well as matters of market manipulation, custody and valuation. We understand that market participants are working to make their services compliant with the existing regulatory framework, and we are happy to continue our engagement in this process.

What are some of the factors to consider in assessing whether a digital asset is offered as an investment contract and is thus a security? Primarily, consider whether a third party – be it a person, entity or coordinated group of actors – drives the expectation of a return. That question will always depend on the particular facts and circumstances, and this list is illustrative, not exhaustive:

1. Is there a person or group that has sponsored or promoted the creation and sale of the digital asset, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?

2. Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?

3. Has the promoter raised an amount of funds in excess of what may be needed to establish a functional network, and, if so, has it indicated how those funds may be used to support the value of the tokens or to increase the value of the enterprise? Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?

4. Are purchasers "investing," that is seeking a return? In that regard, is the instrument marketed and sold to the general public instead of to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?

5. Does application of the Securities Act protections make sense? Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be important to investors? Do informational asymmetries exist between the promoters and potential purchasers/investors in the digital asset?

6. Do persons or entities other than the promoter exercise governance rights or meaningful influence?

While these factors are important in analyzing the role of any third party, there are contractual or technical ways to structure digital assets so they function more like a consumer item and less like a security. Again, we would look to the economic substance of the transaction, but promoters and their counsels should consider these, and other,

possible features. This list is not intended to be exhaustive and by no means do I believe each and every one of these factors needs to be present to establish a case that a token is not being offered as a security. This list is meant to prompt thinking by promoters and their counsel, and start the dialogue with the staff – it is not meant to be a list of all necessary factors in a legal analysis.

1. Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?

2. Are independent actors setting the price or is the promoter supporting the secondary market for the asset or otherwise influencing trading?

3. Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment? Have purchasers made representations as to their consumptive, as opposed to their investment, intent? Are the tokens available in increments that correlate with a consumptive versus investment intent?

4. Are the tokens distributed in ways to meet users' needs? For example, can the tokens be held or transferred only in amounts that correspond to a purchaser's expected use? Are there built-in incentives that compel using the tokens promptly on the network, such as having the tokens degrade in value over time, or can the tokens be held for extended periods for investment?

5. Is the asset marketed and distributed to potential users or the general public?

6. Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?

7. Is the application fully functioning or in early stages of development?

These are exciting legal times and I am pleased to be part of a process that can help promoters of this new technology and their counsel navigate and comply with the federal securities laws.

---

[1] The Securities and Exchange Commission disclaims responsibility for any private publication or statement of any SEC employee or Commissioner. This speech expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners or other members of the staff.

[2] Section 2(a)(1) of the Securities Act of 1933 (Securities Act) [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act) [15 U.S.C. § 78c(a)(10)] define "security." These definitions contain "slightly different formulations" of the term "security," but the U.S. Supreme Court has "treated [them] as essentially identical in meaning." *SEC v. Edwards*, 540 U.S. 389, 393 (2004).

[3] I am using the term "promoters" in a broad, generic sense. The important factor in the legal analysis is that there is a person or coordinated group (including "any unincorporated organization" see 5 U.S.C. § 77n(a)(4)) that is working actively to develop or guide the development of the infrastructure of the network. This person or group could be founders, sponsors, developers or "promoters" in the traditional sense. The presence of promoters in this context is important to distinguish from the circumstance where multiple, independent actors work on the network but no individual actor's or coordinated group of actors' efforts are essential efforts that affect the failure or success of the enterprise.

[4] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Depending on the features of any given instrument and the surrounding facts, it may also need to be evaluated as a possible security under the general definition of security – see footnote 2 – and the case law interpreting it.

[5] *Id*. at 298.

[6] *United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975).

[7] *Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development*, SEC Rel. No. 33-5347 (Jan. 4, 1973).

[8] *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985).

[9] Secondary trading in digital assets by regulated entities may otherwise implicate the federal securities laws, as well as the Commodity Exchange Act. In addition, as SEC Chairman Jay Clayton has stated, regulated financial entities that allow for payment in cryptocurrencies, allow customers to purchase cryptocurrencies on margin or otherwise use cryptocurrencies to facilitate securities transactions should exercise caution, including ensuring that their cryptocurrency activities are not undermining their anti-money laundering and know-your-customer obligations. *Statement on Cryptocurrencies and Initial Coin Offerings* (Dec. 11, 2017). In addition, other laws and regulations, such as IRS regulations and state money servicing laws, may be implicated.

[10] The Supreme Court's investment contract test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

[11] "[T]he name given to an instrument is not dispositive." *Forman*, 421 U.S. at 850.

[12] *Forman*, 421 U.S. at 853.

[13] *See* footnotes 10 and 11.

[14] SEC Rel. No. 33-5018 (Nov. 4, 1969); *Investment in Interests in Whisky*, SEC Rel. No. 33-5451 (Jan 7, 1974).

[15] For example, some have raised questions about the offering structure commonly referred to as a Simple Agreement for Future Tokens, or "SAFT." Because the legal analysis must follow the economic realities of the particular facts of an offering, it may not be fruitful to debate a hypothetical structure in the abstract and nothing in these remarks is meant to opine on the legality or appropriateness of a SAFT. From the discussion in this speech, however, it is clear I believe a token once offered in a security offering can, depending on the circumstances, later be offered in a non-securities transaction. I expect that some, perhaps many, may not. I encourage anyone that has questions on a particular SAFT structure to consult with knowledgeable securities counsel or the staff.

# Exhibit 4

Case 2:23-cv-00580RSM | Document 38-1 | Filed 06/20/23 | Page 54 of 123

Testimony

# Testimony on "Oversight of the U.S. Securities and Exchange Commission"

Chairman Jay Clayton

**Washington D.C.**

**June 21, 2018**

**Before the**

**Committee on Financial Services**

**U.S. House of Representatives**

Chairman Hensarling, Ranking Member Waters and members of the Committee, thank you for the opportunity to testify today about the work of the U.S. Securities and Exchange Commission (SEC).[1]

With a workforce of over 4,500 staff in Washington and across our 11 regional offices, the SEC oversees, among other things (1) approximately $82 trillion in securities trading annually on U.S. equity markets; (2) the disclosures of approximately 4,300 exchange-listed public companies with an approximate aggregate market capitalization of $30 trillion; and (3) the activities of over 26,000 registered entities and self-regulatory organizations. These registered entities and registrants include, among others, investment advisers, broker-dealers, transfer agents, securities exchanges, clearing agencies, mutual funds and exchange-traded funds (ETFs), and employ over one million people in the United States.

Since arriving at the Commission, I have been working with my fellow Commissioners and the SEC's dedicated staff to pursue an agenda that advances the agency's mission—to protect investors, maintain fair, orderly and efficient markets and facilitate capital formation. As we pursue that tripartite mission, I believe we should focus on the interests of our long-term Main Street investors.[2]

My interactions with the SEC staff over the past year have demonstrated unequivocally that the women and men of the SEC place the interests of our long-term Main Street investors first. We recognize, and are motivated by, the fact that tens of millions of Americans are invested in our securities markets and have to make personal investment decisions—both direct decisions such as which stocks, bonds, mutual funds, ETFs and other securities to purchase and indirect investment decisions such as which broker-dealer or investment adviser to hire. Many Americans are also invested in our markets through pension funds and other intermediaries. Main Street investors benefit from investment opportunities, fair and efficient markets and, importantly, investor protection. In turn, we believe serving these interests furthers America's broad interests.

It is our Main Street investors, and their willingness to commit their hard-earned money to our capital markets for the long term, who have ensured that the U.S. capital markets have long been the deepest, most dynamic and most liquid in the world. Their capital provides businesses with the opportunity to grow and create jobs and supplies the capital markets with the funds that give the U.S. economy a competitive advantage. In turn, our markets have provided American Main Street investors with better investment opportunities than comparable investors in other jurisdictions. We should strive to maintain and enhance these complementary positions, including by being mindful of emerging trends and related risks.

The historic performance and strength of our markets is even more striking when viewed in comparison to world markets and world population. The U.S. population is only approximately 4.4 percent of global population, but of the world's 100 largest publicly traded companies, 53 are U.S. companies, representing 62 percent of the total market capitalization of those top 100 companies. These figures demonstrate the historic importance of our capital markets to the America economy and the American people and also demonstrate that our relative contribution to the global economy is a remarkable, long-term achievement that has been driven, to a significant extent, by our capital markets.

More significantly, at least 51 percent of U.S. households are invested directly or indirectly in our capital markets.[3] This level of retail investor participation stands out against other large industrialized countries. When I engage with my international counterparts, they make it clear that they would like to replicate our capital markets' broad retail investor participation for many reasons, including the competitive advantage it provides to our economy and how our capital markets have made a broad cross section of Americans' lives better. This level of investor participation, opportunity and protection has been a decades-long endeavor involving the SEC, other regulators and market participants and should not be taken for granted.

*Our New Strategic Plan*

The principles I have discussed—most notably the interests of our long-term Main Street investors—are integrated in our new strategic plan. With input from my fellow Commissioners, Kara Stein, Michael Piwowar, Robert Jackson, Jr. and Hester Peirce, as well as many dozens of my colleagues at the SEC, the SEC recently published a new, multi-year strategic plan that will establish a framework for the future of the agency.[4]

The plan, which is available on our website for public comment, re-affirms the SEC's tripartite mission and the values that unite us in our work, while also providing a strategic vision and path that describes where we want to be in the future and how we expect to get there. The key priorities include (1) our commitment to Main Street investors; (2) a focus on being innovative, responsive and resilient to developments and trends in the markets; and (3) using technology, data analytics and human capital to improve our performance and manage our internal resources and risks. We are looking forward to the additional insights we will gain from our various constituents as we finalize the plan in the coming months. I welcome your comments on the strategic plan.

**Fiscal Year 2018 Developments**

These principles set forth in our strategic plan are embodied in our near-term Regulatory Flexibility Act rulemaking agenda.[5] When the agenda was published, I noted that it was shorter than prior agendas and was so, principally, because it reflected what I expected us to complete during the year.[6]

Case 2:23-cv-00580-RSM    Document 39-1    Filed 06/30/23    Page 55 of 123

We have made significant progress since the Fall 2017 Agenda, and I would like to now highlight several of the SEC's accomplishments over the past months.

***Facilitating Capital Formation and Investment Opportunities***

In executing the SEC's tripartite mission, we seek to promote a market environment conducive to capital formation while ensuring that our markets are fair and resilient and our investors remain well protected. As I have noted on many occasions, facilitating capital formation, particularly with an eye toward encouraging promising emerging companies to enter our public capital markets, has been a focus for the past year. While progress has been made, I believe we can and should do more to facilitate capital formation in our public and private capital markets and, particularly, for small and emerging companies.

Fewer promising emerging companies are choosing to enter our public capital markets than in the past, and, as a result, equity investment opportunities for Main Street investors are more limited. There has been much debate about the causes and effects of this trend, but from my perspective, having a broader portfolio of quality public companies—especially those at the earlier stage of their growth cycle—ultimately will have positive results for our Main Street investors. Because it is generally difficult and expensive for Main Street investors to invest in private companies, they will not have the opportunity to participate in the growth phase of these companies to the extent they choose not to enter our public markets or do so only later in their life cycle. Additionally, it is my experience that companies that go through the SEC public registration and offering process often come out as better companies, providing net benefits to the company, investors and our capital markets.

While there is no silver bullet to counter the negative trend in the number of U.S. public companies, we will continue working to enhance capital formation opportunities without sacrificing the important investor protections our public company disclosure system has provided for over 80 years. Part of the solution, however, is to recognize that a one size regulatory structure for public companies does not fit all. The Jumpstart Our Business Startups (JOBS) Act helped create an ecosystem whereby scaling disclosure and other regulatory requirements provided incentives for companies to conduct public offerings while maintaining the world's most robust investor protection environment.

Over the past year, our Division of Corporation Finance (Corporation Finance), under the direction of Bill Hinman, has carried out several key initiatives with a particular emphasis on capital-raising opportunities, which I will highlight below. We also are working to identify the Commission's first Advocate for Small Business Capital Formation, who will provide additional leadership in helping small issuers raise capital.

*Simplifying the Public Capital-Raising Process*

Corporation Finance simplified the capital raising process for first-time registrants and newly public companies by expanding the confidential submission process, which provides for non-public review of certain securities offerings, including for initial public offerings (IPOs) and offerings within one year of an IPO, allowing newly public companies to raise capital with less exposure to market volatility, which benefits them and their investors.[7] Corporation Finance also provided greater clarity about what financial information is required when submitting draft registration statements so companies can avoid the time and expense of preparing and filing interim financial information that will be superseded by the time the filing is first made publicly available.[8] These accommodations appear to be making a positive difference for issuers; according to reports, the amount of time that it has taken for issuers to price their offerings after publicly posting their registration statement information has dropped.[9] This gives issuers more control over their offering schedules and limits their exposure to market volatility. At the same time, we continue to devote significant staff resources to reviewing filings for compliance with the rules that require companies to provide investors key financial information and other required disclosures.

Corporation Finance has also been encouraging companies and investors to approach our staff about impediments to raising capital and pursuing novel transactions. For example, there are circumstances in which the Commission's reporting rules may require publicly traded companies to file financial statements for other entities, such as a probable business acquisition. However, for some transactions this information is clearly not material to the total mix of information available to investors and is burdensome and costly to generate. Under Rule 3-13 of Regulation S-X, issuers may request and the Commission may grant modifications to their financial reporting requirements in these situations and where consistent with investor protection. Corporation Finance staff are placing a high priority on responding to these requests with timely guidance.

With regard to future Commission actions, I anticipate that the Commission will soon consider adopting final amendments to the "smaller reporting company" definition, which would expand the number of issuers eligible to provide scaled disclosures. In light of comments received during that rulemaking process, we are also taking a fresh look at the thresholds that trigger the requirement contained in Section 404(b) of the Sarbanes-Oxley Act to have an auditor provide an attestation report on internal control over financial reporting.

Corporation Finance also is exploring additional ideas to encourage more companies to enter our public equity markets. For example, the JOBS Act provided an exemption for Emerging Growth Companies (EGCs) to communicate with potential investors prior to or following the filing of a registration statement to "test the waters" for an offering, and our current near-term agenda includes a proposal to extend the "test the waters" provision to non-EGCs.

*Improving Disclosure Effectiveness*

Another important component of improving our public company regulatory regime is Corporation Finance's initiative to improve public company disclosure by reviewing our disclosure requirements and considering ways to improve the disclosure regime for the benefit of both investors and companies. I believe we should regularly review whether we have disclosure requirements that are outdated, duplicative or can otherwise be improved.

In October 2017, the Commission proposed amendments, as required by the Fix America's Surface Transportation (FAST) Act, to modernize and simplify certain disclosure requirements in Regulation S-K and related rules and forms in a manner that reduces the costs and burdens on registrants while continuing to provide all material information to investors.[10] Corporation Finance is preparing recommendations for the Commission to finalize these amendments. Further, Corporation Finance is developing recommendations for updating certain Industry Guides to modernize industry-specific disclosure requirements, specifically for mining and bank holding company issuers. Corporation Finance is also developing recommendations for final rules to update and simplify disclosure requirements that may have become outdated, overlapping or duplicative with other Commission rules or U.S. GAAP.

Corporation Finance is developing recommendations for the Commission for proposed changes to the requirements in Rules 3-05, 3-10 and 3-16 of Regulation S-X (which provides requirements for financial statements) to improve those requirements for both investors and registrants. While our disclosure requirements in Regulation S-K (which provides requirements for public company disclosure) often receive more attention, many Regulation S-X rules are more prescriptive and more costly for issuers. I anticipate that Corporation Finance's work in this area will yield significant benefits for public issuers without adversely affecting the availability of material financial information or adversely affecting investor protection.

*Exempt Offerings and Small Business Initiatives*

As the number of public offerings has declined, a significant and growing amount of capital is being raised pursuant to non-registered offering exemptions. Congress and the Commission have taken notable steps in recent years to further develop a capital formation ecosystem that includes a scaled disclosure regime and provides small- and medium-sized businesses additional capital raising avenues while maintaining robust investor protections.

Since the Commission adopted amendments to Regulation A in 2015, the number of qualified offerings and the aggregate amount sought in those offerings has substantially increased relative to the pre-amendment numbers. Eighty-nine issuers in 221 qualified offerings raised a total of approximately $798 million through March 31, 2018. I directed the staff to continue monitoring this market and gathering additional information about the use of Regulation A by issuers, investors and other market participants. I also requested that the staff accelerate the next statutory review of the current Regulation A offering limit to 2019. Further, enacted last month, the Economic Growth, Regulatory Relief, and Consumer Protection Act requires the Commission to amend Regulation A to allow reporting companies to use the exemption, and that rulemaking project is underway.

In addition to Regulation A, in 2017, $147 billion was raised using Rule 506(c), which permits the use of general solicitation in exempt offerings. We are also seeing early-stage businesses use crowdfunding as a securities offering method. Between May 2016, when Regulation Crowdfunding went into effect, and March 2018, there were 778 offerings initiated under the regulation's exemption, with a reported total amount raised of $68.7 million.

As the exempt offering market grows and evolves, the SEC staff continues to monitor developments, gather and examine data and assess the effectiveness of these new exemptions in terms both of their ability to raise capital for smaller companies as well as providing appropriate protections for investors in these markets. Staff will be conducting reviews of the impact of Regulation Crowdfunding and Regulation A on capital formation and investor protection and will provide recommendations to the Commission.

The Economic Growth, Regulatory Relief, and Consumer Protection Act also requires the Commission to revise Securities Act Rule 701, which provides an exemption from registration for securities issued by non-reporting companies pursuant to compensatory arrangements. Specifically, the Commission is required to increase from $5 million to $10 million the aggregate sales price or amount of securities able to be sold during any consecutive 12-month period before an issuer is required to deliver additional disclosures to investors. Work on that rule amendment is underway, and staff is considering additional ways that Rule 701 might be modernized.

We recognize that as new and enhanced exemptions provide additional avenues for capital formation, small companies and their investors also could benefit from reduced regulatory complexity. Corporation Finance is considering ways to harmonize and streamline the Commission's exempt offering rules in order to enhance their clarity and ease of use.

*Shareholder Engagement and the Proxy Process*

Given the core role of the proxy process in public company governance, I believe the Commission should examine this area to determine whether the needs of shareholders and companies are being adequately and efficiently addressed. Over the years, participants in the proxy process—companies and shareholders alike—have expressed concerns about a variety of proxy matters. In 2010, the SEC solicited input on several proxy matters in a concept release on the U.S. proxy system.[11] It is clear that opportunities for improvement exist, and I am interested in obtaining updated feedback on the 2010 "Proxy Plumbing" concept release from market participants.[12]

There are a number of issues that this should address, including the quality and mix of information provided to shareholders and how that information is provided, shareholder proposals, the role of proxy advisory firms and the costs and burdens of the proxy system on companies and shareholders. One area in particular I believe we should analyze is whether the voices of long-term retail investors are being underrepresented, misrepresented or selectively represented in corporate governance.

**Cybersecurity**

As a general matter, it is critical that investors be informed about the dependence of our economy on the storage, transmission and protection of data and the related material threats that issuers, market participants and our markets themselves face. The Commission recently provided greater clarity on disclosure obligations related to cybersecurity. In February 2018, the Commission issued a statement and interpretive guidance to assist public companies in preparing disclosures about cybersecurity.[13] This guidance provides the Commission's views about public companies' disclosure obligations under our laws and regulations with respect to matters involving cybersecurity risk and incidents. It also describes the importance of comprehensive policies and procedures related to cybersecurity events. This includes appropriate disclosure controls and having insider trading policies and procedures that guard against corporate insiders trading during the period between a company's discovery of a cybersecurity incident and public disclosure. It also addresses the importance of selective disclosure prohibitions in the cybersecurity context. We are continuing to examine whether public companies are taking appropriate action to inform investors about material cyber-related information, including after a breach has occurred, and we will investigate issuers that mislead investors about material cybersecurity risks or data breaches.

In the area of enforcing our disclosure rules and their application to cyber intrusions, we recently announced charges against the company formerly known as Yahoo! in the first enforcement action that the Commission has brought against a public company for disclosure failures relating to a cyber breach.[14] As one of the Co-Directors of our Enforcement Division said, companies can face difficult choices when deciding whether and how to disclose information about cyber incidents, and we should hesitate before second-guessing reasonable judgments on these issues.[15] But the Yahoo! case should serve as an example that, in today's world, companies must have adequate policies and procedures in place to ensure that they respond appropriately to—and, where necessary, adequately disclose—material cyber risks and incidents.

Turning to cybersecurity at the SEC, in August 2017, shortly after my arrival at the Commission, I learned about an intrusion into the SEC's EDGAR system that occurred in 2016. We promptly disclosed this intrusion to the public and this Committee.[16] As you may recall, the intrusion concerned the test filing component of our EDGAR system. The intruders gained unauthorized access to EDGAR filing information that was not yet public, which may have provided a basis for illicit trading.

Upon learning of this intrusion last August, after consulting with my colleagues, I initiated a number of different work streams to assess the nature, cause and scope of the intrusion; the potential factors that may have led to the intrusion; the agency's response at the time; and the extent to which cybersecurity enhancements are needed at the SEC.[17] Personnel from across the agency—including members of the Office of Information Technology (OIT), Division of Enforcement (Enforcement), Office of the General Counsel (OGC) and the Office of the Inspector General (OIG)—as well as outside advisors and other authorities,[18] have been involved in these efforts. We have made progress on these fronts; and while much remains to be done, I believe it is appropriate to provide a brief update on the status of our work.

OGC has informed me that its internal review of the 2016 intrusion is in its final stages. Upon its completion, I expect to provide this Committee with additional information resulting from that review. The OGC review is focused on understanding the nature, cause and scope of the intrusion.

With regard to the 2016 intrusion itself, we believe that cyber threat actors were able to exploit a defect in our EDGAR system and access information in certain test filings (e.g., from a company checking the formatting of a draft earnings release to be filed on a Form 8-K) before the information became public through a subsequent live filing. Enforcement continues to investigate potential illicit trading that may be related to the intrusion.

As a result of this review, technical, process and organizational deficiencies were identified. It appears that these deficiencies, taken together, contributed to internal delays in both the recognition of the intrusion itself and the internal appreciation of its scope and impact. We are working hard to address these issues. Although substantial work remains to be done, I will outline our principal efforts to date.

- Governance and oversight. The OGC review has identified the need for better IT governance and oversight. We have created a new enterprise-level position of Chief Risk Officer, which will be responsible for coordinating efforts to identify, monitor and mitigate risks across the agency.[19] We are in the process of reorganizing our IT security office to provide additional resources in our cybersecurity operations branch, including additional management personnel to provide dedicated focus and expertise. In addition, we have launched an initiative to install Information System Security Officers in various functions to facilitate and improve collaboration between information system owners and business personnel, and to help ensure that each information system has operational security commensurate with the sensitivity of its information.

- Security controls. The OGC review has made it clear that the SEC would have benefitted from more robust preventative and detective cybersecurity controls, and we are working to improve our control environment. The reorganization described above is designed to provide for increased focus on preventative and detective security and controls. Our new standalone EDGAR Business Office, established in 2017, has been working with OIT to implement technological enhancements and improve security monitoring, protections and compliance. On that front we have made technological enhancements, including to our security monitoring processes, and implemented additional data protection technologies.

  We have expanded our use of penetration testing on our systems, including EDGAR, and we have undertaken additional efforts to analyze EDGAR's source code. In addition, we are working with outside experts and have partnered with other government agencies to assess the SEC's critical systems more broadly.

- Risk awareness. The OGC review also makes it clear that SEC could have benefitted from improved awareness across the agency of the sensitivity and risks related to data collection and storage. We have enhanced cyber-incident information sharing across Enforcement, OIG and OIT, and we have improved reporting protocols for cyber security risks and exposures.

  It is very important to me to foster a culture that recognizes the great responsibility we have with respect to the data entrusted to us by our registrants and the public. We are closely scrutinizing how we can reduce any potential exposure of personally identifiable information contained in SEC systems, including EDGAR. In this regard, earlier this year, the Commission has acted to eliminate the collection of social security numbers and dates of birth on a number of EDGAR forms where we concluded that the information was not necessary to our mission.[20]

  Similarly, with respect to market sensitive data, we are looking into whether we can reduce the data we take in or reduce its sensitivity (including, for example, by taking certain market sensitive data in on a delayed basis). For our systems that hold sensitive data, we have engaged an outside expert to help us assess our efforts to secure those systems.

- Incident response. The OGC review highlighted the need to ensure that we have comprehensive incident response and escalation plans in place. We have revised the agency's incident management plan, which addresses reporting procedures and escalation protocols for cyber security events or incidents, and we expect to further improve the plan as we test it. And we have conducted multiple cyber incident response exercises to help prepare appropriate decision makers for various threat scenarios.

- Legacy systems. The OGC review confirmed that we need to continue and improve upon our efforts to modernize key legacy information systems, especially EDGAR, and address risks associated with bespoke systems. We have increased the focus and resources on our legacy systems, particularly with respect to maintenance and replacement of those systems. The increased funding provided to us by Congress for fiscal year 2018 will allow us to accelerate our transition away from certain legacy systems and functionalities towards systems that have additional security enhancements.

To be sure, no system can be 100 percent safe from a cyber intrusion, particularly in a world where cyber threat actors are backed by substantial resources. More needs to be done to strengthen the SEC's cybersecurity posture. Indeed, our uplift efforts have revealed additional areas that have required attention. But we are working through recommendations from our internal offices and several outside experts to improve, and we expect more recommendations to come. The review I requested by OIG, which is focused on the factors that led to the intrusion and the agency's response, similarly is ongoing. I appreciate OIG's efforts to help improve our knowledge and address risks, and I expect to receive a final report from OIG later this year. We look forward to reviewing the report and working with OIG to implement their recommendations.

We are greatly appreciative of the support given by the Committee in our efforts in this ongoing process. The additional funding Congress have given us, and the feedback that members of this Committee have given me, will go a long way to helping us upgrade our security posture to better protect against the persistent threats that continue.

*Standards of Conduct for Broker-Dealers and Investment Advisers*

In early 2017, as I moved through the confirmation process, it became apparent that a wide range of market participants, including retail investors, and policymakers believed that standards of conduct for investment professionals (e.g., investment advisers and broker-dealers) were a matter where Commission action, including coordination with our fellow regulators, would be both appropriate and timely. In one of my first actions as Chairman, in June 2017, I issued a request for information, seeking input from the public on a range of potential issues, and since then, I have had a number of meetings with investors, consumer groups, industry participants and others across the full spectrum of these issues.

In particular, the candid comments of retail investors in Missouri, Montana, Illinois and California, as well as those who travelled to New York for a roundtable, on what they expect and do not expect from investment professionals resonated with me in considering the appropriate course of action. These interactions, including consultations with my fellow Commissioners and staff, led me to the conclusion that the Commission should lead—but not dictate—our federal and state regulatory efforts in this area in order to (1) address investor confusion regarding the roles of, and the differences between, broker-dealers and investment advisers; (2) establish standards of conduct that meet reasonable investor expectations and adequately address conflicts of interest; and (3) minimize the effects of regulatory complexity, and potentially inconsistent legal standards applied to financial advice, due to the number of regulators in this space.[21]

Case 2:23-cv-00580RSM | Document 38-1 | Filed 06/20/23 | Page 58 of 123

In April, the Commission voted to issue for public comment a comprehensive package designed to close the gaps between the reasonable expectations of retail investors, on the one hand, and market and legal realities on the other hand.[22]  The package is a multi-pronged solution, enhancing or clarifying obligations of broker-dealers and investment advisers to their retail clients, as well as requiring disclosure designed to increase investor understanding.  Our rulemaking package would significantly enhance retail investor protection and understanding while preserving retail investor access, in terms of both availability and cost, to a variety of types of investment services, in particular, the "pay as you go" broker-dealer model.[23]

First, to address conflicts of interest and establish a relationship standard that reflects reasonable retail investor expectations, we proposed enhancing the standard of conduct for broker-dealers.  Under proposed Regulation Best Interest, a broker-dealer, when making a recommendation of a securities transaction or investment strategy to a retail customer, would be prohibited from placing their financial or other interest ahead of the interest of the retail customer.  To add clarity for all participants, the proposal would require the broker-dealer to comply with a disclosure obligation, a care obligation and two conflict of interest obligations.

Under current standards, it has been argued that broker-dealers are permitted to recommend to their retail customer a product that is "suitable" for the customer but not as good for the customer as another product that the broker-dealer offers because the first product makes the broker-dealer more money.  No reasonable retail investor thinks that makes sense.  Most broker-dealers say they do not do this.  I believe our regulations should prohibit this.  Let me be clear: our proposed Regulation Best Interest would address this.

What would the broker-dealer have to do to act in the retail customer's best interest?  First, the broker-dealer would need to disclose material facts relating to the scope and terms of their relationship with the retail customer, including all material conflicts associated with the recommendation.  Second, the broker-dealer would need to exercise reasonable diligence, care, skill and prudence to make recommendations that are in the best interest of the retail customer.  Among other things, this standard would put greater emphasis on cost and financial incentives as factors in evaluating the facts and circumstances of a recommendation and whether it is in the customer's best interest. Third, and the most significant, the broker-dealer would need to establish, maintain and enforce policies and procedures to eliminate, or mitigate and disclose, material conflicts of interest related to financial incentives. To be clear, disclosure alone would not be sufficient.  Even if a broker-dealer has mitigated and disclosed its conflicts, its recommendations to the client cannot place the broker-dealer's interests ahead of the retail customer's interests.

The proposed broker-dealer best interest obligation draws from the principles underlying an investment adviser's fiduciary duty, recognizing that both broker-dealers and investment advisers often provide advice in the face of conflicts of interest.  These common principles are easier to compare given that as another part of our reform package we issued a proposed interpretation reaffirming—and in some cases clarifying—the fiduciary duty that investment advisers owe to their client.  The interpretation is designed to provide advisers with a reference point for understanding their obligations to clients and reaffirms that an investment adviser must act in the best interests of its client.

While the two standards draw from common principles, some obligations of broker-dealers and investment advisers will differ because the relationship types of these investment professionals differ.  This is a practical necessity.  But the principles are the same, and I believe the outcomes in both cases should be the same: retail investors expect high-quality advice where their investment professional is not placing their interest ahead of the investor's interest—I believe our proposals are designed to make sure they get just that.

Second, the rulemaking package would help retail investors understand who they are dealing with, what that means and why it matters.  Our proposal would (1) require broker-dealers and investment advisers to clearly state what they are; and (2) prohibit stand-alone broker-dealers from using the terms "adviser" or "advisor" as part of their names or title.  Also, firms would be required to provide investors with a new, distinct disclosure that we call a "Relationship Summary" that would highlight key differences between broker-dealers and investment advisers, and also provide relevant questions for investors to ask.  We have already received helpful suggestions from commenters, including retail investors, on how we can improve the proposed Relationship Summary via a "feedback flyer" available on our website and look forward to even more engagement on how we get this disclosure right.

I believe that our framework will allow investment professionals to provide high-quality advice while maintaining a range of options for retail investors.  More pointedly, and importantly for investors, this approach allows for further engagement with our fellow federal and state regulators to seek consistency and cohesion across the spectrum of investment professionals and products—and we intend to work closely with them to promote regulatory harmonization and reduce duplication and inconsistency.

The Commission and staff have been thinking about these issues for over 20 years and about this rulemaking for many years.  I urge commenters—particularly Main Street investors—to review the proposed rules thoroughly and engage with us on it during the 90-day comment period.  In order to provide as much opportunity for that engagement as possible, I also announced several investor roundtables across the country to hear directly from those the proposal is designed to serve—Main Street investors.[24]  I, along with others at the SEC, have since met in person with retail investors in Houston and Atlanta and look forward to hearing from others at additional roundtables to come.

### Digital Assets and ICOs

The digital asset and initial coin offering (ICO) markets are areas where the Commission has been focusing a significant amount of attention and resources.  I am very optimistic that developments in financial technology, including distributed ledger technology, will help facilitate capital formation, providing promising investment opportunities for institutional and Main Street investors alike.  At the same time, regardless of the promise of this technology, those who invest their hard-earned money in opportunities that fall within the scope of the federal securities laws deserve the full protections afforded under those laws.  This ever-present need comes into focus when enthusiasm for obtaining a profitable piece of a new technology "before it's too late" is strong and broad.  Fraudsters and other bad actors prey on this enthusiasm and sense of urgency.

My efforts—and the tireless efforts of the SEC staff—have been driven by various factors, but most significantly by a desire to see to it that Main Street investors understand all the material facts and risks involved, particularly with ICOs.[25]  Unfortunately, it is clear that nefarious actors have sought to prey on investors' excitement about the quick rise in cryptocurrency and ICO prices.[26]

There has been significant interest and many questions about the SEC's role in this space, particularly relating to ICOs.  Some say we are slow to regulate in this area while others have requested an unprecedented relaxation of our regulations.  These requests have, on occasion, been cast as a need for guidance.  We have been clear—we are not relaxing our requirements that apply to the offer, sale and trading of securities.  We also have discussed in detail how our laws define what is a security.[27]  Determining what falls within the ambit of a securities offer and sale is a facts-and-circumstances analysis, utilizing a principles-based framework that has served American companies and American investors well through periods of innovation and change for over 80 years.  If you are attempting to fund a project—whether it be opening a new manufacturing plant or creating an application on a distributed network—by inviting others to invest in the enterprise based on the expectation that they will profit from other people's efforts, the same laws and standards apply: register the securities offering or use an exemption from registration.  Issuing a "token" rather than a share certificate

does not change that approach. Concluding otherwise would ignore the fundamental tenets of over 80 years of securities regulation and put other businesses seeking to raise capital at a competitive disadvantage.

Overall, I believe the Commission is taking a balanced regulatory approach to distributed ledger technology (and FinTech more generally) that both fosters innovation and protects investors. For example, in the area of ICOs, the Commission issued a Report of Investigation in July 2017 regarding the application of the federal securities laws to those products.[28] Our Corporation Finance Division Director recently further outlined the approach staff takes to evaluate whether a digital asset is a security.[29] Our staff meets regularly with entrepreneurs and market professionals interested in developing new and innovative investment products in compliance with the federal securities laws. We are also encouraging issuers and other market participants to contact SEC staff at our dedicated email address, FinTech@sec.gov.

We established a dedicated Distributed Ledger Technology Working Group which focuses on emerging applications of distributed ledger technology in the financial industry, and a FinTech Working Group. We recently named a new Associate Director in Corporation Finance to serve as the Senior Advisor for Digital Assets and Innovation and coordinate efforts in this area across the agency.[30] We are also meeting regularly with other regulatory agencies to coordinate efforts and identify any areas where additional regulatory oversight may be needed, particularly through efforts led by the Department of the Treasury. Divisions across the Commission have worked together, as well as with other regulators, to issue public statements regarding ICOs and virtual currencies.[31] And importantly, we have acted swiftly to crack down on allegedly fraudulent activity in this space, particularly fraud and other violations that have targeted Main Street investors.[32]

### Enforcement

Dedicated staff of the Division of Enforcement (Enforcement), led by Co-Directors Stephanie Avakian and Steven Peikin, continues its work safeguarding investors and the capital markets through the vigorous enforcement of our federal securities laws. Since I was last before the Committee, the Commission has taken a number of significant enforcement-related actions that, when considered together, demonstrate our commitment to protecting investors, deterring, detecting and punishing wrongdoing and rooting out fraud and bad actors in our financial markets. I believe that the net effect of Enforcement's efforts over the past year has been to make our capital markets a safer place for investors to put their hard-earned money to work.

After more than a year on the job, I continue to firmly believe that Enforcement's work is essential to protecting investors and maintaining confidence in the integrity and fairness of our capital markets. While some point to particular statistics to claim that the SEC and more specifically Enforcement are pulling back their investor protection efforts, I want to make absolutely clear that is not the case. As noted by Enforcement's Co-Directors in their Annual Report, our success is best judged both quantitatively and qualitatively and over various periods of time.[33] Based on such an evaluation, including bringing actions for the most serious violations, obtaining punishments to deter unlawful conduct and returning money to investors, Enforcement has been successful. I can assure you that our Enforcement Division will continue its vigorous enforcement of the federal securities laws and hold bad actors accountable.

One area where the Enforcement staff has redoubled its focus is on protecting Main Street investors. Looking out for these investors has always been a core tenet of the Commission's enforcement program, and the last year has been no exception. To bolster our capabilities and focus on protecting Main Street investors, Enforcement formed a new Retail Strategy Task Force, which concentrates resources and draws on expertise from across the Commission to develop strategies and techniques for addressing the types of misconduct that most affect retail investors.[34] Going forward, Enforcement will continue to place a priority on misconduct that harms retail investors, such as offering frauds, Ponzi schemes, conflicts of interest and inappropriate or excessive fees.[35]

Enforcement has also continued to focus its efforts on addressing cyber-related threats to investors and the financial markets. Since I was last before the Committee, these threats have only increased in magnitude and frequency, and I believe that they present some of the greatest risks that we must confront today. In response to these risks, last year Enforcement created a new Cyber Unit, which focuses the Division's resources and expertise on, among others things, hacking to obtain material, non-public information, violations involving distributed ledger technology and cyber intrusions.[36] The resources we have dedicated to the Cyber Unit's important work demonstrate the high priority that we continue to place on cyber-related issues affecting investors and our markets.

### Returning Funds to Main Street Investors

In my view, protecting retail investors also means, whenever possible, putting money back in their pockets when they are harmed by violations of the federal securities laws. Last fiscal year, the Commission returned a record $1.07 billion to harmed investors.[37] We remain committed to this important part of our work, and we expect to return a substantial amount this year as well.

The recent unanimous Supreme Court decision in Kokesh v. SEC, however, has impacted our ability to return funds fraudulently taken from Main Street investors. In Kokesh, the Supreme Court found our use of the disgorgement remedy to be a penalty, which time-limited the ability of the Commission to seek disgorgement of ill-gotten gains beyond a five-year statute of limitations applicable to penalties. I do not believe it is productive to debate the merits of the Kokesh decision. I agree that statutes of limitation serve many important functions in our legal system, and remedies should have reasonable limitations periods. Civil and criminal authorities, including the SEC, should do everything in their power to bring appropriate actions swiftly. But, as I look across the scope of our remedial powers, I am troubled by the substantial amount of losses that we may not be able to recover for retail investors. Said simply, if the fraud is well-concealed and stretches beyond the five-year limitations period applicable to penalties, it is likely that we will not have the ability to recover funds invested by our retail investors more than five years ago. Allowing clever fraudsters to keep their ill-gotten gains at the expense of our Main Street investors—particularly those with fewer savings and more to lose—is inconsistent with basic fairness and undermines the confidence that our capital markets are fair, efficient and provide Americans with opportunities for a better future.

I would welcome the opportunity to work with Congress to address this issue to ensure defrauded retail investors can get their investment dollars back. I believe that any such authority should be narrowly tailored to that end while being true to the principles embedded in statutes of limitations.

### Examination Priorities

Earlier this year, our Office of Compliance Inspections and Examinations (OCIE), led by Director Peter Driscoll, published its 2018 examination priorities with a continued focus on the SEC's commitment to protecting retail investors.[38] In particular, OCIE will look closely at products and services offered to retail investors, the disclosures they receive about those investments and the financial services professionals who serve them. OCIE will also focus its attention on several other areas that present heightened risks, including: (1) compliance and risks in critical market infrastructure, such as exchanges and clearing agencies; (2) the continued growth of cryptocurrencies and initial coin offerings; (3) cybersecurity; and (4) anti-money laundering programs.

OCIE conducts risk-based examinations of registered entities, including broker-dealers, investment advisers, investment companies, municipal advisors, national securities exchanges, clearing agencies, transfer agents and FINRA, among others. Our examination program is one of many areas where we

have focused on doing more with our available resources.  In FY 2017, OCIE completed nearly 2,900 examinations—an increase of more than 450 examinations from the prior year.  As of late May, OCIE has completed more than 1,700 examinations thus far in FY 2018, representing an increase of approximately nine percent over last year at this time.

OCIE has also made significant strides to keep pace with the continued growth of investment advisers by increasing its examination of these registrants by more than 40 percent in FY 2017 over FY 2016—to approximately 15 percent of all SEC-registered investment advisers.  OCIE achieved this result through the reallocation of resources, advancements in OCIE's use of technology, targeted examination initiatives and other efficiencies.  Although this increase in examination coverage has been a very positive step, more needs to be done to continue to increase investment adviser examination coverage levels, while at the same time conducting high quality risk-based examinations to ensure that our mission is met.  We will also continue to strive to do more with existing resources to improve our risk-based examination program.

One way to help us achieve our goals is through enhancing technological tools and continuing to use data analytics to allow our examination teams to more efficiently and effectively focus on higher risk areas and registrants.  Leveraging technology helps our front line examiners analyze information better and faster than ever before.  Some of our in-house developed tools scan arrays of data fields to help analyze and identify potentially problematic activities and registrants.  These tools, and others employed in OCIE, have become essential to our continued advancement in identifying risks to investors and the markets, and effective deployment of examination resources to address these risks to have the greatest impact.

### Equity Market Structure

One of the few certainties of trading markets is that they continually evolve.  The SEC's responsibility as the capital markets regulator is to ensure that our regulations continue to drive efficiency, integrity and resilience as technology changes.[39]  Our Division of Trading and Markets, under the leadership of Brett Redfearn, has continued to address market structure issues.

For example, in March, the Commission proposed a transaction fee pilot in National Market System (NMS) stocks,[40] which would provide the Commission with data to help us analyze the effects of exchange fees and rebates on order routing behavior, execution quality and our market structure generally.  This issue has received much attention ever since Regulation NMS was implemented, and more recently, development of a pilot program on transaction fees was one of the SEC's Equity Market Structure Advisory Committee's (EMSAC's) most prominent recommendations.[41]  In my view, the proposed pilot, if adopted, would lead to a more thorough understanding of these issues, which would help the Commission make more informed and effective policy decisions in the future, all to the benefit of retail investors.

Another potential issue presented by the complex U.S. equity market structure is the need for improved public transparency about alternative trading system (ATS) operations and the order-routing practices of brokers.  Responding to the Commission's 2010 Concept Release on Equity Market Structure, a broad range of investors and market participants urged the SEC to address a lack of transparency in this area.  The SEC published proposals to improve ATS transparency in 2015 and order routing transparency in 2016.  I expect that the Commission will consider adopting final rules for the ATS initiative and the order routing initiative in the coming months.  Both of these transparency initiatives highlight the traditional approach of empowering the marketplace to address problems through disclosure.  Investors and market participants armed with more robust information about ATS operations and broker order routing practices should be able to make more informed decisions that reward those market participants who advance their customers' interests.

Beyond these initiatives, the Commission and staff will continue to evaluate other equity market structure issues impacting investors, issuers and other market participations.  While the EMSAC's charter expired in January 2018, the staff is organizing targeted roundtables among market participants on discrete equity market structure issues, which will feature experts representative of a broad diversity of viewpoints and will provide further opportunities for discussions about critical issues affecting our equity markets.  In April, the staff held its first roundtable focused on market structure issues for thinly-traded exchange-listed securities—an important issue as smaller companies, the securities of which are often relatively illiquid, play an essential role in our economy and may be the larger companies of tomorrow.  Indeed, it is in these less active securities—where the challenges are greatest—that the potential benefits of a tailored market structure are most significant.  We should continue to examine whether the current equity market structure—which is uniform for all companies, large and small, liquid and illiquid—meets the needs of all types of companies.

### Fixed Income Market Structure

When I last testified before this Committee, I stated my belief that the time is right for the Commission to broaden its review of market structure to include our fixed income markets, where, historically, less attention has been focused relative to our equity markets.  The fixed income markets are critical to our economy and Main Street investors.  The U.S. corporate bond market has experienced significant growth since the early 2000s as issuance hit record highs and the increase in the value of corporate bonds outstanding outpaced the growth in U.S. equity market cap between 2006 and 2016.[42]  Similarly, the municipal bond market continues to be a large and vital market.

To address these issues, in November 2017, the Fixed Income Market Structure Advisory Committee (FIMSAC) was established to provide diverse perspectives on the structure and operations of the U.S. fixed income markets, as well as advice and recommendations on fixed income market structure.  The FIMSAC has held two public meetings and recently provided a recommendation for a pilot program to study the market implications of changing the public dissemination regime for block-size trades in corporate bonds.

FIMSAC members have prioritized their work around key topic areas in the corporate and municipal bond markets, including the extent to which the current pre-trade and post-trade transparency regimes are serving the markets, the implications of the recent growth in the number of registered mutual funds and ETFs active in our fixed income markets and the impact of increased electronic trading systems on these markets.  I am acutely aware that our interconnected and constantly evolving financial markets produce a dynamic risk landscape.  As technological advancements continue to have an increasing impact on the operations of fixed income markets, the work of the FIMSAC will assist our efforts to identify emerging market developments and risks and ensure that our regulations promote efficiency, transparency and resiliency, as well as investment opportunity.

### Consolidated Audit Trail

Another important market structure initiative is the implementation of the Consolidated Audit Trail (CAT).  When implemented, the CAT will provide a single, comprehensive database allowing regulators to more efficiently and accurately track trading in equities and options throughout the U.S. markets.  This enhanced ability will allow the Commission to better carry out its tripartite mission by improving our ability to reconstruct trading activity during a market disruption, which in turn would allow us to more quickly understand the causes behind such disruption and respond with measures to help detect and prevent a recurrence.

Under the CAT NMS Plan, the self-regulatory organizations (SROs)—the national securities exchanges and FINRA—are responsible for developing and implementing the CAT and were required to begin reporting data to the CAT by November 15, 2017.  The SROs missed that deadline, and they remain

out of compliance with the CAT NMS Plan today. Progress is being made. But the process remains slow and cumbersome, due largely to what I believe are issues relating to governance and project management by the SROs. We are actively encouraging the SROs to set forth a timeline of detailed, objective and achievable milestones, clearly defined progress objectives for the SROs and Thesys (the plan processor) and a comprehensive description of the functionality that will be developed by specified dates.

I know there are substantial concerns about the protection of investors' personally identifiable information (PII) that would be stored in the CAT. I have the same concerns and continue to make the protection of CAT data, particularly any form of PII, a paramount issue. Additionally, I have made it clear that the SEC will not retrieve sensitive information from the CAT unless we need it and believe appropriate protections to safeguard it are in place.

In November, I asked the Commission staff to evaluate the need for PII in the CAT. This evaluation includes consideration of, among other things, what PII data elements need to be collected and retained in the CAT in order to achieve the regulatory goals of the CAT, and how PII in the CAT would be used by the SEC and the SROs. We are considering alternatives to the current scope of PII that would be collected and retained by the CAT under the current plan that can provide the Commission and the SROs with the market surveillance and reconstruction data needed to conduct our regulatory and enforcement functions. More generally, as I have stated before, I believe that the Commission, the SROs and the plan processor must continuously evaluate the approach to the collection, retention and protection of PII and other sensitive data, as we continue to progress in the development and operation of the CAT.

### Security-Based Swaps

With respect to our security-based swap regime, the staff of the Commission continues to work to develop recommendations for final rules required by Title VII of the Dodd-Frank Act. Additionally, the staff has been actively engaged with our counterparts at the Commodity Futures Trading Commission (CFTC) to find ways to further harmonize our respective rules with those of the CFTC, where appropriate, to increase effectiveness as well as reduce complexity and costs. Staff is initially focusing on a number of different rule sets, but more generally remains committed to consulting and coordinating to the benefit of our respective agencies and the markets and market participants we oversee.

### Improving the Investor Experience

We live in a world that has become rich with information and ways to present it. The Division of Investment Management (Investment Management), led by Dalia Blass, is leading a long-term project to explore modernization of the design, delivery and content of fund disclosures and other information for the benefit of investors. These initiatives are an important part of how the Commission can serve investors in the 21st century. Fund disclosures are especially important because millions of Americans invest in funds to help them reach personal financial goals, such as saving for retirement and their children's educations. As of the end of 2017, over 100 million individuals representing nearly 60 million households, or 45 percent of U.S. households, owned funds.[43]

Earlier this month, the Commission issued a request for comment on enhancing disclosures by mutual funds, exchange-traded funds and other types of investment companies to improve the investor experience and to help investors make more informed investment decisions (Fund Disclosure RFC).[44] The Fund Disclosure RFC seeks input from retail investors, experts and others on how they use fund disclosures and how they believe funds can improve disclosures to aid investment decision-making. In order to facilitate retail investor engagement and comment on improving fund disclosure, the Commission has provided a short Feedback Flier on Improving Fund Disclosure, which can be viewed and submitted at www.sec.gov/tell-us.

Earlier this month, the Commission also adopted a new rule that creates an optional "notice and access" method for delivering fund shareholder reports. [45] The reforms include protections for those without internet access or who simply prefer paper by preserving the ability to easily continue to receive reports in paper. Under the rule, a fund may deliver its shareholder reports by making them publicly accessible on a website, free of charge, and sending investors a paper notice of each report's availability by mail. To inform investors in advance of this new delivery method, there is an extended transition period so that the earliest a fund could begin to rely on the rule would be January 1, 2021. During this time, funds that choose to implement the new delivery method must provide prominent disclosures in prospectuses and certain other shareholder documents that will generally notify investors of the upcoming change in delivery format on a recurring basis for a period of two years.

### Modernizing Asset Management Regulations

Investment Management is seeking ways to modernize and streamline rules under the Investment Company Act and Investment Advisers Act, many of which were adopted decades ago and have not been amended, notwithstanding significant changes in practices and products in the asset management industry.

Investment Management is working on a recommendation to replace the process of individually-issued exemptive relief for certain exchange-traded funds (ETFs) with a rule to create a consistent, transparent and efficient regulatory framework for ETFs and to facilitate greater competition and innovation among ETFs. This work is a high priority, as we have an ETF market of over $3.4 trillion operating under more than 300 individually issued exemptive orders.[46] It is not ideal for such an important segment of the asset management market to operate under so many individual exemptive orders.

This May, the Commission also proposed rules in furtherance of the mandate of the Fair Access to Investment Research Act of 2017.[47] These proposed rules would promote research on mutual funds, ETFs, registered closed-end funds, business development companies (BDCs) and other covered investment funds. The proposal is intended to provide investors with greater access to research to aid them in making investment decisions and would reduce obstacles to providing research on investment funds by harmonizing the treatment of such research with research on other public entities.

In 2016, the Commission adopted a new rule designed to promote effective liquidity risk management practices among open-end funds. As with any new rule, the staff's work did not end with adoption. After hearing from interested parties about the implementation of this requirement, in 2018, the Commission provided a delay for the classification elements of the rule and proposed targeted amendments to the aggregate public reporting requirements.[48] These amendments are designed to enhance the disclosure funds provide to investors about liquidity risks and reduce the risk that investors may be misled about the comparability of certain fund liquidity metrics. I anticipate that the Commission will soon consider adopting this proposal.

Additionally, the Small Business Credit Availability Act directs the Commission to revise certain securities offering and proxy rules in order to harmonize existing registration and reporting requirements to allow BDCs to be treated in the same manner as public corporate issuers. The Economic Growth, Regulatory Relief, and Consumer Protection Act similarly directs the Commission to issue rules to allow certain registered closed-end funds to use the securities offering and proxy rules that are available to public corporate issuers. Investment Management is working to develop rule recommendations related to these two bills.

### Dodd-Frank Act

6/27/23, 3:22 PM
SEC.gov | Testimony on Oversight of the U.S. Securities and Exchange Commission
Case 2:23-cv-00580-RSM | Document 38-1 | Filed 06/20/23 | Page 62 of 123

Almost eight years after the enactment of the Dodd-Frank Act, the Commission still has outstanding mandates. Earlier this year, I addressed how I plan to prioritize and tackle the remaining mandates from the Dodd-Frank Act.[49] Generally speaking, there are four categories of Dodd-Frank Act rules remaining:

1. the remaining rules to stand-up the security-based swap regime, which I believe should be done holistically as a coherent package due in large part to the interrelated nature of the rules;

2. executive compensation rules for both public companies and SEC-regulated entities, for which, as a result of the complexity and scope of the existing executive compensation disclosure regime, as well as the nature of the mandates, I believe a serial approach is likely to be most efficient and best serve the SEC's mission;

3. specialized disclosure rules, such as resource extraction disclosure, which pose additional challenges, including how the SEC can meet its obligations under the Administrative Procedure Act and, in the case of resource extraction, the Congressional Review Act; and

4. mandates, some of which overlap with examples above, for which market developments—including developments resulting from shareholder engagement—have, at least in part, mitigated some of the concerns that motivated the statutory requirements.[50] Our rulemaking priorities, as well as the rules themselves, should reflect these observable developments.

All that said, it is the SEC's obligation to complete the rules mandated by Congress in Dodd-Frank, and I intend to do so.

*Investor Education and Outreach*

Beyond our rulemaking agenda, we are very focused on efforts to educate Main Street investors to help empower them to make informed investment decisions – so that they have the best chance of protecting and growing their life's savings. We place great importance on in-person outreach efforts, including regional roundtable meetings with investors and events specifically targeting seniors. We also have a website at Investor.gov with a great deal of information geared specifically toward older Americans. And of course, our investor advocacy team at the SEC is just a phone call away for those Americans that don't have access to the Internet.

My fellow Commissioners and I also participate in investor education and outreach efforts with military servicewomen and men, seniors and other retail investors. Last week, all five of us, along with staff from across the agency, were in Atlanta for an investor town hall where Main Street investors heard directly from, and shared feedback with, the Commission on issues important to them.[51]

Earlier this year, we launched a new online search tool designed to empower retail investors to make better-informed investment decisions, the SEC Action Lookup for Individuals—or SALI.[52] SALI enables anyone to find out if the individual he or she is dealing with on an investment has been sanctioned as a result of SEC enforcement actions, for both registered and unregistered individuals. It is part of our ongoing efforts to help investors research financial professionals who they are entrusting with their savings. SALI continues to be updated on an ongoing basis, making it an ever better resource for Main Street investors.

*Conclusion*

I would like to thank this Committee and its members, especially the Chairman and Ranking Member, for their continued support of the SEC, its mission and its staff. And most important, I thank you all for supporting our efforts to ensure that America's capital markets continue to provide quality, long-term investment opportunities that will enhance the lives and futures of our long term Main Street investors.

I look forward to answering any questions you may have.

---

[1] The views expressed in this testimony are those of the Chairman of the Securities and Exchange Commission and do not necessarily represent the views of the President, the full Commission or any Commissioner.

[2] My remarks in connection with our recent Investor Advisory Committee in Atlanta discussed in detail this principle—focusing on the interest of our long term Main Street investors—and the steps we have taken to further those interests. See Remarks to the SEC Investor Advisory Committee (June 14, 2018), available at https://www.sec.gov/news/public-statement/clayton-statement-investor-advisory-committee-061418.

[3] See Jesse Bricker et al. (2017), "Changes in U.S. Family Finances from 2013 to 2016: Evidence from the Survey of Consumer Finances," Federal Reserve Bulletin, vol. 103 (September), available at https://www.federalreserve.gov/publications/files/scf17.pdf; see also Rel. No. 34-83063, Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles (Apr. 18, 2018) (for statistics except the mutual fund data); 2018 Investment Company Fact Book (ICI, 58th ed. 2018) (mutual fund statistics).

[4] See U.S. Sec. and Exch. Comm'n Strategic Plan: Fiscal Years 2018-2022, Draft for Comment (June 2018), available at https://www.sec.gov/files/sec-strategic-plan-2018-2022.pdf. The SEC's plan was prepared pursuant to the Government Performance and Results Act (GPRA), as amended, which requires agencies to publish a strategic plan once every four years (see 5 USC § 306).

[5] See U.S. Sec. and Exch. Comm'n, Agency Rule List (Spring 2018), available at https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&currentPub=true&agencyCode=&showStage=active&agencyCd=3235&Image58.x=84&Image58.y=13&Image58=Submit.

[6] Over the past 10 years, the Commission has completed, on average, only a third of the rules listed on the near-term agenda. As examples, 18 rules were listed as to-be-adopted in 2008, and 32 rules were listed in the same category for 2016; in each case, about 27 percent of the rules were adopted in each year.

[7] See Draft Registration Statement Processing Procedures Expanded, Division of Corporation Finance Announcement (June 29, 2017) [Supplemented Aug. 17, 2017], available at https://www.sec.gov/corpfin/announcement/draft-registration-statement-processing-procedures-expanded.

[8] See Securities Act Forms Compliance and Disclosure Interpretation 101.04 and 101.05, available at https://www.sec.gov/divisions/corpfin/guidance/safinterp.htm.

[9] See Brandon Kochkodin and Alex Barinka, IPO Timelines Are Cut by 80% After SEC's Private Filing Decision, Bloomberg (Dec. 22, 2017), available at https://www.bloomberg.com/news/articles/2017-12-22/ipo-timelines-are-cut-by-80-after-sec-s-private-filing-decision.

Case 2:23-cv-00580-RSM | Document 39-1 | Filed 06/20/23 | Page 63 of 123

[10] See Press Release 2017-192, SEC Proposes Rules to Implement FAST Act Mandate to Modernize and Simplify Disclosure (Oct. 11, 2017), available at https://www.sec.gov/news/press-release/2017-192.

[11] Concept Release on the U.S. Proxy System, Release No. 34-62495 (July 14, 2010) [75 FR 42982 (July 22, 2010)].

[12] See Remarks at the PLI 49th Annual Institute on Securities Regulation (Nov. 8, 2017), available at https://www.sec.gov/news/speech/speech-clayton-2017-11-08.

[13] See Press Release 2018-22, SEC Adopts Statement and Interpretative Guidance on Public Company Cybersecurity Disclosures (Feb. 21, 2018), available at https://www.sec.gov/news/press-release/2018-22.

[14] See Press Release 2018-71, Altaba, Formerly Known as Yahoo!, Charged With Failing to Disclose Massive Cybersecurity Breach; Agrees To Pay $35 Million (Apr. 24, 2018), available at https://www.sec.gov/news/press-release/2018-71.

[15] See also Remarks at the Economic Club of New York (July 12, 2017), available at https://www.sec.gov/news/speech/remarks-economic-club-new-york ("Being a victim of a cyber penetration is not, in itself, an excuse.  But, I think we need to be cautious about punishing responsible companies who nevertheless are victims of sophisticated cyber penetrations.  Said another way, the SEC needs to have a broad perspective and bring proportionality to this area that affects not only investors, companies and our markets, but our national security and our future").

[16] See Press Release 2017-170, SEC Chairman Clayton Issues Statement on Cybersecurity:  Discloses the Commission's Cyber Risk Profile, Discusses Intrusions at the Commission, and Reviews the Commission's Approach to Oversight and Enforcement (Sept. 20, 2017), available at https://www.sec.gov/news/press-release/2017-170; Statement on Cybersecurity (Sept. 20, 2017), available at https://www.sec.gov/news/public-statement/statement-clayton-2017-09-20; Testimony on "Examining the SEC's Agenda, Operation, and Budget" (Oct. 4, 2017), available at https://www.sec.gov/news/testimony/testimony-examining-secs-agenda-operation-and-budget.

[17] See Testimony on "Examining the SEC's Agenda, Operation, and Budget," supra note 16.

[18] For example, OGC has retained an outside technology and cybersecurity consultant with extensive expertise in cyber intrusion investigations, and OIT has engaged outside technology and cybersecurity experts to advise on cybersecurity uplift efforts.

[19] We have named Julie Erhardt as the acting Chief Risk Officer while we complete our search.  Julie is a Deputy Chief Accountant at the agency and has an M.S. in management from Stanford University.  Through her 14 years at the Commission and prior work as an auditor, Julie has substantial experience in internal controls, auditing and risk management.

[20] Amendments to Forms and Schedules To Remove Provision of Certain Personally Identifiable Information, Rel. Nos. 33–10486, 34–83097, IC–33077 (Apr. 24, 2018), available at https://www.sec.gov/rules/final/2018/33-10486.pdf.

[21] For example, if you have a portfolio with a few stocks, a couple of mutual funds in a 401(k) and an annuity, then your relationship with your investment professional could be subject to regulation by the SEC, FINRA, the Department of Labor, state insurance regulators, state securities regulators, state attorneys general, and, if the investment professional is associated with a broker-dealer or investment adviser or both that is part of a bank, federal and/or state banking regulators.

[22] See Press Release 2018-68, SEC Proposes to Enhance Protections and Preserve Choice for Retail Investors in Their Relationships with Investment Professionals (Apr. 18, 2018), available at https://www.sec.gov/news/press-release/2018-68.

[23] See The Evolving Market for Retail Investment Services and Forward-Looking Regulation—Adding Clarity and Investor Protection while Ensuring Access and Choice (May 2, 2018), available at https://www.sec.gov/news/speech/speech-clayton-2018-05-02.

[24] See Statement on Public Engagement Regarding Standards of Conduct for Investment Professionals Rulemaking (Apr. 24, 2018), available at https://www.sec.gov/news/public-statement/public-engagement-standards-conduct-investment-professionals-rulemaking.

[25] In December, I issued a statement that provided my general views on the cryptocurrency and ICO markets.  The statement was directed principally at two groups: (1) Main Street investors and (2) market professionals—including, for example, broker-dealers, investment advisers, exchanges, lawyers and accountants—whose actions impact Main Street investors.  See Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), available at https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

[26] In one instance, the SEC brought an enforcement action against a purported bitcoin mining company that claimed to have a product "so easy to use that it is 'Grandma approved.'"  In this case, in less than six months, the company allegedly raised more than $19 million from more than 10,000 investors.  The SEC charged that company with operating a Ponzi scheme.  See SEC Obtains Final Judgment Against Founder of Bitcoin Mining Companies Used to Defraud Investors (Oct. 4, 2017), available at https://www.sec.gov/litigation/litreleases/2017/lr23960.htm; Press Release 2015-271, SEC Charges Bitcoin Mining Companies (Dec. 1, 2015), available at https://www.sec.gov/news/pressrelease/2015-271.html.

[27] See Testimony on "Oversight of the SEC's Division of Enforcement" (May 16, 2018), available at https://www.sec.gov/news/testimony/testimony-oversight-secs-division-enforcement; Testimony on "Oversight of the SEC's Division of Corporation Finance" (Apr. 26, 2018), available at https://www.sec.gov/news/testimony/testimony-oversight-secs-division-corporation-finance; Joint Statement by Divisions of Enforcement and Trading and Markets on Potentially Unlawful Online Platforms for Trading Digital Assets (Mar. 7, 2018), available at https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading; Testimony on "Virtual Currencies: The Roles of the SEC and CFTC" (Feb. 6, 2018) available at https://www.sec.gov/news/testimony/testimony-virtual-currencies-oversight-role-us-securities-and-exchange-commission; Statement by SEC Chairman Jay Clayton and CFTC Chairman J. Christopher Giancarlo: Regulators Are Looking at Cryptocurrency (Jan. 25, 2018), available at https://www.sec.gov/news/public-statement/statement-clayton-giancarlo-012518; Joint Statement by SEC and CFTC Enforcement Directors Regarding Virtual Currency Enforcement Actions (Jan. 19, 2018), available at https://www.sec.gov/news/public-statement/joint-statement-sec-and-cftc-enforcement-directors; Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), available at https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11; SEC Statement Urging Caution Around Celebrity Backed ICOs (Nov. 1, 2017), available at https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos; Statement by the Divisions of Corporation Finance and Enforcement on the Report of Investigation on The DAO (July 25, 2017), available at https://www.sec.gov/news/public-statement/corpfin-enforcement-statement-report-investigation-dao; see also U.S. Sec. and Exch. Comm'n, Cybersecurity Enforcement Actions, available at https://www.sec.gov/spotlight/cybersecurity-enforcement-actions.

[28] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017), available at https://www.sec.gov/litigation/investreport/34-81207.pdf.

[29] See William Hinman, Digital Asset Transactions: When Howey Met Gary (Plastic): Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018), available at https://www.sec.gov/news/speech/speech-hinman-061418.

[30] See Press Release 2018-102, SEC Names Valerie A. Szczepanik Senior Advisor for Digital Assets and Innovation (June 4, 2018), available at https://www.sec.gov/news/press-release/2018-102.

[31] Statement by the Division of Enforcement and Office of Compliance, Inspections and Examinations on Potentially Unlawful Promotion of Initial Coin Offerings and Other Investments by Celebrities and Others (Nov. 1, 2017), available at https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos; Joint Statement by SEC and CFTC Enforcement Directors Regarding Virtual Currency Enforcement Actions (Jan. 19, 2018), available at https://www.sec.gov/news/public-statement/joint-statement-sec-and-cftc-enforcement-directors; Statement by Divisions of Enforcement and Trading and Markets on Potentially Unlawful Online Platforms for Trading Digital Assets (Mar. 7, 2018), available at https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading.

[32] See U.S. Sec. and Exch. Comm'n, Cybersecurity Enforcement Actions, available at https://www.sec.gov/spotlight/cybersecurity-enforcement-actions.


[33] See U.S. Sec. & Exch. Comm'n, Div. of Enforcement, Annual Report: A Look Back at Fiscal Year 2017 at 3 (Nov. 15, 2017), available at https://www.sec.gov/files/enforcement-annual-report-2017.pdf [hereinafter Enforcement Annual Report].

[34] See Press Release 2017-176, SEC Announces Enforcement Initiatives to Combat Cyber-Based Threats and Protect Retail Investors (Sept. 25, 2017), available at https://www.sec.gov/news/press-release/2017-176.

[35] For example, Enforcement's Share Class Selection Disclosure Initiative reflects our continuing commitment to protecting and compensating retail investors whenever possible. The initiative encourages self-reporting and self-remediation by investment advisers who received compensation for putting retail clients in more-expensive mutual fund share classes when identical, less-expensive share classes were available, without disclosing the conflict of interest. The initiative represents an effort by Enforcement to efficiently leverage its resources to expose widespread misconduct in the investment advisor industry while, at the same time, quickly and efficiently compensating harmed investors.

[36] See SEC Announces Enforcement Initiatives to Combat Cyber-Based Threats and Protect Retail Investors, supra note 34.

[37] Enforcement Annual Report, supra note 33, at 6-11.

[38] U.S. Sec. & Exch. Comm'n, Off. of Compliance Inspections and Examinations, 2018 Nat'l Exam Program Examination Priorities (Feb. 7, 2018), available at https://www.sec.gov/about/offices/ocie/national-examination-program-priorities-2018.pdf.

[39] Remarks at the Equity Market Structure Symposium Sponsored by the University of Chicago and the STA Foundation (Apr. 10, 2018), available at https://www.sec.gov/news/speech/speech-clayton-2018-04-10.

[40] See Press Release 2018-43, SEC Proposes Transaction Fee Pilot for NMS Stocks (Mar. 14, 2018), available at https://www.sec.gov/news/press-release/2018-43.

[41] EMSAC, Recommendation for an Access Fee Pilot (July 8, 2016), available at https://www.sec.gov/spotlight/emsac/recommendation-access-fee-pilot.pdf.

[42] See Opening Remarks at the Inaugural Meeting of the Fixed Income Market Structure Advisory Committee (Jan. 11, 2018), available at https://www.sec.gov/news/public-statement/opening-remarks-inaugural-meeting-fixed-income-market-structure-advisory.

[43] Investment Company Institute, 2018 Investment Company Fact Book, at ii (2018), available at https://www.ici.org/pdf/2018_factbook.pdf.

[44] See Investment Company Act Release No. 33113, Request for Comment on Fund Retail Investor Experience and Disclosure (June 5, 2018), available at https://www.sec.gov/rules/other/2018/33-10503.pdf.

[45] See Securities Act Release No. 10506, Optional Internet Availability of Investment Company Shareholder Reports (June 5, 2018), available at https://www.sec.gov/rules/final/2018/33-10506.pdf.

[46] This market figure is based on data obtained from Bloomberg; see also Investment Company Act Notices and Orders, Category Listing, available at https://www.sec.gov/rules/icreleases.shtml.

[47] See Press Release 2018-92, SEC Proposes FAIR Act Rules to Promote Research Reports on Investment Funds (May 23, 2018), available at https://www.sec.gov/news/press-release/2018-92.

[48] See Press Release 2018-42, SEC Proposes Targeted Changes to Public Liquidity Risk Management Disclosure (Mar. 14, 2018), available at https://www.sec.gov/news/press-release/2018-42.

[49] See Opening Remarks at the Securities Regulation Institute (Jan. 22, 2018), available at https://www.sec.gov/news/speech/speech-clayton-012218.

[50] For example, several companies already have made public their policies regarding compensation clawbacks. Some of these policies go beyond what would be required under Dodd-Frank. We have seen a few companies attempt to claw back compensation from their executives under these policies.

[51] See Investing in America: The SEC Comes to You, available at https://www.sec.gov/investing-america.

[52] See Press Release 2018-78, SEC Launches Additional Investor Protection Search Tool (May 2, 2018), available at https://www.sec.gov/news/press-release/2018-78.

# Exhibit 5

Case 2:23-cv-00580-RSM    Document 39-1    Filed 06/30/23    Page 66 of 123

# Intelligencer

THE MONEY GAME | FEB. 23, 2023

# Can Gary Gensler Survive Crypto Winter? D.C.'s top financial cop on Bankman-Fried blowback.

*By Ankush Khardori*



Photo: Shuran Huang/The New York Times

As recently as a year ago, Sam Bankman-Fried seemed to be an unstoppable force in official Washington. The conspicuously disheveled founder and CEO of FTX had positioned himself as a new sort of billionaire and crypto entrepreneur — someone who promised to do good with his extraordinary wealth, who had publicly discussed supporting Democratic political candidates to the tune of a billion dollars in upcoming elections, and who seemed to offer the possibility of legitimizing an industry that had grown exponentially during the pandemic while operating on the fringes of America's financial regulatory apparatus.

By last March, things appeared to be going exceptionally well for Bankman-Fried as he prepared for a private meeting with Gary Gensler, the chair of the Securities and Exchange Commission. We now know that Bankman-Fried was in the midst of executing a dual-pronged political and media strategy that looks to have been one of the most ambitious political-influence operations in recent memory. He was testifying before Congress about how to regulate crypto markets, and behind closed doors, he was successfully lobbying for a bill that would have enacted a system that was very beneficial to him. Meanwhile, Bankman-Fried was schmoozing with (and offering money to) a group of self-styled policy professionals and political pundits whose unofficial seal of approval conferred an aura of intellectual seriousness on his project.

---

**Sign up for Dinner Party**
*A lively evening newsletter about everything that just happened.*

| Enter your email | SIGN UP |

---

At the time of his meeting with Gensler, Bankman-Fried was in the process of acquiring a stake in the stock exchange IEX, and he was joined by a group of FTX and IEX representatives to pitch a new SEC-approved crypto-trading platform. They included a top FTX lawyer who had worked with Gensler and who, in private, had reportedly bragged about his access to "Gary." This meeting was coming on the heels of a dinner Bankman-Fried arranged with the SEC's incoming general counsel, Dan Berkovitz. (Berkowitz recently stepped down.)

But things did not go as planned for the FTX and IEX crew at that meeting last March. They were evidently seeking agency approval for a so-called "alternative trading system," a more lightly regulated alternative to national securities exchanges. Gensler, in his telling, sharply rebuffed the group.

"I indicated to them they could take their slide deck down on the second slide," Gensler told me during a recent and wide-ranging conversation, "and that I didn't think that they should — with all respect — that it was not a valuable use of their time."

According to Gensler, FTX was far too conflicted to satisfy the agency's regulations. He said that he told the group "that alternative trading systems were something amongst and for institutional investors" and that "just coming into compliance was going to need them to disaggregate their business to address the conflicts — that they should have a separate exchange, separate broker-dealer, separate custody, and that they were in the national security exchange Zip Code, not in the ATS Zip Code." (The outcome of the meeting was first reported by the New York *Times*.)

It was not the first time that Gensler met with Bankman-Fried and other FTX representatives — there was also a previously disclosed session in late 2021 — but when we spoke, it was unclear whether there had been any other meetings between the two men, which might raise further questions among the public about Bankman-Fried's access to U.S. regulators. Gensler's calendars for 2022 have not yet been fully released, so questions on this front have persisted.

So were there any other meetings between the two? "No," Gensler quickly responded when I put the question to him directly.

Gensler's brushback last March may have helped to limit the extraordinary fallout in the sector last year, though of course, plenty of people have been caught without their coats in the harsh and unsparing deep freeze of crypto winter. Retail investors have lost extraordinary sums, there has been a wave of large crypto bankruptcies, and evidence of rampant fraud in the industry, which was already abundant, continues to accumulate.

It is also eminently reasonable to ask whether the SEC could — and should — have done more to crack down on the industry before now. It is, after all, comparatively easy to aggressively go after companies or their principals after their businesses have been exposed by the press or competitors as financially unsound or perhaps even fundamentally fraudulent enterprises, and given the publicly available information, it is fair to question whether the SEC should have pursued concerns about the industry more quickly and assertively than it did in recent years.

The political fallout from the implosion of FTX and the criminal indictment of Bankman-Fried is far from over. It has embarrassed prominent figures throughout Washington. Whether it will have any implications for Gensler, by all accounts an ambitious player in the Biden administration, is still an open question.

It all occurred at a precarious time for him. He was already under fire for an ambitious regulatory agenda that had drawn the ire of Wall Street and generated internal frustration among SEC staff, and some of the same members of Congress who criticized Gensler last year for investigating the industry too aggressively, including New York congressman Ritchie Torres and Minnesota representative Tom Emmer, have since sought to blame Gensler for the FTX disaster.

Meanwhile, there have been reports since last summer suggesting the possibility of a change of leadership at the Treasury Department, where Secretary Janet Yellen has had to deal with widespread public anxiety over inflation. Gensler began his career in government service at Treasury in the late 1990s after nearly two decades at Goldman Sachs, and there have been slight rumblings, which have made their way into the financial press, that Gensler might be interested in leading the department if Yellen decides to leave at some point in the coming years, particularly if Biden is reelected.

All of this raises the stakes for the 65-year-old, as he mounts a public defense of the SEC's record on crypto regulation and enforcement, including during our discussion. We talked about how the industry tried to outmaneuver Congress and the country's financial regulators, as well as how crypto markets should be regulated, but Gensler also made clear that he has been grappling with the same question as many of the rest of us: What, exactly, is the point of crypto?

From the vantage point of today, it is clear that Bankman-Fried was very close to building what has been fairly described as a "regulatory moat" around FTX — locking in a role for himself and his company at the top of the crypto industry. The legislation that he backed, called the Digital Commodities Consumer Protection Act, would have given the Commodity Futures Trading Commission authority to regulate certain crypto products — specifically, bitcoin, ether, and other vaguely identified "digital commodities" — and displaced

the SEC's jurisdiction in the area. It was an ambitious but straightforward strategy of domestic regulatory arbitrage that would have effectively allowed the company to pick its own regulator in the U.S. (Though, of course, the March meeting with Gensler shows that Bankman-Fried was looking for regulatory buy-in from all relevant agencies.)

Fairly or not, the CFTC is generally regarded as a more pliant and less assertive financial regulator than the SEC. It was therefore not that surprising when the head of the CFTC disclosed that Bankman-Fried had met with him and other senior officials at the agency ten times over roughly the year leading up to the collapse of the FTX, despite concerns raised in real time by commodities specialists.

"I love the CFTC," said Gensler, who ran the agency during the Obama administration, as we touched on these uncomfortable facts, implicating some of his former and current colleagues. "You're not going to get me to say anything negative about" the CFTC, he added. "It's just too — it's in my blood."

Still, he was unsparing in his assessment of the merits of the legislative effort, which was spearheaded in the Senate by Michigan Democrat Debbie Stabenow. The bill, Gensler told me, would have "unambiguously undermined investor protection" thanks to the vague legislative text that was on the table. "We live in a world where Amazon stock and U.S. treasuries are already digital," Gensler explained. "So many of the bills, literally, you could take the $24 trillion treasury market, put it on a blockchain ledger, and take it outside of the current regime" of federal regulation. (This may sound a bit dry in Gensler's phrasing, but to be clear, it would be a radical and crazy outcome.)

The new Congress is looking again at crypto-specific legislation, but Gensler believes that the SEC has all of the legal tools that it needs. Over the course of our discussion, he articulated a straightforward view of the agency's reach — that pretty much every sort of crypto transaction already falls under the SEC's jurisdiction except spot transactions in bitcoin itself and the actual purchase or sale of goods or services with cryptocurrencies.

"Everything other than bitcoin," Gensler told me, "you can find a website, you can find a group of entrepreneurs, they might set up their legal entities in a tax haven offshore, they might have a foundation, they might lawyer it up to try to arbitrage and make it hard jurisdictionally or so forth." In other words, there are people behind these cryptocurrencies using a variety of complex and legally opaque mechanisms, but at the most basic level, they are trying to promote their tokens and entice investors. (Bitcoin, because of its unique history and creation story, is fundamentally different from other crypto projects in this respect.)

"They might drop their tokens overseas at first and contend or pretend that it's going to take six months before they come back to the U.S.," he continued. "But at the core," he argued, "these tokens are securities because there's a group in the middle and the public is anticipating profits based on that group." The claim that crypto investors are hoping to profit based on the efforts of those intermediaries — in much the same way that stockholders in public companies hope to see their investments appreciate over time — is central to Gensler's position that, as a legal matter, these are actually transactions in securities that fall within the SEC's jurisdiction.

As a matter of securities law, Gensler's view is not that hard to understand, though it is still being tested in the courts. The agency racked up a significant win last November, but there are other pending legal rulings that are eagerly awaited by industry observers, and there is a well-resourced crypto lobby that is not likely to back down anytime soon.

For now, the SEC has emerged as the industry's primary civil regulator, whether crypto advocates like it or not — but there are still plenty of big questions about what the agency has been up to in recent years and what its current enforcement strategy will actually achieve. Arguably the federal government's actions — including those of the SEC — didn't do much to

Case 2:23-cv-00580-RSM   Document 38-1   Filed 06/30/23   Page 70 of 123

prevent the loss of trillions of dollars in value over the last year, potentially impacting tens of millions of Americans who hold crypto assets in some form.

Gensler was extremely diplomatic about it when we spoke, but a large part of this mess is attributable to the Trump administration's extremely lax approach to financial fraud and regulation, as well as the credulousness of the industry's supporters in Congress. "In terms of policy-makers around the globe," Gensler explained, "you had this ascendancy in the crypto market during the COVID period and low interest rates," during which time the market grew "from $250 billion to $3 trillion."

Capitol Hill was also an important player in the mess. Many members of Congress — "good faith, hardworking members of Congress," Gensler was quick to add — felt compelled to meet with industry advocates and hear them out about the supposed financial revolution that they were ushering in. According to Gensler, members of Congress "were hearing about crypto increasingly because the retail public was also caught up" thanks to things like Super Bowl advertising and support from celebrities like Kim Kardashian. In the downturn that followed, Gensler's agency has brought charges against various high-profile crypto opportunists, including Kardashian, who settled an enforcement action last October.

ensler has said that the "roadway" or "runway" for crypto firms that are not registered with the SEC is "getting shorter," but the metaphor is an odd one. The planes are already in the air, so the agency is really trying to ground them.

That explains a series of significant moves by the agency since the start of the year — including a major enforcement action against two prominent crypto firms based on an unregistered crypto asset lending program; a recent settlement with a crypto exchange based on an industry practice known as "staking"; and notice of a potential enforcement action against a stablecoin issuer whose product is affiliated with Binance.

Gensler broadly referred to these kinds of firms, which seem to differ endlessly in their offerings and corporate structures, as "storefronts" that are providing services to the public "in a way that's commingled and is rife with conflicts." He argued that many of them combine functions that would have to be legally disaggregated in traditionally regulated markets, including roles that would ordinarily be separated among some combination of exchanges, lenders, market-makers, broker-dealers, investment advisers, and custodians.

"The conflicts in these storefronts," Gensler told me, "we do not allow in traditional finance, we don't allow in the securities markets, we don't allow it in the commercial banking markets, and we don't allow it in crypto because these storefronts are fundamentally and generally noncompliant with the securities laws as we know them." He argued that network effects have made "a small handful of storefronts" particularly important, but "whether they call themselves lending or staking as a service or exchanges, they're bringing together millions of customers."

On its face, the idea that an increase in SEC registrations and filings from crypto companies will somehow markedly improve the integrity and resilience of this market seems dubious. Last February, the crypto lender BlockFi agreed to register with the SEC at the agency's urging, paid a $100 million fine, and then went bankrupt in November. The stark turn of events seemed to reflect, at least in part, the fact that the underlying crypto asset class is both novel and unstable, and that this is not an industry with consistent and widely accepted valuation, marking, or disclosure conventions.

Perhaps more importantly, the implosion of BlockFi seemed to reflect the legal and practical limits of the SEC's strategy to force more crypto firms to register with the agency. That is because companies that register with the SEC may have to satisfy more detailed and

burdensome disclosure requirements, but that does not mean that those companies or their business models will magically become more stable or financially sound.

The unstated premise of the SEC's current enforcement push appears to be that if the government can broadly stigmatize the industry and market participants, then ordinary people — the retail investors all over the world who have gotten swept up in the crypto frenzy of recent years — might think long and hard about whether to hold these assets in any form. It is a message that federal regulators recently delivered directly to the banking industry, warning them not to issue or hold any crypto assets because doing so would be "highly likely to be inconsistent with safe and sound banking practices."

I asked Gensler whether federal regulators with consumer-facing responsibilities should send a comparable message to retail investors, but he gently resisted. "I'm in a job where I'm supposed to be merit neutral in terms of what risk investors want to take," he told me at one point, "but not neutral towards the investor protection — the full, fair, and truthful disclosure you get when you're investing in a security."

Perhaps the most telling answer I got from Gensler over the course of our discussion was when I asked him to explain the legitimate use case for crypto: What is the actual point of this new sector, and could it actually provide a valuable economic or financial service for ordinary people and the global economy?

Gensler was careful to draw a sharp distinction between two types of supposed innovations promoted by crypto's earliest advocates. The first is the idea of a distributed accounting ledger — the blockchain technology that came into the world with Bitcoin's invention — that is in theory more transparent, accessible, and resilient against theft and cyberattacks than centralized ledgers. Gensler clearly admired the technical creation. "I personally think it's very rare that you need that, but it's possible," he said. "That's a real innovation."

The second, of course, is the notion that cryptocurrencies might actually provide a useful store of value or alternative payment mechanism, and on that point, Gensler appeared to be much less impressed.

"History tells us throughout — through antiquity to now — that economies coalesce around one monetary unit," he said. "There is a network effect to having one unit that we humans accept as a medium of exchange and unit of account — a store of value — one unit. The two things governments do since Genghis Khan," he observed, "is basically say, 'This is what's accepted for your taxes, and it's accepted for all debts, public and private.'"

"I don't think there's much economic use for a micro-currency, and we haven't seen one in centuries," Gensler said. "Most of these tokens will fail, because the question is about these economics. What's the 'there' there?"

It was a diplomatic answer for someone who is tasked with reigning in a well-funded and well-lawyered industry that many people believe is generally useless and economically wasteful. Here is a simpler way of thinking about it if you are an ordinary investor who bought "shitcoins" in recent years, perhaps because of the celebrity endorsements, the high-profile ads, or plain-old fear of missing out: Get out while you can.

TAGS: THE MONEY GAME  GARY GENSLER  CRYPTO  BITCOIN  MORE

🖿  SHOW 9 COMMENTS

# Exhibit 6

**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**

**Release No. 81207 / July 25, 2017**

**Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO**

## I.    Introduction and Summary

The United States Securities and Exchange Commission's ("Commission") Division of Enforcement ("Division") has investigated whether The DAO, an unincorporated organization; Slock.it UG ("Slock.it"), a German corporation; Slock.it's co-founders; and intermediaries may have violated the federal securities laws.  The Commission has determined not to pursue an enforcement action in this matter based on the conduct and activities known to the Commission at this time.

As described more fully below, The DAO is one example of a Decentralized Autonomous Organization, which is a term used to describe a "virtual" organization embodied in computer code and executed on a distributed ledger or blockchain.  The DAO was created by Slock.it and Slock.it's co-founders, with the objective of operating as a for-profit entity that would create and hold a corpus of assets through the sale of DAO Tokens to investors, which assets would then be used to fund "projects."  The holders of DAO Tokens stood to share in the anticipated earnings from these projects as a return on their investment in DAO Tokens.  In addition, DAO Token holders could monetize their investments in DAO Tokens by re-selling DAO Tokens on a number of web-based platforms ("Platforms") that supported secondary trading in the DAO Tokens.

After DAO Tokens were sold, but before The DAO was able to commence funding projects, an attacker used a flaw in The DAO's code to steal approximately one-third of The DAO's assets.  Slock.it's co-founders and others responded by creating a work-around whereby DAO Token holders could opt to have their investment returned to them, as described in more detail below.

The investigation raised questions regarding the application of the U.S. federal securities laws to the offer and sale of DAO Tokens, including the threshold question whether DAO Tokens are securities.  Based on the investigation, and under the facts presented, the Commission has determined that DAO Tokens are securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").[1]  The Commission deems it appropriate and in the public interest to issue this report of investigation ("Report") pursuant to

---

[1]  This Report does not analyze the question whether The DAO was an "investment company," as defined under Section 3(a) of the Investment Company Act of 1940 ("Investment Company Act"), in part, because The DAO never commenced its business operations funding projects.  Those who would use virtual organizations should consider their obligations under the Investment Company Act.

Section 21(a) of the Exchange Act[2] to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws.  All securities offered and sold in the United States must be registered with the Commission or must qualify for an exemption from the registration requirements.  In addition, any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption from such registration.

This Report reiterates these fundamental principles of the U.S. federal securities laws and describes their applicability to a new paradigm—virtual organizations or capital raising entities that use distributed ledger or blockchain technology to facilitate capital raising and/or investment and the related offer and sale of securities.  The automation of certain functions through this technology, "smart contracts,"[3] or computer code, does not remove conduct from the purview of the U.S. federal securities laws.[4]  This Report also serves to stress the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces.

## II.    Facts

### A.    Background

From April 30, 2016 through May 28, 2016, The DAO offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH"), a

---

[2]  Section 21(a) of the Exchange Act authorizes the Commission to investigate violations of the federal securities laws and, in its discretion, to "publish information concerning any such violations."  This Report does not constitute an adjudication of any fact or issue addressed herein, nor does it make any findings of violations by any individual or entity.  The facts discussed in Section II, *infra*, are matters of public record or based on documentary records.  We are publishing this Report on the Commission's website to ensure that all market participants have concurrent and equal access to the information contained herein.

[3] Computer scientist Nick Szabo described a "smart contract" as:

> a computerized transaction protocol that executes terms of a contract.  The general objectives of smart contract design are to satisfy common contractual conditions (such as payment terms, liens, confidentiality, and even enforcement), minimize exceptions both malicious and accidental, and minimize the need for trusted intermediaries.  Related economic goals include lowering fraud loss, arbitrations and enforcement costs, and other transaction costs.

*See* Nick Szabo, *Smart Contracts*, 1994, http://www.virtualschool.edu/mon/Economics/SmartContracts.html.

[4] *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943) ("[T]he reach of the [Securities] Act does not stop with the obvious and commonplace.  Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a 'security'."); *see also Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.").

virtual currency[5] used on the Ethereum Blockchain.[6]  As of the time the offering closed, the total ETH raised by The DAO was valued in U.S. Dollars ("USD") at approximately $150 million.

The concept of a DAO Entity is memorialized in a document (the "White Paper"), authored by Christoph Jentzsch, the Chief Technology Officer of Slock.it, a "Blockchain and IoT [(internet-of-things)] solution company," incorporated in Germany and co-founded by Christoph Jentzsch, Simon Jentzsch (Christoph Jentzsch's brother), and Stephan Tual ("Tual").[7]  The White Paper purports to describe "the first implementation of a [DAO Entity] code to automate organizational governance and decision making."[8]  The White Paper posits that a DAO Entity "can be used by individuals working together collaboratively outside of a traditional corporate form.  It can also be used by a registered corporate entity to automate formal governance rules contained in corporate bylaws or imposed by law."  The White Paper proposes an entity—a DAO Entity—that would use smart contracts to attempt to solve governance issues it described as inherent in traditional corporations.[9]  As described, a DAO Entity purportedly would supplant traditional mechanisms of corporate governance and management with a blockchain such that contractual terms are "formalized, automated and enforced using software."[10]

---

[5]  The Financial Action Task Force defines "virtual currency" as:

> a digital representation of value that can be digitally traded and functions as:  (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status (i.e., when tendered to a creditor, is a valid and legal offer of payment) in any jurisdiction. It is not issued or guaranteed by any jurisdiction, and fulfils the above functions only by agreement within the community of users of the virtual currency. Virtual currency is distinguished from fiat currency (a.k.a. "real currency," "real money," or "national currency"), which is the coin and paper money of a country that is designated as its legal tender; circulates; and is customarily used and accepted as a medium of exchange in the issuing country.  It is distinct from e-money, which is a digital representation of fiat currency used to electronically transfer value denominated in fiat currency.

*FATF Report, Virtual Currencies, Key Definitions and Potential AML/CFT Risks*, FINANCIAL ACTION TASK FORCE (June 2014), http://www.fatf-gafi.org/media/fatf/documents/reports/Virtual-currency-key-definitions-and-potential-aml-cft-risks.pdf.

[6]  Ethereum, developed by the Ethereum Foundation, a Swiss nonprofit organization, is a decentralized platform that runs smart contracts on a blockchain known as the Ethereum Blockchain.

[7]  Christoph Jentzsch released the final draft of the White Paper on or around March 23, 2016.  He introduced his concept of a DAO Entity as early as November 2015 at an Ethereum Developer Conference in London, as a medium to raise funds for Slock.it, a German start-up he co-founded in September 2015.  Slock.it purports to create technology that embeds smart contracts that run on the Ethereum Blockchain into real-world devices and, as a result, for example, permits anyone to rent, sell or share physical objects in a decentralized way.  *See* SLOCK.IT, https://slock.it/.

[8]  Christoph Jentzsch, *Decentralized Autonomous Organization to Automate Governance Final Draft – Under Review*, https://download.slock.it/public/DAO/WhitePaper.pdf.

[9]  *Id.*

[10]  *Id.*  The White Paper contained the following statement:

> A word of caution, at the outset:  the legal status of [DAO Entities] remains the subject of active and vigorous debate and discussion.  Not everyone shares the same definition.  Some have said that [DAO Entities] are autonomous code and can operate independently of legal systems; others

B.     The DAO

"The DAO" is the "first generation" implementation of the White Paper concept of a DAO Entity, and it began as an effort to create a "crowdfunding contract" to raise "funds to grow [a] company in the crypto space."[11]   In November 2015, at an Ethereum Developer Conference in London, Christoph Jentzsch described his proposal for The DAO as a "for-profit DAO [Entity]," where participants would send ETH (a virtual currency) to The DAO to purchase DAO Tokens, which would permit the participant to vote and entitle the participant to "rewards."[12] Christoph Jentzsch likened this to "buying shares in a company and getting … dividends."[13]  The DAO was to be "decentralized" in that it would allow for voting by investors holding DAO Tokens.[14]  All funds raised were to be held at an Ethereum Blockchain "address" associated with The DAO and DAO Token holders were to vote on contract proposals, including proposals to The DAO to fund projects and distribute The DAO's anticipated earnings from the projects it funded.[15]  The DAO was intended to be "autonomous" in that project proposals were in the form of smart contracts that exist on the Ethereum Blockchain and the votes were administered by the code of The DAO.[16]

have said that [DAO Entities] must be owned or operate[d] by humans or human created entities. There will be many use cases, and the DAO [Entity] code will develop over time.  Ultimately, how a DAO [Entity] functions and its legal status will depend on many factors, including how DAO [Entity] code is used, where it is used, and who uses it.  This paper does not speculate about the legal status of [DAO Entities] worldwide.  This paper is not intended to offer legal advice or conclusions.  Anyone who uses DAO [Entity] code will do so at their own risk.

*Id.*

[11] Christoph Jentzsch, *The History of the DAO and Lessons Learned*, SLOCK.IT BLOG (Aug. 24, 2016), https://blog.slock.it/the-history-of-the-dao-and-lessons-learned-d06740f8cfa5#.5o62zo8uv.  Although The DAO has been described as a "crowdfunding contract," The DAO would not have met the requirements of Regulation Crowdfunding, adopted under Title III of the Jumpstart Our Business Startups (JOBS) Act of 2012 (providing an exemption from registration for certain crowdfunding), because, among other things, it was not a broker-dealer or a funding portal registered with the SEC and the Financial Industry Regulatory Authority ("FINRA").  *See Regulation Crowdfunding: A Small Entity Compliance Guide for Issuers*, SEC (Apr. 5, 2017), https://www.sec.gov/info/smallbus/secg/rccomplianceguide-051316.htm; *Updated Investor Bulletin: Crowdfunding for Investors*, SEC (May 10, 2017), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_crowdfunding-.html.

[12]  *See* Slockit, *Slock.it DAO demo at Devcon1: IoT + Blockchain*, YOUTUBE (Nov. 13, 2015), https://www.youtube.com/watch?v=49wHQoJxYPo.

[13]  *Id.*

[14]  *See* Jentzsch, *supra* note 8.

[15]  *Id.*  In theory, there was no limitation on the type of project that could be proposed.  For example, proposed "projects" could include, among other things, projects that would culminate in the creation of products or services that DAO Token holders could use or charge others for using.

[16]  *Id.*

4

On or about April 29, 2016, Slock.it deployed The DAO code on the Ethereum Blockchain, as a set of pre-programmed instructions.[17]  This code was to govern how The DAO was to operate.

To promote The DAO, Slock.it's co-founders launched a website ("The DAO Website"). The DAO Website included a description of The DAO's intended purpose:  "To blaze a new path in business for the betterment of its members, existing simultaneously nowhere and everywhere and operating solely with the steadfast iron will of unstoppable code."[18]  The DAO Website also described how The DAO operated, and included a link through which DAO Tokens could be purchased.  The DAO Website also included a link to the White Paper, which provided detailed information about a DAO Entity's structure and its source code and, together with The DAO Website, served as the primary source of promotional materials for The DAO.  On The DAO Website and elsewhere, Slock.it represented that The DAO's source code had been reviewed by "one of the world's leading security audit companies" and "no stone was left unturned during those five whole days of security analysis."[19]

Slock.it's co-founders also promoted The DAO by soliciting media attention and by posting almost daily updates on The DAO's status on The DAO and Slock.it websites and numerous online forums relating to blockchain technology.  Slock.it's co-founders used these posts to communicate to the public information about how to participate in The DAO, including: how to create and acquire DAO Tokens; the framework for submitting proposals for projects; and how to vote on proposals.  Slock.it also created an online forum on The DAO Website, as well as administered "The DAO Slack" channel, an online messaging platform in which over 5,000 invited "team members" could discuss and exchange ideas about The DAO in real time.

### 1.    DAO Tokens

In exchange for ETH, The DAO created DAO Tokens (proportional to the amount of ETH paid) that were then assigned to the Ethereum Blockchain address of the person or entity remitting the ETH.  A DAO Token granted the DAO Token holder certain voting and ownership rights.  According to promotional materials, The DAO would earn profits by funding projects

---

[17]  According to the White Paper, a DAO Entity is "activated by deployment on the Ethereum [B]lockchain.  Once deployed, a [DAO Entity's] code requires 'ether' [ETH] to engage in transactions on Ethereum.  Ether is the digital fuel that powers the Ethereum Network."  The only way to update or alter The DAO's code is to submit a new proposal for voting and achieve a majority consensus on that proposal.  *See* Jentzsch, *supra* note 8.  According to Slock.it's website, Slock.it gave The DAO code to the Ethereum community, noting that:

> The DAO framework is [a] side project of Slock.it UG and a gift to the Ethereum community.  It consisted of a definitive whitepaper, smart contract code audited by one of the best security companies in the world and soon, a complete frontend interface.  All free and open source for anyone to re-use, it is our way to say 'thank you' to the community.

SLOCK.IT, https://slock.it. The DAO code is publicly-available on GitHub, a host of source code.  *See The Standard DAO Framework, Inc., Whitepaper*, GITHUB, https://github.com/slockit/DAO.

[18]  The DAO Website was available at https://daohub.org.

[19]  Stephen Tual, *Deja Vu DAO Smart Contracts Audit Results*, SLOCK.IT BLOG (Apr. 5, 2016), https://blog.slock.it/deja-vu-dai-smart-contracts-audit-results-d26bc088e32e.

that would provide DAO Token holders a return on investment. The various promotional materials disseminated by Slock.it's co-founders touted that DAO Token holders would receive "rewards," which the White Paper defined as, "any [ETH] received by a DAO [Entity] generated from projects the DAO [Entity] funded." DAO Token holders would then vote to either use the rewards to fund new projects or to distribute the ETH to DAO Token holders.

From April 30, 2016 through May 28, 2016 (the "Offering Period"), The DAO offered and sold DAO Tokens. Investments in The DAO were made "pseudonymously" (i.e., an individual's or entity's pseudonym was their Ethereum Blockchain address). To purchase a DAO Token offered for sale by The DAO, an individual or entity sent ETH from their Ethereum Blockchain address to an Ethereum Blockchain address associated with The DAO. All of the ETH raised in the offering as well as any future profits earned by The DAO were to be pooled and held in The DAO's Ethereum Blockchain address. The token price fluctuated in a range of approximately 1 to 1.5 ETH per 100 DAO Tokens, depending on when the tokens were purchased during the Offering Period. Anyone was eligible to purchase DAO Tokens (as long as they paid ETH). There were no limitations placed on the number of DAO Tokens offered for sale, the number of purchasers of DAO Tokens, or the level of sophistication of such purchasers.

DAO Token holders were not restricted from re-selling DAO Tokens acquired in the offering, and DAO Token holders could sell their DAO Tokens in a variety of ways in the secondary market and thereby monetize their investment as discussed below. Prior to the Offering Period, Slock.it solicited at least one U.S. web-based platform to trade DAO Tokens on its system and, at the time of the offering, The DAO Website and other promotional materials disseminated by Slock.it included representations that DAO Tokens would be available for secondary market trading after the Offering Period via several platforms. During the Offering Period and afterwards, the Platforms posted notices on their own websites and on social media that each planned to support secondary market trading of DAO Tokens.[20]

In addition to secondary market trading on the Platforms, after the Offering Period, DAO Tokens were to be freely transferable on the Ethereum Blockchain. DAO Token holders would also be permitted to redeem their DAO Tokens for ETH through a complicated, multi-week (approximately 46-day) process referred to as a DAO Entity "split."[21]

### 2.  *Participants in The DAO*

According to the White Paper, in order for a project to be considered for funding with "a DAO [Entity]'s [ETH]," a "Contractor" first must submit a proposal to the DAO Entity. Specifically, DAO Token holders expected Contractors to submit proposals for projects that could provide DAO Token holders returns on their investments. Submitting a proposal to The DAO involved: (1) writing a smart contract, and then deploying and publishing it on the

---

[20] The Platforms are registered with FinCEN as "Money Services Businesses" and provide systems whereby customers may exchange virtual currencies for other virtual currencies or fiat currencies.

[21] According to the White Paper, the primary purpose of a split is to protect minority shareholders and prevent what is commonly referred to as a "51% Attack," whereby an attacker holding 51% of a DAO Entity's Tokens could create a proposal to send all of the DAO Entity's funds to himself or herself.

Ethereum Blockchain; and (2) posting details about the proposal on The DAO Website, including the Ethereum Blockchain address of the deployed contract and a link to its source code.  Proposals could be viewed on The DAO Website as well as other publicly-accessible websites.  Per the White Paper, there were two prerequisites for submitting a proposal.  An individual or entity must:  (1) own at least one DAO Token; and (2) pay a deposit in the form of ETH that would be forfeited to the DAO Entity if the proposal was put up for a vote and failed to achieve a quorum of DAO Token holders.  It was publicized that Slock.it would be the first to submit a proposal for funding.[22]

ETH raised by The DAO was to be distributed to a Contractor to fund a proposal only on a majority vote of DAO Token holders.[23]  DAO Token holders were to cast votes, which would be weighted by the number of tokens they controlled, for or against the funding of a specific proposal.  The voting process, however, was publicly criticized in that it could incentivize distorted voting behavior and, as a result, would not accurately reflect the consensus of the majority of DAO Token holders.  Specifically, as noted in a May 27, 2016 blog post by a group of computer security researchers, The DAO's structure included a "strong positive bias to vote YES on proposals and to suppress NO votes as a side effect of the way in which it restricts users' range of options following the casting of a vote."[24]

Before any proposal was put to a vote by DAO Token holders, it was required to be reviewed by one or more of The DAO's "Curators."  At the time of the formation of The DAO, the Curators were a group of individuals chosen by Slock.it.[25]  According to the White Paper, the Curators of a DAO Entity had "considerable power."  The Curators performed crucial security functions and maintained ultimate control over which proposals could be submitted to, voted on, and funded by The DAO.  As stated on The DAO Website during the Offering Period, The DAO relied on its Curators for "failsafe protection" and for protecting The DAO from "malicous [sic] actors."  Specifically, per The DAO Website, a Curator was responsible for:  (1) confirming that any proposal for funding originated from an identifiable person or organization; and (2)

---

[22]  It was stated on The DAO Website and elsewhere that Slock.it anticipated that it would be the first to submit a proposal for funding.  In fact, a draft of Slock.it's proposal for funding for an "Ethereum Computer and Universal Sharing Network" was publicly-available online during the Offering Period.

[23]  DAO Token holders could vote on proposals, either by direct interaction with the Ethereum Blockchain or by using an application that interfaces with the Ethereum Blockchain.  It was generally acknowledged that DAO Token holders needed some technical knowledge in order to submit a vote, and The DAO Website included a link to a step-by-step tutorial describing how to vote on proposals.

[24]  By voting on a proposal, DAO Token holders would "tie up" their tokens until the end of the voting cycle.  *See* Jentzsch, *supra* note 8 at 8 ("The tokens used to vote will be blocked, meaning they can not  [sic] be transferred until the proposal is closed.").  If, however, a DAO Token holder abstained from voting, the DAO Token holder could avoid these restrictions; any DAO Tokens not submitted for a vote could be withdrawn or transferred at any time.  As a result, DAO Token holders were incentivized either to vote yes or to abstain from voting. *See* Dino Mark et al., *A Call for a Temporary Moratorium on The DAO*, HACKING, DISTRIBUTED (May 27, 2016, 1:35 PM), http://hackingdistributed.com/2016/05/27/dao-call-for-moratorium/.

[25]  At the time of The DAO's launch, The DAO Website identified eleven "high profile" individuals as holders of The DAO's Curator "Multisig" (or "private key").  These individuals all appear to live outside of the United States.  Many of them were associated with the Ethereum Foundation, and The DAO Website touted the qualifications and trustworthiness of these individuals.

confirming that smart contracts associated with any such proposal properly reflected the code the Contractor claims to have deployed on the Ethereum Blockchain. If a Curator determined that the proposal met these criteria, the Curator could add the proposal to the "whitelist," which was a list of Ethereum Blockchain addresses that could receive ETH from The DAO if the majority of DAO Token holders voted for the proposal.

Curators of The DAO had ultimate discretion as to whether or not to submit a proposal for voting by DAO Token holders. Curators also determined the order and frequency of proposals, and could impose subjective criteria for whether the proposal should be whitelisted. One member of the group chosen by Slock.it to serve collectively as the Curator stated publicly that the Curator had "complete control over the whitelist … the order in which things get whitelisted, the duration for which [proposals] get whitelisted, when things get unwhitelisted … [and] clear ability to control the order and frequency of proposals," noting that "curators have tremendous power."[26] Another Curator publicly announced his subjective criteria for determining whether to whitelist a proposal, which included his personal ethics.[27] Per the White Paper, a Curator also had the power to reduce the voting quorum requirement by 50% every other week. Absent action by a Curator, the quorum could be reduced by 50% only if no proposal had reached the required quorum for 52 weeks.

### 3. Secondary Market Trading on the Platforms

During the period from May 28, 2016 through early September 2016, the Platforms became the preferred vehicle for DAO Token holders to buy and sell DAO Tokens in the secondary market using virtual or fiat currencies. Specifically, the Platforms used electronic systems that allowed their respective customers to post orders for DAO Tokens on an anonymous basis. For example, customers of each Platform could buy or sell DAO Tokens by entering a market order on the Platform's system, which would then match with orders from other customers residing on the system. Each Platform's system would automatically execute these orders based on pre-programmed order interaction protocols established by the Platform.

None of the Platforms received orders for DAO Tokens from non-Platform customers or routed its respective customers' orders to any other trading destinations. The Platforms publicly displayed all their quotes, trades, and daily trading volume in DAO Tokens on their respective websites. During the period from May 28, 2016 through September 6, 2016, one such Platform executed more than 557,378 buy and sell transactions in DAO Tokens by more than 15,000 of its U.S. and foreign customers. During the period from May 28, 2016 through August 1, 2016, another such Platform executed more than 22,207 buy and sell transactions in DAO Tokens by more than 700 of its U.S. customers.

---

[26] Epicenter, *EB134 – Emin Gün Sirer And Vlad Zamfir: On A Rocky DAO*, YOUTUBE (June 6, 2016), https://www.youtube.com/watch?v=ON5GhIQdFU8.

[27] Andrew Quentson, *Are the DAO Curators Masters or Janitors?*, THE COIN TELEGRAPH (June 12, 2016), https://cointelegraph.com/news/are-the-dao-curators-masters-or-janitors.

#### 4.    Security Concerns, The "Attack" on The DAO, and The Hard Fork

In late May 2016, just prior to the expiration of the Offering Period, concerns about the safety and security of The DAO's funds began to surface due to vulnerabilities in The DAO's code.  On May 26, 2016, in response to these concerns, Slock.it submitted a "DAO Security Proposal" that called for the development of certain updates to The DAO's code and the appointment of a security expert.[28]  Further, on June 3, 2016, Christoph Jentzsch, on behalf of Slock.it, proposed a moratorium on all proposals until alterations to The DAO's code to fix vulnerabilities in The DAO's code had been implemented.[29]

On June 17, 2016, an unknown individual or group (the "Attacker") began rapidly diverting ETH from The DAO, causing approximately 3.6 million ETH—1/3 of the total ETH raised by The DAO offering—to move from The DAO's Ethereum Blockchain address to an Ethereum Blockchain address controlled by the Attacker (the "Attack").[30]  Although the diverted ETH was then held in an address controlled by the Attacker, the Attacker was prevented by The DAO's code from moving the ETH from that address for 27 days.[31]

In order to secure the diverted ETH and return it to DAO Token holders, Slock.it's co-founders and others endorsed a "Hard Fork" to the Ethereum Blockchain.  The "Hard Fork," called for a change in the Ethereum protocol on a going forward basis that would restore the DAO Token holders' investments as if the Attack had not occurred.  On July 20, 2016, after a majority of the Ethereum network adopted the necessary software updates, the new, forked Ethereum Blockchain became active.[32]  The Hard Fork had the effect of transferring all of the funds raised (including those held by the Attacker) from The DAO to a recovery address, where DAO Token holders could exchange their DAO Tokens for ETH.[33]  All DAO Token holders

---

[28]  *See* Stephan Tual, *Proposal #1-DAO Security, Redux*, SLOCK.IT BLOG (May 26, 2016), https://blog.slock.it/both-our-proposals-are-now-out-voting-starts-saturday-morning-ba322d6d3aea.  The unnamed security expert would "act as the first point of contact for security disclosures, and continually monitor, pre-empt and avert any potential attack vectors The DAO may face, including social, technical and economic attacks."  *Id.*  Slock.it initially proposed a much broader security proposal that included the formation of a "DAO Security" group, the establishment of a "Bug Bounty Program," and routine external audits of The DAO's code.  However, the cost of the proposal (125,000 ETH), which would be paid from The DAO's funds, was immediately criticized as too high and Slock.it decided instead to submit the revised proposal described above.  *See* Stephan Tual, *DAO.Security, a Proposal to guarantee the integrity of The DAO*, SLOCK.IT BLOG (May 25, 2016), https://blog.slock.it/dao-security-a-proposal-to-guarantee-the-integrity-of-the-dao-3473899ace9d.

[29]  *See TheDAO Proposal_ID 5*, ETHERSCAN, https://etherscan.io/token/thedao-proposal/5.

[30]  *See* Stephan Tual, *DAO Security Advisory: live updates*, SLOCK.IT BLOG (June 17, 2016), https://blog.slock.it/dao-security-advisory-live-updates-2a0a42a2d07b.

[31]  *Id.*

[32]  A minority group, however, elected not to adopt the new Ethereum Blockchain created by the Hard Fork because to do so would run counter to the concept that a blockchain is immutable.  Instead they continued to use the former version of the blockchain, which is now known as "Ethereum Classic."

[33]  *See* Christoph Jentzsch, *What the 'Fork' Really Means*, SLOCK.IT BLOG (July 18, 2016), https://blog.slock.it/what-the-fork-really-means-6fe573ac31dd.

who adopted the Hard Fork could exchange their DAO Tokens for ETH, and avoid any loss of the ETH they had invested.[34]

## III.    Discussion

The Commission is aware that virtual organizations and associated individuals and entities increasingly are using distributed ledger technology to offer and sell instruments such as DAO Tokens to raise capital.  These offers and sales have been referred to, among other things, as "Initial Coin Offerings" or "Token Sales."   Accordingly, the Commission deems it appropriate and in the public interest to issue this Report in order to stress that the U.S. federal securities law may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale.  In this Report, the Commission considers the particular facts and circumstances of the offer and sale of DAO Tokens to demonstrate the application of existing U.S. federal securities laws to this new paradigm.

### A.    Section 5 of the Securities Act

The registration provisions of the Securities Act contemplate that the offer or sale of securities to the public must be accompanied by the "full and fair disclosure" afforded by registration with the Commission and delivery of a statutory prospectus containing information necessary to enable prospective purchasers to make an informed investment decision. Registration entails disclosure of detailed "information about the issuer's financial condition, the identity and background of management, and the price and amount of securities to be offered … ."  *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998).  "The registration statement is designed to assure public access to material facts bearing on the value of publicly traded securities and is central to the Act's comprehensive scheme for protecting public investors."  *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979) (citing *SEC v. Ralston Purina Co.,* 346 U.S. 119, 124 (1953)), *vacated on other grounds*, 446 U.S. 680 (1980). Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to engage in the offer or sale of securities in interstate commerce.  Section 5(c) of the Securities Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. Thus, both Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce.  15 U.S.C. § 77e(a) and (c).  Violations of Section 5 do not require scienter.  *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976).

---

[34] *Id.*

10

B.      DAO Tokens Are Securities

1.      *Foundational Principles of the Securities Laws Apply to Virtual Organizations or Capital Raising Entities Making Use of Distributed Ledger Technology*

Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract." *See* 15 U.S.C. §§ 77b-77c. An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Edwards*, 540 U.S. 389, 393 (2004); *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301 (1946); *see also United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) (The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."). This definition embodies a "*flexible rather than a static principle*, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299 (emphasis added). The test "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *Id.* In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto." *United Housing Found.*, 421 U.S. at 849.

2.      *Investors in The DAO Invested Money*

In determining whether an investment contract exists, the investment of "money" need not take the form of cash. *See, e.g.*, *Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991) ("[I]n spite of *Howey's* reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract.").

Investors in The DAO used ETH to make their investments, and DAO Tokens were received in exchange for ETH. Such investment is the type of contribution of value that can create an investment contract under *Howey*. *See SEC v. Shavers*, No. 4:13-CV-416, 2014 WL 4652121, at *1 (E.D. Tex. Sept. 18, 2014) (holding that an investment of Bitcoin, a virtual currency, meets the first prong of *Howey*); *Uselton*, 940 F.2d at 574 ("[T]he 'investment' may take the form of 'goods and services,' or some other 'exchange of value'.") (citations omitted).

3.      *With a Reasonable Expectation of Profits*

Investors who purchased DAO Tokens were investing in a common enterprise and reasonably expected to earn profits through that enterprise when they sent ETH to The DAO's Ethereum Blockchain address in exchange for DAO Tokens. "[P]rofits" include "dividends, other periodic payments, or the increased value of the investment." *Edwards*, 540 U.S. at 394. As described above, the various promotional materials disseminated by Slock.it and its co-founders informed investors that The DAO was a for-profit entity whose objective was to fund

11

projects in exchange for a return on investment.[35]  The ETH was pooled and available to The DAO to fund projects.  The projects (or "contracts") would be proposed by Contractors.  If the proposed contracts were whitelisted by Curators, DAO Token holders could vote on whether The DAO should fund the proposed contracts.  Depending on the terms of each particular contract, DAO Token holders stood to share in potential profits from the contracts.  Thus, a reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment of ETH in The DAO.

### 4.    *Derived from the Managerial Efforts of Others*

#### a.    The Efforts of Slock.it, Slock.it's Co-Founders, and The DAO's Curators Were Essential to the Enterprise

Investors' profits were to be derived from the managerial efforts of others—specifically, Slock.it and its co-founders, and The DAO's Curators.  The central issue is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973).  The DAO's investors relied on the managerial and entrepreneurial efforts of Slock.it and its co-founders, and The DAO's Curators, to manage The DAO and put forth project proposals that could generate profits for The DAO's investors.

Investors' expectations were primed by the marketing of The DAO and active engagement between Slock.it and its co-founders with The DAO and DAO Token holders.  To market The DAO and DAO Tokens, Slock.it created The DAO Website on which it published the White Paper explaining how a DAO Entity would work and describing their vision for a DAO Entity.  Slock.it also created and maintained other online forums that it used to provide information to DAO Token holders about how to vote and perform other tasks related to their investment.  Slock.it appears to have closely monitored these forums, answering questions from DAO Token holders about a variety of topics, including the future of The DAO, security concerns, ground rules for how The DAO would work, and the anticipated role of DAO Token holders.  The creators of The DAO held themselves out to investors as experts in Ethereum, the blockchain protocol on which The DAO operated, and told investors that they had selected persons to serve as Curators based on their expertise and credentials.  Additionally, Slock.it told investors that it expected to put forth the first substantive profit-making contract proposal—a blockchain venture in its area of expertise.  Through their conduct and marketing materials, Slock.it and its co-founders led investors to believe that they could be relied on to provide the significant managerial efforts required to make The DAO a success.

Investors in The DAO reasonably expected Slock.it and its co-founders, and The DAO's Curators, to provide significant managerial efforts after The DAO's launch.  The expertise of The DAO's creators and Curators was critical in monitoring the operation of The DAO, safeguarding investor funds, and determining whether proposed contracts should be put for a

---

[35]  That the "projects" could encompass services and the creation of goods for use by DAO Token holders does not change the core analysis that investors purchased DAO Tokens with the expectation of earning profits from the efforts of others.

12

vote. Investors had little choice but to rely on their expertise. At the time of the offering, The DAO's protocols had already been pre-determined by Slock.it and its co-founders, including the control that could be exercised by the Curators. Slock.it and its co-founders chose the Curators, whose function it was to: (1) vet Contractors; (2) determine whether and when to submit proposals for votes; (3) determine the order and frequency of proposals that were submitted for a vote; and (4) determine whether to halve the default quorum necessary for a successful vote on certain proposals. Thus, the Curators exercised significant control over the order and frequency of proposals, and could impose their own subjective criteria for whether the proposal should be whitelisted for a vote by DAO Token holders. DAO Token holders' votes were limited to proposals whitelisted by the Curators, and, although any DAO Token holder could put forth a proposal, each proposal would follow the same protocol, which included vetting and control by the current Curators. While DAO Token holders could put forth proposals to replace a Curator, such proposals were subject to control by the current Curators, including whitelisting and approval of the new address to which the tokens would be directed for such a proposal. In essence, Curators had the power to determine whether a proposal to remove a Curator was put to a vote.[36]

And, Slock.it and its co-founders did, in fact, actively oversee The DAO. They monitored The DAO closely and addressed issues as they arose, proposing a moratorium on all proposals until vulnerabilities in The DAO's code had been addressed and a security expert to monitor potential attacks on The DAO had been appointed. When the Attacker exploited a weakness in the code and removed investor funds, Slock.it and its co-founders stepped in to help resolve the situation.

### b.    DAO Token Holders' Voting Rights Were Limited

Although DAO Token holders were afforded voting rights, these voting rights were limited. DAO Token holders were substantially reliant on the managerial efforts of Slock.it, its co-founders, and the Curators.[37] Even if an investor's efforts help to make an enterprise profitable, those efforts do not necessarily equate with a promoter's significant managerial efforts or control over the enterprise. *See, e.g.*, *Glenn W. Turner*, 474 F.2d at 482 (finding that a multi-level marketing scheme was an investment contract and that investors relied on the promoter's managerial efforts, despite the fact that investors put forth the majority of the labor that made the enterprise profitable, because the promoter dictated the terms and controlled the scheme itself); *Long v. Shultz*, 881 F.2d 129, 137 (5th Cir. 1989) ("An investor may authorize the assumption of particular risks that would create the possibility of greater profits or losses but still depend on a third party for all of the essential managerial efforts without which the risk could not

---

[36] DAO Token holders could put forth a proposal to split from The DAO, which would result in the creation of a new DAO Entity with a new Curator. Other DAO Token holders would be allowed to join the new DAO Entity as long as they voted yes to the original "split" proposal. Unlike all other contract proposals, a proposal to split did not require a deposit or a quorum, and it required a seven-day debating period instead of the minimum two-week debating period required for other proposals.

[37] Because, as described above, DAO Token holders were incentivized either to vote yes or to abstain from voting, the results of DAO Token holder voting would not necessarily reflect the actual view of a majority of DAO Token holders.

13

pay off."). *See also generally SEC v. Merchant Capital, LLC*, 483 F.3d 747 (11th Cir. 2007) (finding an investment contract even where voting rights were provided to purported general partners, noting that the voting process provided limited information for investors to make informed decisions, and the purported general partners lacked control over the information in the ballots).

The voting rights afforded DAO Token holders did not provide them with meaningful control over the enterprise, because (1) DAO Token holders' ability to vote for contracts was a largely perfunctory one; and (2) DAO Token holders were widely dispersed and limited in their ability to communicate with one another.

First, as discussed above, DAO Token holders could only vote on proposals that had been cleared by the Curators.[38]  And that clearance process did not include any mechanism to provide DAO Token holders with sufficient information to permit them to make informed voting decisions.  Indeed, based on the particular facts concerning The DAO and the few draft proposals discussed in online forums, there are indications that contract proposals would not have necessarily provide enough information for investors to make an informed voting decision, affording them less meaningful control.  For example, the sample contract proposal attached to the White Paper included little information concerning the terms of the contract.  Also, the Slock.it co-founders put forth a draft of their own contract proposal and, in response to questions and requests to negotiate the terms of the proposal (posted to a DAO forum), a Slock.it founder explained that the proposal was intentionally vague and that it was, in essence, a take it or leave it proposition not subject to negotiation or feedback.  *See, e.g.*, *SEC v. Shields,* 744 F.3d 633, 643-45 (10th Cir. 2014) (in assessing whether agreements were investment contracts, court looked to whether "the investors actually had the type of control reserved under the agreements to obtain access to information necessary to protect, manage, and control their investments at the time they purchased their interests.").

Second, the pseudonymity and dispersion of the DAO Token holders made it difficult for them to join together to effect change or to exercise meaningful control.  Investments in The DAO were made pseudonymously (such that the real-world identities of investors are not apparent), and there was great dispersion among those individuals and/or entities who were invested in The DAO and thousands of individuals and/or entities that traded DAO Tokens in the secondary market—an arrangement that bears little resemblance to that of a genuine general partnership.  *Cf. Williamson v. Tucker*, 645 F.2d 404, 422-24 (5th Cir. 1981) ("[O]ne would not expect partnership interests sold to large numbers of the general public to provide any real partnership control; at some point there would be so many [limited] partners that a partnership vote would be more like a corporate vote, each partner's role having been diluted to the level of a single shareholder in a corporation.").[39]  Slock.it did create and maintain online forums on which

---

[38]  Because, in part, The DAO never commenced its business operations funding projects, this Report does not analyze the question whether anyone associated with The DAO was an "[i]nvestment adviser" under Section 202(a)(11) of the Investment Advisers Act of 1940 ("Advisers Act"). *See* 15 U.S.C. § 80b-2(a)(11).  Those who would use virtual organizations should consider their obligations under the Advisers Act.

[39]  The Fifth Circuit in *Williamson* stated that:

14

investors could submit posts regarding contract proposals, which were not limited to use by DAO Token holders (anyone was permitted to post). However, DAO Token holders were pseudonymous, as were their posts to the forums. Those facts, combined with the sheer number of DAO Token holders, potentially made the forums of limited use if investors hoped to consolidate their votes into blocs powerful enough to assert actual control. This was later demonstrated through the fact that DAO Token holders were unable to effectively address the Attack without the assistance of Slock.it and others. The DAO Token holders' pseudonymity and dispersion diluted their control over The DAO. *See Merchant Capital*, 483 F.3d at 758 (finding geographic dispersion of investors weighing against investor control).

These facts diminished the ability of DAO Token holders to exercise meaningful control over the enterprise through the voting process, rendering the voting rights of DAO Token holders akin to those of a corporate shareholder. *Steinhardt Group, Inc. v. Citicorp.*, 126 F.3d 144, 152 (3d Cir. 1997) ("It must be emphasized that the assignment of nominal or limited responsibilities to the participant does not negate the existence of an investment contract; where the duties assigned are so narrowly circumscribed as to involve little real choice of action … a security may be found to exist … . [The] emphasis must be placed on economic reality.") (citing *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 n. 14 (5th Cir. 1974)).

By contract and in reality, DAO Token holders relied on the significant managerial efforts provided by Slock.it and its co-founders, and The DAO's Curators, as described above. Their efforts, not those of DAO Token holders, were the "undeniably significant" ones, essential to the overall success and profitability of any investment into The DAO. *See Glenn W. Turner*, 474 F.2d at 482.

C.      Issuers Must Register Offers and Sales of Securities Unless a Valid Exemption Applies

The definition of "issuer" is broadly defined to include "every person who issues or proposes to issue any security" and "person" includes "any unincorporated organization." 15 U.S.C. § 77b(a)(4). The term "issuer" is flexibly construed in the Section 5 context "as issuers devise new ways to issue their securities and the definition of a security itself expands." *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 909 (5th Cir. 1977); *accord SEC v. Murphy*, 626 F.2d 633, 644 (9th Cir. 1980) ("[W]hen a person [or entity] organizes or sponsors the organization of

---

A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venture that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Williamson*, 645 F.2d at 424 & n.15 (court also noting that, "this is not to say that other factors could not also give rise to such a dependence on the promoter or manager that the exercise of partnership powers would be effectively precluded.").

limited partnerships and is primarily responsible for the success or failure of the venture for which the partnership is formed, he will be considered an issuer … .").

The DAO, an unincorporated organization, was an issuer of securities, and information about The DAO was "crucial" to the DAO Token holders' investment decision. *See Murphy*, 626 F.2d at 643 ("Here there is no company issuing stock, but instead, a group of individuals investing funds in an enterprise for profit, and receiving in return an entitlement to a percentage of the proceeds of the enterprise.") (citation omitted). The DAO was "responsible for the success or failure of the enterprise," and accordingly was the entity about which the investors needed information material to their investment decision. *Id.* at 643-44.

During the Offering Period, The DAO offered and sold DAO Tokens in exchange for ETH through The DAO Website, which was publicly-accessible, including to individuals in the United States. During the Offering Period, The DAO sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million ETH, which was valued in USD, at the time, at approximately $150 million. Because DAO Tokens were securities, The DAO was required to register the offer and sale of DAO Tokens, unless a valid exemption from such registration applied.

Moreover, those who participate in an unregistered offer and sale of securities not subject to a valid exemption are liable for violating Section 5. *See, e.g.*, *Murphy*, 626 F.2d at 650-51 ("[T]hose who ha[ve] a necessary role in the transaction are held liable as participants.") (citing *SEC v. North Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970); *SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir. 1959); *SEC v. International Chem. Dev. Corp.*, 469 F.2d 20, 28 (10th Cir. 1972); *Pennaluna & Co. v. SEC*, 410 F.2d 861, 864 n.1, 868 (9th Cir. 1969)); *SEC v. Softpoint, Inc.*, 958 F. Supp 846, 859-60 (S.D.N.Y. 1997) ("The prohibitions of Section 5 … sweep[] broadly to encompass 'any person' who participates in the offer or sale of an unregistered, non-exempt security."); *SEC v. Chinese Consol. Benevolent Ass'n.*, 120 F.2d 738, 740-41 (2d Cir. 1941) (defendant violated Section 5(a) "because it engaged in selling unregistered securities" issued by a third party "when it solicited offers to buy the securities 'for value'").

D.      A System that Meets the Definition of an Exchange Must Register as a National Securities Exchange or Operate Pursuant to an Exemption from Such Registration

Section 5 of the Exchange Act makes it unlawful for any broker, dealer, or exchange, directly or indirectly, to effect any transaction in a security, or to report any such transaction, in interstate commerce, unless the exchange is registered as a national securities exchange under Section 6 of the Exchange Act, or is exempted from such registration. *See* 15 U.S.C. §78e. Section 3(a)(1) of the Exchange Act defines an "exchange" as "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood … ." 15 U.S.C. § 78c(a)(1).

Exchange Act Rule 3b-16(a) provides a functional test to assess whether a trading system meets the definition of exchange under Section 3(a)(1). Under Exchange Act Rule 3b-16(a), an

16

organization, association, or group of persons shall be considered to constitute, maintain, or provide "a marketplace or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange," if such organization, association, or group of persons: (1) brings together the orders for securities of multiple buyers and sellers; and (2) uses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of the trade.[40]

A system that meets the criteria of Rule 3b-16(a), and is not excluded under Rule 3b-16(b), must register as a national securities exchange pursuant to Sections 5 and 6 of the Exchange Act[41] or operate pursuant to an appropriate exemption. One frequently used exemption is for alternative trading systems ("ATS").[42] Rule 3a1-1(a)(2) exempts from the definition of "exchange" under Section 3(a)(1) an ATS that complies with Regulation ATS,[43] which includes, among other things, the requirement to register as a broker-dealer and file a Form ATS with the Commission to provide notice of the ATS's operations. Therefore, an ATS that operates pursuant to the Rule 3a1-1(a)(2) exemption and complies with Regulation ATS would not be subject to the registration requirement of Section 5 of the Exchange Act.

The Platforms that traded DAO Tokens appear to have satisfied the criteria of Rule 3b-16(a) and do not appear to have been excluded from Rule 3b-16(b). As described above, the Platforms provided users with an electronic system that matched orders from multiple parties to buy and sell DAO Tokens for execution based on non-discretionary methods.

## IV.    Conclusion and References for Additional Guidance

Whether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the

---

[40]  *See* 17 C.F.R. § 240.3b-16(a). The Commission adopted Rule 3b-16(b) to exclude explicitly certain systems that the Commission believed did not meet the exchange definition. These systems include systems that merely route orders to other execution facilities and systems that allow persons to enter orders for execution against the bids and offers of a single dealer system. *See* Securities Exchange Act Rel. No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998) (Regulation of Exchanges and Alternative Trading Systems) ("Regulation ATS"), 70852.

[41]  15 U.S.C. § 78e. A "national securities exchange" is an exchange registered as such under Section 6 of the Exchange Act. 15 U.S.C. § 78f.

[42]  Rule 300(a) of Regulation ATS promulgated under the Exchange Act provides that an ATS is:

> any organization, association, person, group of persons, or system: (1) [t]hat constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange within the meaning of [Exchange Act Rule 3b-16]; and (2) [t]hat does not: (i) [s]et rules governing the conduct of subscribers other than the conduct of subscribers' trading on such [ATS]; or (ii) [d]iscipline subscribers other than by exclusion from trading.

Regulation ATS, *supra* note 40, Rule 300(a).

[43]  *See* 17 C.F.R. § 240.3a1-1(a)(2). Rule 3a1-1 also provides two other exemptions from the definition of "exchange" for any ATS operated by a national securities association, and any ATS not required to comply with Regulation ATS pursuant to Rule 301(a) of Regulation ATS. *See* 17 C.F.R. §§ 240.3a1-1(a)(1) and (3).

17

economic realities of the transaction. Those who offer and sell securities in the United States must comply with the federal securities laws, including the requirement to register with the Commission or to qualify for an exemption from the registration requirements of the federal securities laws. The registration requirements are designed to provide investors with procedural protections and material information necessary to make informed investment decisions. These requirements apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology. In addition, any entity or person engaging in the activities of an exchange, such as bringing together the orders for securities of multiple buyers and sellers using established non-discretionary methods under which such orders interact with each other and buyers and sellers entering such orders agree upon the terms of the trade, must register as a national securities exchange or operate pursuant to an exemption from such registration.

To learn more about registration requirements under the Securities Act, please visit the Commission's website here. To learn more about the Commission's registration requirements for investment companies, please visit the Commission's website here. To learn more about the Commission's registration requirements for national securities exchanges, please visit the Commission's website here. To learn more about alternative trading systems, please see the Regulation ATS adopting release here.

For additional guidance, please see the following Commission enforcement actions involving virtual currencies:

- *SEC v. Trendon T. Shavers and Bitcoin Savings and Trust*, Civil Action No. 4:13-CV-416 (E.D. Tex., complaint filed July 23, 2013)

- *In re Erik T. Voorhees*, Rel. No. 33-9592 (June 3, 2014)

- *In re BTC Trading, Corp. and Ethan Burnside*, Rel. No. 33-9685 (Dec. 8, 2014)

- *SEC v. Homero Joshua Garza, Gaw Miners, LLC, and ZenMiner, LLC (d/b/a Zen Cloud)*, Civil Action No. 3:15-CV-01760 (D. Conn., complaint filed Dec. 1, 2015)

- *In re Bitcoin Investment Trust and SecondMarket, Inc.*, Rel. No. 34-78282 (July 11, 2016)

- *In re Sunshine Capital, Inc.*, File No. 500-1 (Apr. 11, 2017)

And please see the following investor alerts:

- *Bitcoin and Other Virtual Currency-Related Investments* (May 7, 2014)

- *Ponzi Schemes Using Virtual Currencies* (July 2013)

By the Commission.

18

# Exhibit 7

S-1/A 1 coinbaseglobalincs-1a2.htm S-1/A

**As filed with the Securities and Exchange Commission on March 23, 2021**

Registration No. 333-253482

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

**AMENDMENT NO. 2**
**TO**
**FORM S-1**
**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# Coinbase Global, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **7389** | **46-4707224** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**Brian Armstrong, Chief Executive Officer**
**Coinbase Global, Inc.**
**Address Not Applicable[1]**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**The Corporation Trust Company**
**1209 Orange Street**
**Wilmington, Delaware 19801**
**(302) 777-0200**
(Name, address, including zip code, and telephone number, including
area code, of agent for service)

*Copies to:*

| Mark C. Stevens | Paul Grewal | Satoshi Nakamoto |
|---|---|---|
| Michael A. Brown | Juan Suarez | 1A1zP1eP5QGefi2DMPTfTL5SLmv7DivfNa |
| Ran D. Ben-Tzur | Doug Sharp | |
| Faisal Rashid | Coinbase Global, Inc. | |
| Jennifer J. Hitchcock | Address Not Applicable[1] | |
| Fenwick & West LLP | | |
| 228 Santa Monica Blvd, Suite 300 | | |
| Santa Monica, California 90401 | | |
| (310) 434-5400 | | |

**Approximate date of commencement of proposed sale to the public:**
**As soon as practicable after this registration statement becomes effective.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended, or Securities Act, check the following box: ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

---

[1]  In May 2020, we became a remote-first company. Accordingly, we do not maintain a headquarters.

*A particular crypto asset's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, which may adversely affect our business, operating results, and financial condition.*

The SEC and its staff have taken the position that certain crypto assets fall within the definition of a "security" under the U.S. federal securities laws. The legal test for determining whether any given crypto asset is a security is a highly complex, fact-driven analysis that evolves over time, and the outcome is difficult to predict. The SEC generally does not provide advance guidance or confirmation on the status of any particular crypto asset as a security. Furthermore, the SEC's views in this area have evolved over time and it is difficult to predict the direction or timing of any continuing evolution. It is also possible that a change in the governing administration or the appointment of new SEC commissioners could substantially impact the views of the SEC and its staff. Public statements by senior officials at the SEC indicate that the SEC does not intend to take the position that Bitcoin or Ethereum are securities (in their current form). Bitcoin and Ethereum are the only crypto assets as to which senior officials at the SEC have publicly expressed such a view. Moreover, such statements are not official policy statements by the SEC and reflect only the speakers' views, which are not binding on the SEC or any other agency or court and cannot be generalized to any other crypto asset. With respect to all other crypto assets, there is currently no certainty under the applicable legal test that such assets are not securities, notwithstanding the conclusions we may draw based on our risk-based assessment regarding the likelihood that a particular crypto asset could be deemed a "security" under applicable laws. Similarly, though the SEC's Strategic Hub for Innovation and Financial Technology published a framework for analyzing whether any given crypto asset is a security in April 2019, this framework is also not a rule, regulation or statement of the SEC and is not binding on the SEC.

Several foreign jurisdictions have taken a broad-based approach to classifying crypto assets as "securities," while other foreign jurisdictions, such as Switzerland, Malta, and Singapore, have adopted a narrower approach. As a result, certain crypto assets may be deemed to be a "security" under the laws of some jurisdictions but not others. Various foreign jurisdictions may, in the future, adopt additional laws, regulations, or directives that affect the characterization of crypto assets as "securities,"

The classification of a crypto asset as a security under applicable law has wide-ranging implications for the regulatory obligations that flow from the offer, sale, trading, and clearing of such assets. For example, a crypto asset that is a security in the United States may generally only be offered or sold in the United States pursuant to a registration statement filed with the SEC or in an offering that qualifies for an exemption from registration. Persons that effect transactions in crypto assets that are securities in the United States may be subject to registration with the SEC as a "broker" or "dealer." Platforms that bring together purchasers and sellers to trade crypto assets that are securities in the United States are generally subject to registration as national securities exchanges, or must qualify for an exemption, such as by being operated by a registered broker-dealer as an alternative trading system, or ATS, in compliance with rules for ATSs. Persons facilitating clearing and settlement of securities may be subject to registration with the SEC as a clearing agency. Foreign jurisdictions may have similar licensing, registration, and qualification requirements.

We have policies and procedures to analyze whether each crypto asset that we seek to facilitate trading on our platform could be deemed to be a "security" under applicable laws. Our policies and procedures do not constitute a legal standard, but rather represent our company-developed scoring model, which permits us to make a risk-based assessment regarding the likelihood that a particular crypto asset could be deemed a "security" under applicable laws. Regardless of our conclusions, we could be subject to legal or regulatory action in the event the SEC, a foreign regulatory authority, or a court were to determine that a supported crypto asset currently offered, sold, or traded on our platform is a "security" under applicable laws. Because our platform is not registered or licensed with the SEC or foreign authorities as a broker-dealer, national securities exchange, or ATS (or foreign equivalents), and we do not seek to register or rely on an exemption from such registration or license to facilitate the offer and sale of crypto assets on our platform, we only permit trading on our core platform of those crypto assets for

29

which we determine there are reasonably strong arguments to conclude that the crypto asset is not a security. We believe that our process reflects a comprehensive and thoughtful analysis and is reasonably designed to facilitate consistent application of available legal guidance to crypto assets to facilitate informed risk-based business judgment. However, we recognize that the application of securities laws to the specific facts and circumstances of crypto assets may be complex and subject to change, and that a listing determination does not guarantee any conclusion under the U.S. federal securities laws. For example, in December 2020, we announced that we had made a decision to suspend all XRP trading pairs on our platform in light of the SEC's lawsuit filed against Ripple Labs, Inc. and two of its executives, alleging that they have engaged in an unregistered, ongoing securities offering through the sale of XRP. We expect our risk assessment policies and procedures to continuously evolve to take into account case law, facts, and developments in technology.

Although we have applied to operate an ATS in the United States that would allow us to trade crypto assets that are deemed "securities" under U.S. federal securities laws, we have not yet received regulatory approval to, and do not currently, operate an ATS for trading of crypto assets deemed to be securities. Even though we have incurred substantial expenses and compliance costs, we may never receive regulatory approval to operate an ATS for the trading of crypto assets that constitute securities and, even if we were to receive such regulatory approval, the markets for trading crypto assets that constitute securities may lack the depth and liquidity of our platform. There can be no assurances that we will properly characterize any given crypto asset as a security or non-security for purposes of determining which of our platforms that crypto asset is allowed to trade on, or that the SEC, foreign regulatory authority, or a court, if the question was presented to it, would agree with our assessment. If the SEC, foreign regulatory authority, or a court were to determine that a supported crypto asset currently offered, sold, or traded on our platform is a security, we would not be able to offer such crypto asset for trading until we are able to do so in a compliant manner, such as through an ATS approved to trade crypto asset that constitute securities. A determination by the SEC, a foreign regulatory authority, or a court that an asset that we currently support for trading on our platform constitutes a security may also result in us determining that it is advisable to remove assets from our platform that have similar characteristics to the asset that was determined to be a security. In addition, we could be subject to judicial or administrative sanctions for failing to offer or sell the crypto asset in compliance with the registration requirements, or for acting as a broker, dealer, or national securities exchange without appropriate registration. Such an action could result in injunctions, cease and desist orders, as well as civil monetary penalties, fines, and disgorgement, criminal liability, and reputational harm. Customers that traded such supported crypto asset on our platform and suffered trading losses could also seek to rescind a transaction that we facilitated as the basis that it was conducted in violation of applicable law, which could subject us to significant liability. We may also be required to cease facilitating transactions in the supported crypto asset other than via our licensed subsidiaries, which could negatively impact our business, operating results, and financial condition. Furthermore, if we remove any assets from trading on our platform, our decision may be unpopular with users and may reduce our ability to attract and retain customers, especially if such assets remain traded on unregulated exchanges, which includes many of our competitors.

Further, if Bitcoin, Ethereum, or any other supported crypto asset is deemed to be a security under any U.S. federal, state, or foreign jurisdiction, or in a proceeding in a court of law or otherwise, it may have adverse consequences for such supported crypto asset. For instance, all transactions in such supported crypto asset would have to be registered with the SEC or other foreign authority, or conducted in accordance with an exemption from registration, which could severely limit its liquidity, usability and transactability. Moreover, the networks on which such supported crypto assets are utilized may be required to be regulated as securities intermediaries, and subject to applicable rules, which could effectively render the network impracticable for its existing purposes. Further, it could draw negative publicity and a decline in the general acceptance of the crypto asset. Also, it may make it difficult for such supported crypto asset to be traded, cleared, and custodied as compared to other crypto asset that are not considered to be securities.

30

***We currently rely on third-party service providers for certain aspects of our operations, and any interruptions in services provided by these third parties may impair our ability to support our customers.***

We rely on third parties in connection with many aspects of our business, including payment processors, banks, and payment gateways to process transactions; cloud computing services and data centers that provide facilities, infrastructure, website functionality and access, components, and services, including databases and data center facilities and cloud computing; as well as third parties that provide outsourced customer service, compliance support and product development functions, which are critical to our operations. Because we rely on third parties to provide these services and to facilitate certain of our business activities, we face increased operational risks. We do not control the operation of any of these third parties, including the data center facilities we use. These third parties may be subject to financial, legal, regulatory, and labor issues, cybersecurity incidents, break-ins, computer viruses, denial-of-service attacks, sabotage, acts of vandalism, privacy breaches, service terminations, disruptions, interruptions, and other misconduct. They are also vulnerable to damage or interruption from human error, power loss, telecommunications failures, fires, floods, earthquakes, hurricanes, tornadoes, pandemics (including the COVID-19 pandemic) and similar events. For example, on February 24, 2021, the U.S. Federal Reserve's payments network experienced an outage, which had the potential to result in reduced functionality for certain of our products. In addition, these third parties may breach their agreements with us, disagree with our interpretation of contract terms or applicable laws and regulations, refuse to continue or renew these agreements on commercially reasonable terms or at all, fail or refuse to process transactions or provide other services adequately, take actions that degrade the functionality of our services, impose additional costs or requirements on us or our customers, or give preferential treatment to competitors. There can be no assurance that third parties that provide services to us or to our customers on our behalf will continue to do so on acceptable terms, or at all. If any third parties do not adequately or appropriately provide their services or perform their responsibilities to us or our customers on our behalf, such as if third-party service providers to close their data center facilities without adequate notice, are unable to restore operations and data, fail to perform as expected, or experience other unanticipated problems, we may be unable to procure alternatives in a timely and efficient manner and on acceptable terms, or at all, and we may be subject to business disruptions, losses or costs to remediate any of the deficiencies, customer dissatisfaction, reputational damage, legal or regulatory proceedings, or other adverse consequences which could harm our business.

***Loss of a critical banking or insurance relationship could adversely impact our business, operating results, and financial condition.***

We rely on bank accounts to provide our platform and custodial services. In particular, customer cash holdings on our platform are held with one or more of our banking partners. As a registered money services business with FinCEN under the Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, and its implementing regulations enforced by FinCEN, or collectively, the BSA, a licensed money transmitter in a number of U.S. states and territories, a licensee under NYDFS's Virtual Currency Business Activity regime, commonly referred to as a BitLicense, a licensed electronic money institution under both the U.K. Financial Conduct Authority and the Central Bank of Ireland, and a limited purpose trust company chartered by the NYDFS, our banking partners view us as a higher risk customer for purposes of their anti-money laundering programs. We may face difficulty establishing or maintaining banking relationships due to our banking partners' policies and some prior bank partners have terminated their relationship with Coinbase or have limited access to bank services. The loss of these banking partners or the imposition of operational restrictions by these banking partners and the inability for us to utilize other redundant financial institutions may result in a disruption of business activity as well as regulatory risks. In addition, financial institutions in the United States and globally may, as a result of the myriad of regulations or the risks of crypto assets generally, decide to not provide account, custody, or other financial services to us or the cryptoeconomy generally. We also rely on insurance carriers to insure customer losses resulting from a breach of our physical security, cyber security, or by employee or service provider theft. Our ability to maintain crime and specie insurance is subject to the insurance carriers'

31

# Exhibit 8

Sign up and get crypto



**coinbase**                                    Sign up

Blog    Product    Company    Policy    Engineering    International

Share

   

# Algorand (ALGO) is now available on Coinbase

By Author

Product, July 16, 2020, 2min read time

   



**Starting today, Coinbase supports Algorand (ALGO) at Coinbase.com and in the Coinbase Android and iOS apps. Coinbase customers can now buy, sell, convert, send, receive, or store ALGO. ALGO is available in all Coinbase-supported regions.**

**Algorand (ALGO)**

Founded by cryptographer and Turing award winner Silvio Micali, Algorand aims to solve some of the technical barriers of existing blockchain infrastructure. In particular, the project seeks to improve decentralization, scalability and security. Launched in June 2019, Algorand provides a foundation for existing businesses and new projects to operate globally in the emerging decentralized economy. Algorand's permissionless, pure proof-of-stake protocol supports the scale, open participation, and transaction finality required to build scalable blockchain projects.

Last August, ALGO was listed for trading on **Coinbase Pro**, which **recently** announced it will start supporting EUR and GBP trading with ALGO on July 21. ALGO is also supported by **Coinbase Custody** for storage and staking.

One of the most common requests we hear from customers is to be able to buy and sell more cryptocurrencies on Coinbase. We announced a new process for listing assets, designed in part to accelerate the addition of more cryptocurrencies. We are also investing in new tools to help people understand and explore cryptocurrencies. We launched informational asset pages (see ALGO **here**), as well as a new section of the Coinbase website to answer common questions about crypto.

Customers can **sign up for a Coinbase account here** to buy, sell, convert, send, receive, or store ALGO today.

Share



Product

# Recent Stories

Company, Jun 15, 2023, 5mins read time

## Announcing a Global Partnership with Block's Bitkey Wallet

Coinbase has entered into a global partnership with Bitkey, Block's self-custody bitcoin wallet.

Case 2:23-cv-00580-RSM Document 38-1    Filed 06/30/23    Page 99 of 123

**Company,** Jun 14, 2023, 5mins read time

Coinbase anuncia parceria internacional com a Bitkey, a bitcoin wallet de auto custódia desenvolvida pela Block

**Product,** Jun 14, 2023

## Digital Asset Management with MPC (Whitepaper)

The whitepaper outlines the key management mechanism used in Wallet as a Service (WaaS), which utilizes multiparty computation (MPC) to provide a unique combination of...

# Take control of your money. Start your portfolio today and get crypto.

Sign up for a Coinbase account today and see what the world of decentralized finance can do for you.

Get started

# coinbase

© 2023 Coinbase

Blog • Twitter • Facebook

## Company

About

Careers

Affiliates

Blog

Press

Investors

Legal & privacy

Digital Asset Disclosures

Cookie policy

Cookie Preferences

## Learn

Browse crypto prices

Newsletter

Crypto basics

Tips & tutorials

Market updates

What is Bitcoin?

What is crypto?

What is a blockchain?

Case 2:23-cv-00580-RSM    Document 38-1   Filed 06/30/23   Page 101 of 123
Algorand (ALGO) is now available on Coinbase

How to set up a crypto wallet

How to send crypto

Taxes

## Individuals

Buy & sell

Earn free crypto

Wallet

NFT

Card

Derivatives Exchange

Coinbase One

## Businesses

Institutional

Prime

Asset Hub

Commerce

## Developers

Cloud

Wallet as a Service

Wallet SDK

Pay SDK

Commerce

Exchange & Pro

Sign in with Coinbase

Rosetta

Participate

Prime API

## Support

Help Center

Case 2:23-cv-00580-RSM    Document 38-1    Filed 06/30/23    Page 102 of 123

Contact Us

Create account

ID verification

Account information

Payment methods

Account access

Supported crypto

Supported countries

Status

# Exhibit 9

Sign up and get crypto

coinbase                                               Sign up

Blog    Product    Company    Policy    Engineering    International

Share

   

# Dash (DASH) is now available on Coinbase

By Author

[Company,](#) September 19, 2019, 2 min read time

   



Starting today, Coinbase supports Dash (DASH) at Coinbase.com and in the Coinbase Android and iOS apps. Coinbase customers can now buy, sell, convert, send, receive, or store DASH. DASH will be available for customers in all Coinbase-supported regions, with the exception of New York State and the United Kingdom. Additional jurisdictions may be added at a later date.

### Dash (DASH)

Created in 2014, Dash is a cryptocurrency optimized for payments that has optional speed and privacy features. At this time, Coinbase will not support these features. Dash is accepted at over 4,000 merchants worldwide. Its unique network architecture consists of both regular miners and privileged machines called Masternodes. Through its off-chain

community governance system, anyone can submit and vote on proposals to improve the ecosystem's functionality, utility, and adoption.

One of the most common requests we hear from customers is to be able to buy and sell more cryptocurrencies on Coinbase. Last year we announced a new process for listing assets, designed in part to accelerate the addition of more cryptocurrencies. We are also investing in new tools to help people understand and explore cryptocurrencies. We launched informational asset pages (see DASH here), as well as a new section of the Coinbase website to answer common questions about crypto.

You can sign up for a Coinbase account here to buy, sell, convert, send, receive, or store DASH today.

*This website contains links to third-party websites or other content for information purposes only ("Third-Party Sites"). The Third-Party Sites are not under the control of Coinbase, Inc., and its affiliates ("Coinbase"), and Coinbase is not responsible for the content of any Third-Party Site, including without limitation any link contained in a Third-Party Site, or any changes or updates to a Third-Party Site. Coinbase is not responsible for webcasting or any other form of transmission received from any Third-Party Site. Coinbase is providing these links to you only as a convenience, and the inclusion of any link does not imply endorsement, approval or recommendation by Coinbase of the site or any association with its operators.*

Share



**Company**

# Recent Stories

Company, Jun 15, 2023, 5mins read time

## Announcing a Global Partnership with Block's Bitkey Wallet

Coinbase has entered into a global partnership with Bitkey, Block's self-custody bitcoin wallet.

Company, Jun 14, 2023, 5mins read time

## Coinbase anuncia parceria internacional com a Bitkey, a bitcoin wallet de auto custódia desenvolvida pela Block

Product, Jun 14, 2023

## Digital Asset Management with MPC (Whitepaper)

Case 2:23-cv-00580-RSM    Document 28-1    Filed 06/30/23    Page 107 of 123

The white space outline that became apparent—whoever was in Wallet as a Service

# Take control of your money. Start your portfolio today and get crypto.

Sign up for a Coinbase account today and see what the world of decentralized finance can do for you.

**Get started**

## coinbase

© 2023 Coinbase

Blog • Twitter • Facebook

**Company**

About

Careers

Affiliates

Blog

Press

Investors

Legal & privacy

Digital Asset Disclosures

Cookie policy

6/15/23, 12:12 PM
Case 2:23-cv-00580-RSM    Document 28-1    Filed 06/30/23    Page 108 of 123
Dash (DASH) is now available on Coinbase

Cookie Preferences

## Learn

Browse crypto prices

Newsletter

Crypto basics

Tips & tutorials

Market updates

What is Bitcoin?

What is crypto?

What is a blockchain?

How to set up a crypto wallet

How to send crypto

Taxes

## Individuals

Buy & sell

Earn free crypto

Wallet

NFT

Card

Derivatives Exchange

Coinbase One

## Businesses

Institutional

Prime

Asset Hub

Commerce

## Developers

Cloud

Wallet as a Service

Wallet SDK

Pay SDK

Commerce

Exchange & Pro

Sign in with Coinbase

Rosetta

Participate

Prime API

## Support

Help Center

Contact Us

Create account

ID verification

Account information

Payment methods

Account access

Supported crypto

Supported countries

Status

# Exhibit 10

Case 2:23-cv-00580-RSM    Document 38-1    Filed 06/30/23    Page 111 of 123

Sign up and get crypto

**coinbase**
Sign up

Blog    Product    Company    Policy    Engineering    International

Share

   

# OmiseGO (OMG) is now available on Coinbase

By Author

Product, May 21, 2020, 2 min read time

   



Starting today, Coinbase supports OmiseGO (OMG) at Coinbase.com and in the Coinbase Android and iOS apps. Coinbase customers can now buy, sell, convert, send, receive, or store OMG. OMG will be available for customers in all Coinbase-supported regions, with the exception of New York State.

**OmiseGO (OMG)**

OmiseGo (OMG) is an Ethereum token that powers the OmiseGo smart contract platform, which allows for businesses and individuals more financial freedom through financial services and investments. The platform's goal is to facilitate moving funds between payment systems and decentralized blockchains like Ethereum. This allows for better banking and financial services for everyone, including people in developing countries who don't have access to traditional banking services.

Case 2:23-cv-00580-RSM    Document 38-1    Filed 06/30/23    Page 112 of 123

In 2017, the OMG team conducted an airdrop. If you held an ETH balance greater than 0.1 on Coinbase on July 7, 2017 at 4:36 PM UTC, you'll receive OMG from Coinbase. The amount of OMG you'll receive depends on how much ETH you had in your account at the time stated above.

One of the most common requests we hear from customers is to be able to buy and sell more cryptocurrencies on Coinbase. Per the terms of our listing process, we anticipate supporting more assets that meet our standards over time. We are also investing in new tools to help people understand and explore cryptocurrencies. We launched informational asset pages (see OMG here), as well as a new section of the Coinbase website to answer common questions about crypto.

Share

You can sign up for a Coinbase account here to buy, sell, convert, send, receive, or store OMG today.



Product

# Recent Stories

Product, Jun 14, 2023

## Digital Asset Management with MPC (Whitepaper)

Case 2:23-cv-00580-RSM     Document 38-1     Filed 06/30/23     Page 113 of 123



Policy, Jun 13, 2023, 5min read time

United States of Crypto: Blockchain Technology Built in Ohio

# coinbase

Policy, Jun 12, 2023, 7mins read time

As policymakers consider crypto, we must take the right lessons from previous instances of offshoring technology. Our national security is at...

Take control of your money. Start your portfolio today and get crypto.

Sign up for a Coinbase account today and see what the world of decentralized finance can do for you.

Get started

# coinbase

© 2023 Coinbase

Blog • Twitter • Facebook

## Company

About

Careers

Affiliates

Blog

Press

Investors

Legal & privacy

Digital Asset Disclosures

Cookie policy

Cookie Preferences

## Learn

Browse crypto prices

Newsletter

Crypto basics

Tips & tutorials

Market updates

What is Bitcoin?

What is crypto?

What is a blockchain?

How to set up a crypto wallet

How to send crypto

Taxes

## Individuals

Buy & sell

Earn free crypto

Wallet

NFT

Card

Derivatives Exchange

Coinbase One

## Businesses

Institutional

Prime

Asset Hub

Commerce

## Developers

Cloud

Wallet as a Service

Wallet SDK

Pay SDK

Commerce

Exchange & Pro

Sign in with Coinbase

Rosetta

Participate

Prime API

## Support

Help Center

Contact Us

Case 2:23-cv-00580-RSM    Document 38-1    Filed 06/30/23    Page 116 of 123

Create account

ID verification

Account information

Payment methods

Account access

Supported crypto

Supported countries

Status

# Exhibit 11

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# GAME STOPPED? WHO WINS AND LOSES WHEN SHORT SELLERS, SOCIAL MEDIA, AND RETAIL INVESTORS COLLIDE, PART III

# VIRTUAL HEARING

BEFORE THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

MAY 6, 2021

Printed for the use of the Committee on Financial Services

## Serial No. 117–22



U.S. GOVERNMENT PUBLISHING OFFICE

44–837 PDF           WASHINGTON : 2021

11

ing Chair Lee, at the time of this GameStop trade, emphasized that the core market infrastructure is quite resilient. Does the Commission intend to release any additional findings?

Mr. GENSLER. Thank you. And thank you for our meeting earlier this week. I look forward to doing those on a regular basis with the Chair, and you, and the subcommittee, and other members. We are looking at putting together a report. I am only in my 3rd week on the job, but our economists, our Trading and Markets folks have come together, and I think we will be releasing a report sometime this summer that will detail the range of activities out of the January events.

Mr. MCHENRY. Thank you for that. Small businesses right now are emerging from the pandemic just like everyone is, and these small businesses need access to capital. And, as you know, I have been focused on some of the burdensome requirements of the original Regulation Crowdfunding (Reg CF), which I helped legislate, and President Obama signed into law. There have been some helpful changes made to Reg CF to make it more efficient and to boost trading in Reg A and Reg CF securities, such as preemption under certain State regulations. Do you support these streamlining efforts for small businesses, and are you looking at additional steps?

Mr. GENSLER. I look forward to working with you and your staff to learn more about your initiatives and suggestions. But at the core, and maybe it is just a bit because my dad had a small business, never more than 30 employees, and didn't have access to the capital markets, but I think that small business, entrepreneur efforts are really kind of, if I might say, a bit of the backbone of American entrepreneurism and our economy. And so, access to the capital markets is a critical piece, whether it is accessing loans that might be securitized in the markets or accessing through equities. But I look forward to hearing more from you and your staff on ideas.

Mr. MCHENRY. Okay. But no comment on Reg CF?

Mr. GENSLER. Again, I'm just 3 weeks on the job, so I haven't looked closely at Reg CF yet or, frankly, done a detailed enough briefing to see how we can, as you say, and I really do believe this, facilitate capital formation up and down the issue or spectrum.

Mr. MCHENRY. Let's pivot to something that you spent some time out of government understanding. I think what we all have tried to seek is greater collaboration across agencies on the regulatory framework for digital assets, cryptocurrencies, notably. This includes more engagement from industry and appropriate regulators. In 2019, SEC staff produced the framework for investment contract analysis of digital assets. Since then, the staff has sought feedback on a number of issues, most recently on the evolving standards and the best practices for custody. This is progress, but I believe more concrete steps are necessary to further the crypto market. As you look at this issue, what steps can you outline to bring regulatory clarity so that we can have a vibrant digital asset marketplace with legitimate money and the rule of law?

Mr. GENSLER. Thank you for asking that. And I think that this market, which is close to $2 trillion, the crypto asset market, is one that could benefit from greater investor protection within the SEC's current authorities, our authorities around securities, and around

12

asset managers and products that might invest in these cryptocurrencies. As you mentioned, we put out a comment, I think it was in October or November, asking for feedback on custody. I would hope that we would move forward and provide greater clarity around custody.

I do think that working with Congress, and I think it is only Congress that could really address it, it would be good to consider, if you would ask my thoughts, to consider whether to bring greater investor protection to the crypto exchanges. And I think if that were the case, because right now the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the Commodity Futures Trading Commission, that could instill greater confidence. Right now, there is not a market regulator around these crypto exchanges, and, thus, there is really not a protection against fraud or manipulation or a—

Mr. McHENRY. I have time for one final question, Chairman Gensler. I am encouraged by your comments on crypto. Last year, the Commission proposed to allow certain gig workers to have access to equity compensation under the SEC's rules. Will you commit to finishing this important rulemaking?

Mr. GENSLER. Again, I'm in my 3rd week, so I need to get a briefing on it. I commit to work with the staff to understand what the comments were, because I don't know what comments came in, and to trying to understand the economics around that rule set.

Mr. McHENRY. Thank you, and I wish you great luck in your tenure, and thank you for your testimony. Thank you for your outreach.

Mr. GENSLER. Thank you.

Chairwoman WATERS. I now recognize the gentlewoman from New York, Mrs. Maloney, for 5 minutes.

[No response.]

Chairwoman WATERS. We will go on to the gentlewoman from New York, Ms. Velazquez.

[No response.]

Chairwoman WATERS. The gentleman from California, Mr. Sherman, who is also the Chair of our Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets, is now recognized for 5 minutes.

Mr. SHERMAN. Responding to the ranking member, who wants to instill confidence in those buying and selling cryptocurrencies, the only confidence I have is the U.S. dollar is an outstanding good currency, but cryptocurrencies, if they succeed, will have unique appeal to only two groups: narco-terrorists; and tax evaders. And for us to channel the animal spirits that should be investing in the American economy into creating tools for those who want to evade U.S. taxes is a step toward a much weaker America.

Mr. Gensler, you talked about Archegos and the total return swap. The image I have of 1929 is investors jumping out of buildings on Wall Street because they bought stock at 7, 8, 9 times margin. And in the 1930s, we decided to protect the markets and say that if you want to buy stock, the most margin you could get was 1-time margins, sometimes a little more. But we then see that using a total return swap, the big guys, like Archegos, can get 7

13

times margin, can invest only one-seventh of the cash to control $100 million worth of this block of shares or that block of shares.

This raises the question, is 7-to-1 margin fine for everybody, and is that good for the markets? Should 1-time margin either rule for everybody and we should plug the loopholes, or should we continue to have a system where, if you are a family office, you can have 7 times margin by calling it a total return slot, and if you are the regular Robinhood investor, you can only get 1 time? What should the market rule be?

Mr. GENSLER. I think you raise some very important questions that came out of the market events late in March, not the January ones but the March events around a family office, Archegos. Family offices are outside of much of the SEC's remit, but not all of it.

Mr. SHERMAN. If I can clarify, this is not a question about family offices.

Mr. GENSLER. Oh, okay.

Mr. SHERMAN. Just that one investment company that has $1 billion and decides they want a 7-to-1 margin. The fact this was a family office, put that aside. Whether you disclose it or you don't, whether you are a family office or a hedge fund or a billionaire, should you be able to get 7-to-1 margin, and if so, why can't Robinhood?

Mr. GENSLER. I have asked staff to better understand—and, again, it is just the 3rd week—the rules that were adopted by the SEC that are yet to go into final implementation around the margin and for these securities-based swaps, and how they would have affected the circumstances.

Mr. SHERMAN. I look forward—

Mr. GENSLER. But you are right, sir, that they are different than the retail investor, and this is true across our markets. And I have asked staff to better inform me as to what are we seeing there.

Mr. SHERMAN. For Mr. Cook, when it comes to disclosing short selling, there are arguments on both sides as to whether to disclose what an individual investor is doing. Some say it is harmful, some say it is helpful, but there seems to be agreement that the aggregate information is helpful, but we ought to know in aggregate how many shares of GameStop are short. You generate that information, but you don't put it on your website. I am told that you provide it to the exchanges and they publish it if they want to, and, often behind a pay wall. Why doesn't FINRA disclose all this information to everybody for free as quickly as you can?

Mr. COOK. Thank you, Mr. Sherman. That is a great question. As we look at disclosure around short selling, I think there are some good arguments that we can do more here. I have asked our staff to prepare a regulatory notice to solicit comment on changes to FINRA's disclosure here to make it more frequent and more granular. And certainly as part of that, we can look at the way in which that disclosure is disseminated.

Mr. SHERMAN. Is there any justification for what is a regulatory agency generating this information and giving it to private companies for them to sell rather than disclosing it to the public?

Mr. COOK. I appreciate the gist of your question, sir, and I am inclined to be biased towards making it publicly available. I don't understand all the history behind how this developed. I think that

# Exhibit 12



**Bittrex Global GmbH**

Dr. Grass-Strasse 12, 9490 Vaduz, Liechtenstein

|  | Registrierung | Erloschen | Entzogen | Registrierungsdetails |
|---|---|---|---|---|
| Token-Emittent (Art. 12 Abs. 1) | 30.12.2020 |  |  |  |
| VT-Token-Verwahrer | 30.12.2020 |  |  |  |
| VT-Wechseldienstleister | 30.12.2020 |  |  |  |